# Exhibit "6"

30(b)(6) Deposition of

## Wade A. Nielsen
November 6, 2014

## Butler v. American Family
No. 3:14-cv-05305 RBL



## Byers and Anderson, Inc.
**Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316**  Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Taccoma, WA 98403-3360
Tacoma: **253 627-6401**  Fax: **253 383-4884**

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

JEFF BUTLER, individually and as          )
the representative of all persons         )
similarly situated,                       )
                                          )
                    Plaintiff,            ) No. 3:14-cv-05305 RBL
                                          )
           vs.                            )
                                          )
AMERICAN FAMILY MUTUAL INSURANCE          )
COMPANY and AMERICAN STANDARD             )
INSURANCE COMPANY OF WISCONSIN,           )
foreign insurers,                         )
                                          )
                    Defendants.           )

30(b)(6) DEPOSITION OF WADE A. NIELSEN

November 6, 2014

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square          2208 North 30th Street, Suite 202
600 University St.        Tacoma, WA 98403
Suite 2300                (253) 627-6401
Seattle, WA 98101         (253) 383-4884 Fax
(206) 340-1316            scheduling@byersanderson.com
(800) 649-2034            www.byersanderson.com

Serving Washington's Legal Community since 1980

## Page 2

```
 1        APPEARANCES
 2   For the Plaintiff:
 3        Scott P. Nealey
          Nealey Law
 4        71 Stevenson Street
          Suite 400
 5        San Francisco, CA  94105
          415.231.5311
 6        415.231.5313 Fax
          snealey@nealeylaw.com
 7
 8   For the Defendants:
 9        John A. Bennett
          Bullivant Houser Bailey, P.C.
10        888 SW Fifth Avenue
          Suite 300
11        Portland, OR  97204
          503.499.4418
12        503.295.0915 Fax
          john.bennett@bullivant.com
13
          William G. Rasche
14        American Family Insurance
          6000 American Parkway
15        Madison, WI  53783
          608.249.2111
16        866.614.8147 Fax
          wrasche@amfam.com
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1        EXHIBIT INDEX (Continuing)
 2   EXHIBIT NO.    DESCRIPTION           PAGE NO.
 3   Exhibit No. 9   1-page confidential memo to     55
                   Physical Damage Managers and
 4                  Diminished Value Experts from
                   Greg Werner, Auto Policy and
 5                  Procedures Administrator.
                   Bates stamp AMFAM_M001715.
 6
     Exhibit No. 10  31-page confidential American    62
 7                  Family Insurance Certified
                   Repair Program Shop
 8                  Guidelines, February, 2014.
                   Bates stamp AMFAM000001-031.
 9
     Exhibit No. 11  11-page Diminution of Value.    73
10                  Bates stamp
                   AMFAM_MM001726-1736.
11
     Exhibit No. 12  1-page letter to Brandon M.     73
12                  Feldman from Lisa McNally
                   dated 7/30/10, Bates stamp
13                  AMFAM_MM000812.
14   Exhibit No. 13  1-page letter to Christina      74
                   Bower from Lisa McNally dated
15                  8/26/11. Bates stamp
                   AMFAM_B000087.
16
     Exhibit No. 14  1-page letter to Bryce Meyer    79
17                  from American Family
                   Insurance Group dated
18                  6/27/14. Bates stamp
                   AMFAM_MM000766.
19
20
21
22
23
24
25
```

## Page 3

```
 1        EXAMINATION INDEX
 2   EXAMINATION BY:            PAGE NO.
 3   MR. NEALEY              5
 4   MR. BENNETT             80
 5   MR. NEALEY              81
 6
 7        EXHIBIT INDEX
 8   EXHIBIT NO.    DESCRIPTION          PAGE NO.
 9   Exhibit No. 1   4-page Amended Notice of FRCP    5
                   30(b)(6) Deposition.
10
     Exhibit No. 2   25 pages, Family Car Policy.    15
11                  Bates No. POLICY_M000001-
                   025.
12
     Exhibit No. 3   2-page Confidential Loss of     16
13                  Value. Bates No.
                   AMFAM_MM002748-749.
14
     Exhibit No. 4   1-page Confidential          19
15                  Diminished Value Schedule.
                   Bates No. AMFAM_MM002750.
16
     Exhibit No. 5   2-page Autosource Diminution    41
17                  of Value. Bates stamp
                   AMFAM_M000587.
18
     Exhibit No. 6   14-page LexisNexis Moeller vs   44
19                  Farmers Insurance Company of
                   Washington.
20
     Exhibit No. 7   10-page confidential          47
21                  Autosource Diminished Value
                   Workflow Quick Reference
22                  Guide. Bates stamp
                   AMFAM_MM001704-1713.
23
     Exhibit No. 8   3-page ISO Claim Search.       54
24                  Bates stamp
                   AMFAM_M000589-591.
25
```

## Page 5

```
 1              BE IT REMEMBERED that on Thursday,
 2        November 6, 2014, at 1700 Seventh Avenue, Suite 1810,
 3        Washington, at 12:00 p.m., before Eva P. Jankovits,
 4        Certified Court Reporter, appeared WADE A. NIELSEN,
 5        the witness herein;
 6              WHEREUPON, the following
 7        proceedings were had, to wit:
 8
 9              <<<<<< >>>>>>
10
11              (Exhibit No. 1 marked for
12              identification.)
13
14   WADE A. NIELSEN,      having been first duly sworn
15              by the Certified Court
16              Reporter, testified as follows:
17
18              EXAMINATION
19   BY MR. NEALEY:
20   Q   Mr. Nielsen, we met a little bit before the
21       deposition. And we've asked for you -- for your
22       deposition today. And I understand you're being
23       presented as a 30(b)(6).
24   A   Correct.
25   Q   Okay. Which is a corporate representative.
```

1  I have marked as Exhibit 1 a copy of the notice
2  to today's deposition. I've got an extra one if
3  somebody...
4  And do you understand that you're here to testify
5  on the topics that are listed within Exhibit 1?
6  A  I do.
7  Q  Okay. Now, I understand that you're in Phoenix.
8  What's your current title?
9  A  Casualty claim manager.
10  Q  And what's your territory that you're responsible
11  for?
12  A  The states of Washington and Oregon.
13  Q  Okay. And what is your role as casualty claim
14  manager for Washington and Oregon?
15  A  I supervise a team of adjusters that handle injury
16  claims under BIUM and UIMBI for those two states.
17  Q  Okay. Now, when you say UIM, do you supervise
18  adjusters for UIMPD as well?
19  A  No --
20  Q  No?
21  A  -- I do not.
22  Q  Okay. So you just do UIMBI?
23  A  Injury only, yeah.
24  Q  Injury only.
25  Have you supervised UIMPD claims in the state of

Page 6

1  I've had conversations with representatives in other
2  departments within American Family --
3  Q  Okay.
4  A  -- our metrics areas, our policies ad procedures
5  area, and -- and other managers.
6  Q  Who, outside of counsel, have you talked to?
7  A  I've talked with the -- one of the physical damage
8  managers here in Washington, Bryce Hilden. I have
9  visited with Mark Follmann in our policies and
10  procedures area, and briefly with -- I believe his
11  name is Joe Boclare in our metrics area.
12  Q  What -- you were using the term "metrics."
13  Is that the computer analysis and data area?
14  A  For lack of a better term, yeah.
15  Q  Metrics is --
16  A  We call them the metrics people, but they're the --
17  they're the data miners.
18  Q  Okay. I assumed as much.
19  how long have you worked at AmFam?
20  A  I've been with American Family for a little over
21  26 years.
22  Q  Congratulations. It's unusual in the insurance
23  industry to see somebody --
24  A  Thank you.
25  Q  -- that long.

Page 8

1  Washington at any point?
2  A  I have.
3  Q  Okay. In what period of time was that?
4  A  As memory serves, about March of 2007 through January
5  of 2012.
6  Q  Now, obviously, the topics in this case involve
7  first-party property damage coverages and
8  specifically UIM.
9  Have you, other than your work at AmFam, have you
10  done anything to familiarize yourself with the topics
11  that are listed in Exhibit 1 that you'll testify on?
12  And I don't want any conversations you had with
13  counsel. You don't have to tell me the contents of
14  that, but just what have you done to familiarize
15  yourself?
16  A  With all of these topics --
17  Q  Mm-hm.
18  A  -- outside of AmFam?
19  Q  No. Let me back up.
20  You're here as a corporate representative, and I
21  understand you've handled UIMPD. My question is:
22  What have you done to familiarize and gather
23  information on any of these topics either within
24  AmFam or outside of AmFam?
25  A  Okay. I obviously had conversation with counsel.

Page 7

1  So can you just give me a brief synopsis of what
2  positions you've held?
3  A  When I started with the company in '88, I was a
4  claims adjuster transferred to Wichita, Kansas,
5  couple years later, was still an insurance adjuster.
6  I held a field position at that point handling
7  property, physical damage, casualty injuries,
8  everything, and became a casualty claim manager some
9  years later in Kansas. Then I accepted a position in
10  Phoenix a few years later as a physical damage claims
11  manager and held that position until I came to
12  Seattle in 2007 where I was a physical damage claim
13  manager supervising staff in Washington and Oregon,
14  and then became the branch claim manager, and now I'm
15  back in Phoenix.
16  Q  Okay. Do you have any specific training that you've
17  received in auto body repair?
18  A  Yes. I went to a training class a number of years
19  ago. I don't recall when. That was conducted at an
20  auto body repair facility. It was a two-week course
21  where you actually did hands-on body repair. In
22  fact, the car I was working on, I sectioned a quarter
23  panel, painted, the whole nine yards.
24  Q  Okay. Meaning that you cut it away with a torch and
25  then buffed it out and welded it back on --

Page 9

3 (Pages 6 to 9)

1  A  Correct.

2  Q  -- and painted it. Okay.

3      Was this taught through American Family or was

4      this an I-CAR course or -- or community college or --

5  A  It was a course developed by American Family, but I

6      believe it was -- I think it was a combination. It

7      was a collaboration with the auto repair, body repair

8      shop.

9  Q  Anything else that you've done on training or work

10     you've done in auto body other than that two-week

11     course?

12 A  I've taken a number of -- I was I-CAR certified.

13     I've taken the courses sufficient to get that

14     certification. I don't recall anything else, but...

15 Q  Were you I-CAR certified in paint or body work or

16     what areas?

17 A  Structural auto body repair. There was some refinish

18     involved. But the specific certification I guess I

19     don't recall.

20 Q  Okay. Now, looking at the -- Topic 1 -- I'm going to

21     try and go through this -- what -- what, if any,

22     information and disclosures does American Family

23     provide to first-party claimants in the state of

24     Washington as it relates to diminished value?

25 A  I'm not aware of any disclosures to first-party -- to

Page 10

1      our first-party policyholders with regard to

2      diminished value specifically.

3  Q  Okay. And that would be the case if there'd been no

4      disclosure from 2007 to the present?

5  A  Correct.

6  Q  And now, more generally, if somebody has a particular

7      benefit under the policy, that would be something

8      that would be potentially covered under the policy;

9      is that correct?

10     MR. BENNETT: Calls for a legal

11     conclusion.

12 A  "Benefit" meaning coverage --

13 Q  (By Mr. Nealey) Well --

14 A  -- that they have or --

15 Q  -- if you use the term "benefit," pertinent benefits

16     under the policy, what does that mean to you, the

17     benefits under a policy?

18     MR. BENNETT: Object to the extent

19     it asks for a legal conclusion.

20 A  To me, it means what coverages they have that would

21     be applicable to a given loss.

22 Q  (By Mr. Nealey) Okay. Well, let me ask a question.

23     If somebody has a loss under UIM, and the vehicle has

24     to be repaired, and it's undrivable and it is towed

25     to the repair shop, is the payment that you received

Page 11

1      for that towing expense, is that a benefit underneath

2      the policy?

3      MR. BENNETT: Object to the extent

4      it calls for a legal conclusion.

5  A  In some context it is because one of the coverages

6      under the policy is emergency road service that

7      provides coverage for that expense. Typically, if

8      it's associated with a loss, oftentimes that

9      particular expense is paid under that peril -- what

10     we call peril codes --

11 Q  (By Mr. Nealey) Okay.

12 A  -- or that coverage.

13 Q  And I understand. So -- so using an example, and

14     I'll just use Mr. Meyer's case as an example. His

15     2011 Mustang was obviously damaged in an accident,

16     and I believe it was undrivable, so it was towed to

17     the repair shop and they repaired it. And that

18     towing expense would then have been covered under his

19     collision coverage, and then when the claim was

20     turned into UIM, it would have been covered under his

21     UIM, right?

22 A  That would be correct, yeah.

23 Q  Now, but Mr. -- Mr. Meyer does not have a coverage

24     for towing expenses associated with UIM or a

25     collision loss, right?

Page 12

1  A  I don't know --

2  Q  Okay.

3  A  -- what coverages he has.

4  Q  Okay. But you don't have a specific coverage that's

5      a specific coverage that is designed to cover towing

6      expenses associated with a property damage loss.

7      That expense is covered under your comprehensive,

8      your collision, or your uninsured motorist coverage,

9      right?

10 A  Typically, yes.

11 Q  Okay. So, in this case then, the payment that you

12     would receive or reimbursement that you receive for

13     your towing expense, that doesn't come under a

14     specific coverage for towing. It's a payment that's

15     made under the generalized coverages UIM,

16     comprehensive, or collision, right?

17 A  A damage -- yeah, it would be a damage claim that

18     would be collectible under that coverage, yes.

19 Q  Okay. And is one of the benefits you get under the

20     policy the things that are paid, the damages that are

21     paid or reimbursed under the particular coverages?

22     MR. BENNETT: Object to the extent

23     it calls for a legal conclusion.

24 A  To me, benefits are more specific coverages. They're

25     not -- they're not individual items of damage that

Page 13

1   you would get paid for under a claim, but if you want
2   to call them benefits, I guess that's fine.
3   Q   (By Mr. Nealey) Okay. If somebody has a claim --
4   and I'll use Mr. Meyer as an example.
5   A   Okay.
6   Q   And Mr. Meyer, his vehicle is towed in to be repaired
7   and American Family determines that it is covered
8   under one of the first-party coverages and American
9   Family knows that the vehicle has been towed, does
10  American Family reach out to the insured and say
11  We'll cover the cost of towing or send us the bill
12  for the towing if you know that the insured has paid
13  it on their own?
14  A   Yes.
15  Q   Okay. So you would then disclose to an insured if
16  you knew that they paid that expense or they had done
17  it, you would disclose to them one of the things that
18  they receive under their comprehensive, collision, or
19  uninsured motorist is the towing expense to bring it
20  in?
21          MR. BENNETT: Object to form.
22  A   We would. Typically, in most cases, we're the ones
23  actually arranging the tow for the first party, so
24  yeah.
25  Q   (By Mr. Nealey) Okay. But if -- but -- and I

Page 14

1   claim for diminished value under their UIM policy,
2   because there's no disclosure by American Family, the
3   insured would have to raise it with American Family
4   in the first instance?
5          MR. BENNETT: Object to form.
6   A   They would have to present that claim to us, yes.
7   Q   (By Mr. Nealey) Okay. So there are no circumstances
8   in the state of Washington from 2007 until the
9   present when American Family would have run an
10  assessment for diminished value or told an insured
11  about diminished value before the insured raised it
12  with American Family?
13  A   Not that I'm aware of, no.
14  Q   Now, once diminished value is raised by an insured,
15  from approximately 2010 forward, American Family has
16  used a tool by Audatex to determine what they believe
17  to be the diminished value; is that correct?
18  A   Yes.
19  Q   Okay. And I'm going to mark, as Exhibit 3, a copy of
20  a diminished value appraisal that was prepared and
21  was provided as an exemplar. It's Bates No. American
22  Family MM 2748 and 2749.
23          (Exhibit No. 3 marked for
24          identification.)
25  Q   (By Mr. Nealey) Now, a couple questions about this

Page 16

1   understand that you disclose and say we're going to
2   do it, but if you have a situation where a customer
3   has -- for instance, the vehicle was damaged in an
4   accident, they had it towed to a repair shop, and by
5   the time American Family finds out that it's been
6   taken to a repair shop, your insured's already paid,
7   does American Family tell the insured, By the way, we
8   cover the cost of the towing to the repair shop, so
9   send us the bill?
10  A   We do.
11  Q   Okay. Now, similarly, I'm going to mark a copy of
12  the policy as Exhibit 2. This is the sample policy
13  that is Mr. Meyer's.
14          (Exhibit No. 2 marked for
15          identification.)
16  Q   (By Mr. Nealey) And I have -- looking through
17  Mr. Meyer's policy, the definition in the
18  comprehensive and collision coverages... (Peruses
19  document.)
20      I'm sorry. I thought I knew where it was, but I
21  can't find it. Scratch that question.
22      Okay. Okay. Well, I can't find it. I'll leave
23  it out and get to it in a moment. Okay.
24      So when it comes to diminished value, if an
25  insured in the state of Washington is going to make a

Page 15

1   form that is done.
2      If you look at the -- at the bottom, it says --
3   on here, it says, "NADA disclaimer." It says, "These
4   current NADA values are furnished under license from
5   NADASC." And then in the next page, if we continue
6   on Page 2, it says, "The values in the NADA guide
7   assume a vehicle in clean condition. Appropriate
8   deduction should be made to put a vehicle in salable
9   condition."
10      Is it your understanding that up until some
11  recent point anyway that the Audatex tool that
12  American Family would use to assess diminished value
13  was basing the base amount, the what they call total
14  condition adjusted market value, by using the NADA
15  retail clean values of vehicles?
16          MR. BENNETT: Object to the form of
17  the question.
18  A   I couldn't say for sure that that's what --
19  exclusively what that total condition adjusted market
20  value is based on. I assume it plays some role in
21  the value or they wouldn't be putting the -- those
22  comments on it.
23  Q   (By Mr. Nealey) Okay. Well, let me see if I can
24  break the question down to give as much information
25  as I can.

Page 17

5 (Pages 14 to 17)

1      You would agree with me that the Audatex, until
2    some point where they went to using their own
3    proprietary, that the diminished value assessment in
4    Audatex was based upon NADA values; is that correct?
5  A  **We were using NADA evaluations to establish value**
6    **prior to changing tools.**
7  Q  Okay. Meaning prior to using the Audatex --
8  A  **AudaSource.**
9  Q  AudaSource, okay.
10 A  **Yes.**
11 Q  So before using AudaSource, you were using NADA
12   guides to come up with a pre-loss value of cars for
13   diminished value assessments?
14 A  **Correct.**
15 Q  Okay. And then is it your understanding that when
16   you started using the Audatex diminished value guide,
17   or tool, which I've marked an exemplar of as
18   Exhibit 2, your understanding is that the Audatex
19   tool was using NADA guides as well as a starting
20   point for determining the pre-loss value of a
21   vehicle?
22 A  **During the time frame prior to changing to**
23   **AudaSource.**
24 Q  Okay. Do you have any independent knowledge about
25   whether the Audatex loss in value tool or, later on,

Page 18

1    it says diminished value tool, such as I used as
2    Exhibit 2, do you have any independent knowledge
3    whether that's based upon NADA guides other than
4    what's contained in this document -- and I've been
5    saying it wrong -- that I've marked as Exhibit 3?
6  A  **I do not.**
7  Q  Okay. Do you have any reason to doubt what Exhibit 3
8    says, which is that it's based upon NADA guides in
9    clean condition?
10        MR. BENNETT: Object to form.
11 A  **I don't.**
12 Q  (By Mr. Nealey) Okay. When you used NADA guides to
13   do diminished value before you had the tool -- I'm
14   going to mark as Exhibit 4 a document which we
15   received which is Bates 2750.
16            (Exhibit No. 4 marked for
17            identification.)
18 Q  (By Mr. Nealey) Is this document connected to what
19   you were doing before you started using the Audatex
20   diminished value tool?
21 A  **Yes, this is one of the things we used.**
22 Q  Can you explain how this worked, Exhibit 4, what you
23   do under it?
24 A  **It was essentially an Excel spreadsheet that**
25   **auto-calculated percentages of the ACV and the**

Page 19

1    estimate amount as kind of a breakdown numbers-wise.
2  Q  Okay. So this appears to be a run with an ACV of
3    $11,715 and then an estimate amount that's been put
4    in 3,921.36.
5        Can you tell me how -- how this tool would be
6    used with these values? Where'd you pull the number
7    off of this?
8  A  **It would depend on a lot of factors when you look at**
9    **it. This, essentially, was one of the tools used to**
10   **kind of determine if diminished value was at question**
11   **in trying to determine how much that diminished value**
12   **would be in terms of dollars. This was a guide to go**
13   **by based on what was the extent of damage, what was**
14   **the type of damage, and what is the most appropriate**
15   **number based on all these factors, condition of the**
16   **car, those type of things.**
17 Q  Let me see if I can break that down.
18       You said this would be one of the tools that
19   would be used to determine if diminished value was at
20   issue.
21       How would you use this -- I guess I can call it a
22   chart, that's contained in Exhibit 4, how would you
23   use that as a tool to determine if diminished value
24   was at issue?
25 A  **It was a tool to essentially define or try and**

Page 20

1    establish the dollar amount of what it was -- what
2    **the diminished value for that particular vehicle was.**
3    **And this kind of just gave you breakdowns based on**
4    **percentages of -- at various dollar levels, and then,**
5    **based on all the rest of the information, which**
6    **number seemed appropriate in that particular case.**
7  Q  Well, how would you use this? Well, first of all, we
8    have obviously a Xeroxed copy. It appears to me that
9    at some point, maybe on the original, that the boxes
10   for 10 percent were shaded in. Appear to be a little
11   darker. Is that a correct assessment on my part?
12 A  **It kind of looks like it, yeah.**
13 Q  Okay. So I'd just like you to run through how this
14   would be used and describe how this would be used to
15   determine if diminished value was at issue. We've
16   got the numbers at the top with an ACV and then an
17   amount of the estimate. So how would you use this to
18   determine if DV was an issue?
19 A  **It varied depending on, again, the case and the**
20   **particular facts in that scenario. But we would use**
21   **up to -- you know, based on a percentage basis, you**
22   **would compare across the graph -- say, okay given the**
23   **circumstances with this particular vehicle and what**
24   **we're seeing and everything, is 5 percent of the ACV**
25   **appropriate in this case or is 5 percent of the**

Page 21

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1    estimate or 10 percent of the estimate more
2    appropriate in this particular case?
3    Q   Well, how would you decide how far down to go on the
4        chart? You've got numbers here from 1 to 40. How
5        would you decide whether you would use the numbers
6        off the repair estimate amount or off the ACV?
7    A   Well, again, this was only one tool. We used
8        several. And kind of a comparison of this one to the
9        others that came up with a value, such as this loss
10       of value.
11   Q   Was the Audatex system used, Exhibit 3? Was it used
12       at the same time as Exhibit 4 was used, or were these
13       used in different periods of time?
14   A   I believe there was some overlap, but exactly how
15       much an overlap, I don't know.
16   Q   Okay. Well, I understand how the Audatex tool,
17       Exhibit 3, works. I'm trying to figure out how
18       Exhibit 4 works, I mean, so I can give you a
19       hypothetical.
20           So we've got a car, using the numbers on
21       Exhibit 4, that -- that American Family determined
22       has an actual cash value of $11,715. And I guess my
23       first question would be: That would be the NADA
24       value of the vehicle, right?
25   A   Depending on the time frame when this was created, it

Page 22

1    could have been, yes.
2    Q   Well, did you use a value that would be for ACV other
3        than NADA values?
4    A   Years ago we did, yeah.
5    Q   Well, let me just limit my question to 2007 forward.
6    A   Okay.
7    Q   Would you have been using NADA?
8    A   Yes, until we used switched to AudaSource, yep.
9    Q   So -- and would you -- would the ACV be based on an
10       NADA retail value?
11   A   Yes.
12   Q   And would that be based upon a retail -- a clean
13       retail?
14   A   It would. That number would have already been
15       adjusted for any type of, you know, defects or
16       whatever, conditioning.
17   Q   Okay. So, basically, the ACV would be determined
18       from 2007 until you started using the Audatex system
19       by using an NADA clean retail value which then you
20       adjusted to the extent it's necessary to adjust?
21   A   Correct.
22   Q   Now, so -- so I've got a vehicle there. You've got a
23       repair estimate, and the total of the repair estimate
24       is 3,921.36. What do you do from there?
25   A   In come cases, this was used kind of to establish a

Page 23

1    range that if we -- if we went up to, like, 10
2    percent of the actual cash value of the vehicle, and
3    then we looked at, okay, what's 10 percent or
4    15 percent of the estimate, we've got a number from
5    here to here (indicating), and do we feel that, based
6    on the facts that we have in front of us, that the
7    diminished value for this case falls within that.
8    Q   Okay.
9    A   We would use other tools as well to help kind of dial
10       that in to figure out where -- what was a fair
11       number.
12   Q   Well, so you gave me two numbers as examples. You
13       said 10 percent of the ACV and 15 percent of the
14       repair estimate. You actually gave a range.
15           But would those then be upper numbers and lower
16       numbers or what? You talk about a range. How were
17       those two numbers used?
18   A   Well, I'm not exactly sure why this was built out to
19       40 percent, but I don't recall an instance where we
20       went beyond 10 percent of the ACV.
21   Q   So would it be fair to say that from 2007 until when
22       you started using the Audatex system, which is also
23       based on 10 percent, the most that American Family
24       would pay diminished value would be 10 percent of the
25       ACV?

Page 24

1    A   Not absolutely. Is it possible we would go more than
2        that? Maybe. Depends on the circumstances.
3    Q   Would 10 percent of the ACV be sort of a starting
4        point then?
5    A   Prior to using the tool, I wouldn't say it was a
6        starting point, no. It would be -- it would kind of
7        be a starting point to establish kind of the max we
8        would look at.
9    Q   So -- so if I'm understanding, using this tool,
10       Exhibit 4, the spreadsheet, the sort of maximum you
11       would look at for diminished value on this car with
12       the parameters we've got on this sheet would be
13       $1,171 because that was 10 percent of the NADA clean
14       retail value?
15   A   Yeah. For the ACV calculation, yes, so that would be
16       the max.
17   Q   Well, then how would American Family, prior to using
18       the Audatex tool, how would they determine whether
19       they paid that 10 percent maximum or they went down
20       from there? What factors would be considered?
21   A   There's a number. I can almost certain I can't
22       name them all right off the top of my head, but, I
23       mean, it'd be the type of damage -- was there any
24       structural damage involved? Are we dealing with a
25       very common vehicle in the market? Is the market

Page 25

Wade A. Nielsen
November 6, 2014

**Page 26**

1  saturated with those types of vehicles, therefore,
2  the impact would be less, or is it a very high demand
3  vehicle in the market? I mean, there's a number of
4  variables that would come into play.
5  Q  So you would --
6  A  Age of the car.
7  Q  Okay. So you've listed type of damage, whether
8  there's structural damage, whether it's a common
9  vehicle, whether it's a high demand or the market's
10  saturated, and the age of the car.
11  Anything else?
12  A  I'm sure there are, just not that's coming to mind at
13  the moment.
14  Q  Well, when we look at age of the car, putting aside a
15  issue of a classic collectible car, was there sort of
16  an age of the car that you'd say there's not any
17  diminished value?
18  A  Not specifically, no. The market and some experts in
19  the market, or who claim to be experts in the market,
20  would indicate seven years is the number, but that's
21  not always the case. It depends on the vehicle.
22  Q  Do you have any reason -- do you have any information
23  as a representative for American Family that would
24  allow you to dispute that seven years is sort of a
25  cutoff for diminished value?

**Page 27**

1  MR. BENNETT: Object to the form of
2  the question. I don't think that's a topic.
3  A  I wouldn't say it's an absolute cutoff, no.
4  Q  (By Mr. Nealey) Okay. Meaning that there could be
5  cars older than seven years and still have diminished
6  value?
7  A  Could be.
8  Q  Now, was mileage on the car one of the factors that
9  you'd look at?
10  A  Certainly.
11  Q  Is there sort of a cutoff for mileage that you would
12  commonly apply?
13  A  There's not a hard, fast cutoff, no, for us. Again,
14  it depends on the case.
15  Q  Well, the Audatex tool, if you look at it, cuts off
16  at a hundred thousand miles.
17  A  Yes.
18  Q  Was American Family's practice, using the tools it
19  had like Exhibit 4 before they had the Audatex tool,
20  similar, that if you had over about 100,000 miles,
21  barring some really unusual set of facts, you would
22  say that there was no diminished value?
23  A  I don't know that we'd say it was that number. It
24  was more based on did the vehicle have high mileage
25  for its age or low mileage for its age versus what

**Page 28**

1  the actual miles were was more the rule of thumb we
2  used.
3  Q  Okay. How would you use that rule of thumb?
4  A  Well, if you're dealing with, you know, a
5  ten-year-old car, and the calculations have changed
6  over the years, I think the running number now is
7  12,000 a year is average for a car. So if you're
8  dealing with a ten-year-old car, and it has
9  120,000 miles -- or let me -- let me do a better
10  example.
11  If you're dealing with a ten-year-old car and it
12  has 70,000 miles, that's low miles for the age of the
13  vehicle. So that's how we would look at it, and take
14  into consideration is it high miles or low miles for
15  that type of car for the age of the car.
16  Q  So you might have a car that was ten years old but
17  had 70,000 miles, and so you might -- although
18  seven years is something you heard, you might still
19  consider the vehicle to have diminished value because
20  it's a low-mileage car?
21  A  Potentially, yeah.
22  Q  Now, you mentioned whether it's a common vehicle.
23  The fact that something's a common vehicle, would you
24  say that that means that it did not have diminished
25  value or it did? How would you use that factor?

**Page 29**

1  A  I wouldn't say it would be a determining factor to
2  say whether it had diminished value or not. It may
3  have an impact on the amount.
4  Q  Okay. Meaning that you might assign different
5  amounts of diminished value to actual amounts based
6  upon whether it was a common car or a non-common car?
7  A  If there's a -- if there's a tremendous number of
8  that type of vehicle in the market, the impact of
9  diminished value would be less.
10  Q  What do you base that on?
11  A  Because there's plenty of cars out there exactly like
12  that or -- not exactly because you can never have two
13  cars exactly alike, but there's just a high number of
14  them.
15  Q  Well, I mean, is that -- is that assumption that you
16  have less diminished value because it's a common car,
17  is it an assumption you have or do you have some data
18  or some kind of something that you or American Family
19  relied upon?
20  A  There is no data on that basis, but typically what
21  you see in the market over the years is when there's
22  a huge number of vehicles that are the same model,
23  make, whatever, the market value of those vehicles,
24  unless they're in tremendously high demand, is not as
25  lucrative. You can get better deals and stuff

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1  because they need to move them. They have too many.
2  Q  Well, so why would that mean that -- that there would
3    be less diminished value? I mean, I certainly
4    understand that the vehicle's pre-loss value might be
5    reduced because there's a lot of the vehicles, or
6    there's less demand for them, but why would that
7    affect diminished value?
8  A  Well, I'm not saying it necessarily would. I'm just
9    saying it's something we'd look at. Supply and
10   demand has an impact to market value of vehicles.
11 Q  Yes. And my question is: Do you have any reason to
12   believe -- or when I say "you," does American Family
13   have any reason to believe, when it was making these
14   calculations from 2007 until they started using the
15   tool in 2010, that the amount of diminished value as
16   a percentage of vehicle actual cash value would
17   change as a result of the vehicle being in high
18   demand or in low demand or common?
19 A  It could. Like I said, it's one of a number of
20   factors.
21 Q  The next factor you -- and let me just ask. I
22   understand something could, but are you aware of any
23   study or analysis or experts that were consulted, any
24   source of information for that assumption being true
25   or not true that American Family has?

Page 30

1  A  I'm not aware of any, no.
2  Q  Okay. Now, you mentioned have a vehicle have a
3    structural or frame damage.
4    How that does play a part?
5  A  It's essentially because it's more of an invasive
6    repair, and there's more involved with the repair
7    when the damage gets to the structural components
8    which are usually part of the safety operation of a
9    unibody vehicle.
10 Q  So how's that relevant to the existence of diminished
11   value?
12 A  I guess it depends largely on your perspective of the
13   general public, populous. But some would argue that
14   if it's had structural damage, some believe on the
15   street, that that weighs more heavily towards the car
16   not being worth as much as it was before versus
17   simple cosmetic damage to the car that gets repaired
18   routinely throughout the life of the car. It has
19   nothing to do with the safety or the structural
20   integrity of the car. It's just appearance.
21 Q  So would you -- would be it American Family's
22   view, certainly, in assessing diminished value before
23   it started using the Audatex tool that, to the extent
24   that a vehicle had structural damage or frame damage,
25   that it was likely to have more diminished value on

Page 31

1    them?
2  A  If it had structural damage, our position was that
3    diminished value might be possible, not that it would
4    have more or less and that it automatically got
5    diminished value, no.
6  Q  And that's because whenever you have a repaired a
7    safety system vehicle, even if a body shop does
8    appropriate repair, you don't really know how the
9    repair is going to hold up over use in a subsequent
10   accident?
11 A  American Family doesn't know, no.
12 Q  Yeah.
13 A  But if they've done it correctly per manufacturer
14   guidelines, then it should last for the life of the
15   vehicle.
16 Q  Although you've authorized the repair and paid for
17   the repair, you don't know how those repairs are
18   going to perform in a subsequent crash, and the only
19   way to find out would be to crash the vehicle again,
20   right?
21       MR. BENNETT: Object to form.
22 A  Correct.
23 Q  (By Mr. Nealey) And so part of the reason why people
24   will pay less or there might be -- put another way,
25   there might be diminished value on a vehicle with

Page 32

1    structural frame damages, because one does not know
2    how the vehicle is going to perform in a subsequent
3    crash, right?
4       MR. BENNETT: Object to form.
5  A  There are some consumers out there that feel that
6    way, yes.
7  Q  (By Mr. Nealey) Well, let me ask it about -- I know
8    it's outside the 30(b)(6) context. I'll just ask you
9    personally. If you have a car that has had major
10   damage onto its frame and structural systems, it's
11   had major safety components that have -- frame rails
12   that have been bent, sectioning that's taken place,
13   you know, major work so that the cost to repair the
14   vehicle is a very high percentage of the car's actual
15   cash value, and you have that car which has had major
16   repairs to its frame and structure and you've got the
17   same car that's never been in an accident, which of
18   them are you going to take?
19 A  To be honest with you, I'd take the one that was
20   undamaged.
21 Q  And that's because you don't know what might happen
22   with the one that's been damaged?
23 A  Speaking personally, the number one reason why is
24   because I don't know who fixed the car. I don't know
25   what kind of work they did or what kind of job they

Page 33

9 (Pages 30 to 33)

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1    did. If I had it repaired and I picked the shop,
2    then I wouldn't have a problem with the car.
3    Q   And, of course, there's nobody buying the car in the
4        market that's likely to be able to find out who did
5        the repair work or what the repair work was or
6        exactly what was done. They're just generally going
7        to know the extensiveness of the damage, right?
8    A   I'm not sure. I don't know what's disclosed if they
9        go to that level.
10   Q   Do you -- do you have any -- do you have any
11       experience talking to people in the market for buying
12       and selling cars, meaning dealers and brokers of
13       cars, as to what kind of inspections or how they look
14       at cars to see if they've been wrecked and repaired
15       or not?
16   A   I've had discussions with dealers over the years, not
17       in that depth to whether they do a 50-point whatever
18       whatever, I don't know.
19   Q   But you do know that before dealers will purchase a
20       car or before they sell it, they do an inspection to
21       see if it's been in a wreck?
22   A   I believe they do.
23   Q   Now, you mentioned also the type of damage. I
24       understand structural damage.
25       If a car has major panels, body panels on a car

Page 34

1    that have been painted and repaired, how does that
2    play in the determination of whether DV might or
3    might not exist on a car? And just talking a period
4    from 2007 until you started using the Audatex.
5    A   We would look at is the panel itself, for example, a
6        quarter panel on a sedan, is -- is a structural
7        component. It's part of the unibody structure system
8        on most cars, not all. So was there extensive damage
9        to that panel versus a fender, which is a bolt-on
10       panel, and doesn't really have any impact to the
11       structural safety of the vehicle? So we would look
12       at that, you know, what panel is it? How many panels
13       were there that had to be replaced? And, you know,
14       obviously, if you're getting into a roof -- well, if
15       you're getting into a roof, it's probably totaled
16       because you had to go through a lot to get to the
17       roof. But those types of things would come into play
18       in the analysis.
19   Q   Okay. Is it fair to say that, putting aside the
20       issue of whether there -- whether diminished value
21       exists, how extensive the damage is, as we talked,
22       and whether you have frame or structural damage on
23       the vehicle is going to also impact, to the extent
24       that American Family decides there is diminished
25       value, the amount of diminished value?

Page 35

1    A   If I heard your question correctly, does the extent
2        of damage impact what the potential diminished value
3        would be?
4    Q   Yes.
5    A   Yes.
6    Q   And all things being equal, the more extensive the
7        damage is on the vehicle, vis-a-vis panels that have
8        to be painted or repaired, and the presence of frame
9        and structural, the more extensive either of those
10       are, the more actual diminished value you're likely
11       to see?
12   A   Yes.
13   Q   Now, I understand that it may just be entirely a
14       judgment model before you started using the Audatex
15       tool, but I'd like to see if I can get you to
16       describe, other than it just being a judgment model
17       and pulling a number out, exactly how this tool would
18       be used in other things in order to determine what
19       American Family believed to be a diminished value on
20       a car.
21   A   What -- how we would get to the number?
22   Q   Yeah.
23   A   Again, it varied. I can recall cases where we would
24       use this tool. I remember instances where we'd use
25       the online Kelley Blue Book tool that would, once you

Page 36

1    plugged in the variables, and, again, almost every
2    piece of this is subjective. It all boils down to
3    critical thinking and applying the available
4    information. And in some cases we'd take three
5    different numbers and we'd average them and say,
6    Okay, if you take all three of these, not knowing
7    which one's the number, average them, and then you're
8    kind of dialling in on something that, you know...
9    Q   And understanding that it was subjective, and maybe
10       you're pulling numbers from a couple different
11       places, did American Family, from 2007 until -- in
12       the state of Washington, from 2007 until the period
13       in 2010 when they started using the Audatex tool, did
14       American Family provide any training to its claims
15       adjusters on how to do these diminished value
16       calculations?
17   A   There was no formal training done, no. It was done
18       by individual managers.
19   Q   And was there a policy or procedure as to how
20       diminished value was supposed to be determined and,
21       if it was found to exist, calculated, that was in
22       writing in any of that period of time?
23   A   No.
24   Q   Now, when we look at the subjective numbers, you
25       mention the Kelley Blue Book tool. And if I

Page 37

10 (Pages 34 to 37)

1    understand what that is, in conditioning a vehicle in
2    Kelley Blue Book, Kelley Blue Book will change the
3    condition of the vehicle based upon factors including
4    prior damage -- scratch that -- based upon factors
5    including repair damage on the vehicle and how
6    extensive that is, correct?
7  A  I believe so.  It's been quite some time since I've
8     used it.
9  Q  Okay.  And so certainly in the period from 2007 until
10    you started using the Audatex tool, one of the things
11    that you do in the state of Washington would be to
12    use that conditioning tool and find out what had
13    changed in the condition of the vehicle and then use
14    the pre-loss value and then the post-loss value
15    taking into account the impact of that accident and
16    damage repair on the vehicle's condition?
17 A  I believe the Kelley Blue Book tool provided the
18    post-loss value.
19 Q  Yeah.
20 A  And then gave you the net.
21 Q  Yeah.
22 A  Yeah.
23 Q  Okay.  Is that a Kelley Blue Book tool that was
24    just -- you got and used off the web, or was it
25    something you had to purchase from Kelley Blue Book?

Page 38

1  A  It was off the Internet.  Web.
2  Q  Do you know if that's still on the web?
3  A  I would assume so, but I don't know.  I haven't used
4     it for a number of years.
5  Q  And when you were valuing and using the Kelley Blue
6     Book tool, you would use the retail values of the
7     vehicle?
8  A  Yes, the value that we had --
9  Q  Yeah.
10 A  -- established, yes.
11 Q  Okay.  And any time you're determining the actual
12    cash value, you're determining that actual cash value
13    as of the date of the actual loss, right?
14 A  That is correct.
15 Q  Now, when we talk about this period of time or later,
16    if somebody makes a diminished value claim and -- and
17    contends that there's a loss of vehicle, and you
18    determine that there in fact is a loss of value in
19    the vehicle as a result of the accident covered by
20    AmFam, if the person has a subsequent accident with
21    the vehicle, does that, in AmFam's opinion, make that
22    loss go away?
23              MR. BENNETT:  Object to form.
24    Topic.
25 A  I guess which loss?  Does it make which loss go away?

Page 39

1  Q  (By Mr. Nealey)  Well, you determine the amount of
2     diminished value, if any, as of the time of the
3     accident, right?
4  A  Correct.
5  Q  Okay.  So if we've got somebody who's an American
6     Family insured, and they had an accident say in 2013,
7     okay, and you've determined that they have a certain
8     amount of loss, the Audatex tool tells you a certain
9     amount of diminished value, and we'll just say it's a
10    thousand dollars.
11 A  Okay.
12 Q  If they then, after you determined at that point in
13    time, that their loss is $1,000, if six months later
14    they have another accident, covered by American
15    Family or not covered by American Family, does that
16    subsequent accident, does it take away the earlier
17    loss of value?
18              MR. BENNETT:  Object; calls for a
19    legal conclusion.
20 A  I'm not sure that it would take away the diminished
21    value from the first loss --
22 Q  (By Mr. Nealey)  Yeah.
23 A  -- necessarily.
24 Q  Okay.
25 A  I suppose it could, but I don't know.

Page 40

1  Q  Okay.  Could you think of a situation where you
2     would, in essence, determine, because of subsequent
3     events that happened, that there had not been a loss
4     as of the date of the accident?
5  A  Not that I can think of.
6              MR. NEALEY:  Okay.  Now, I'm going
7     to mark another copy of this Audatex estimate, which
8     this one says AudaSource, which is the current name.
9     I'll mark that as Exhibit 5.  And this is the one for
10    Mr. Meyer's vehicle.
11             (Exhibit No. 5 marked for
12              identification.)
13 Q  (By Mr. Nealey)  And -- and if we look here, this has
14    the same language on it, if you turn on Page 2 of
15    that, "These current NADA values..."  "the values in
16    the NADA guide assume vehicle in clean condition."
17    I understand from other witnesses that, at some
18    point, AudaSource, for determining diminished value,
19    stopped using NADA and starting using a proprietary
20    system they have to come up with actual cash value.
21    Is that correct to your knowledge?
22 A  To be honest with you, I couldn't say.
23 Q  Okay.  And so, obviously, you wouldn't know if there
24    was some date when they changed over?
25 A  I would not.

Page 41

11 (Pages 38 to 41)

Wade A. Nielsen
November 6, 2014

1  Q  Now, Topic 2 and also Topic 10 in the notice, which
2     has been marked as Exhibit 1, asks about American
3     Family's position regarding the coverage of
4     diminished value under UIM in the state of
5     Washington. And I'd just like to know what American
6     Family's position is regarding the coverage for
7     diminished value under the UIM coverages in
8     Washington from 2007 forward.
9            MR. BENNETT: Object to the form as
10    it goes to his coverage.
11 A  Well, just -- I guess just to clarify, diminished
12    value is not a coverage under the policy.
13 Q  (By Mr. Nealey) What is it?
14 A  It's potentially a -- I guess I'll call it a
15    compensatory damage or loss that could exist as part
16    of a UIM claim.
17 Q  And under a policy, there's a question whether a
18    particular damage or loss is covered under the
19    policy, right?
20 A  In some cases, yes. I mean, there are certain things
21    that are excluded.
22 Q  Okay. Okay. And there's no exclusion in the UIM for
23    diminished value?
24 A  There isn't.
25 Q  Okay. And under the -- and what -- you said it's

Page 42

1     potentially compensable damage or loss.
2         What would be the circumstances if the loss
3     actual exists, the vehicle has a reduced market
4     value, that American Family would not find it to be
5     covered?
6            MR. BENNETT: In a UIM?
7            MR. NEALEY: In a UIM context.
8  A  Well, it's not really a matter of -- it's not that we
9     wouldn't find it to be covered.
10 Q  (By Mr. Nealey) Okay.
11 A  It's that we potentially might not find that
12    diminished value exists for that particular loss.
13 Q  So if I'm understanding UIM in Washington from 2007
14    forward, if -- just as a hypothetical, if somebody
15    comes in and they've got Nobel Prize winners in
16    economics, all of which put in a declaration saying
17    this car is worth $2,000 less, the market value is
18    reduced by 2,000 the actual diminished value so that
19    nobody in American Family doubts that the car is
20    worth less, it has diminished value, you would find
21    that would be covered under the UIM coverage?
22 A  Correct.
23 Q  Okay. Are you aware personally -- scratch that.
24    You're a corporate designee, so I'll ask both the
25    company -- I guess the question is: Are you aware of

Page 43

1     a case, Moeller versus Farmers Insurance Company of
2     Washington?
3  A  I've heard of it, yes.
4            MR. NEALEY: Okay. I'm going to
5     mark as Exhibit 6 a copy of the Moeller opinion.
6            (Exhibit No. 6 marked for
7            identification.)
8  Q  (By Mr. Nealey) You've heard of it. I'm just
9     handing it to you.
10    Is Moeller something that you've ever read?
11 A  Not in detail, no.
12 Q  Okay.
13 A  I guess I shouldn't say I've ever "read" anything
14    about it.
15 Q  Okay.
16 A  It's been a conversation.
17 Q  Okay. What do -- what do you understand Moeller to
18    say?
19 A  Specifically, I couldn't say for sure. I believe it
20    had to do with diminished value and possibly even
21    talking about type of diminished value --
22 Q  Okay.
23 A  -- is my recollection. That's layman.
24 Q  Okay. So -- but before Moeller came out and after
25    Moeller came out, AmFam's policy in the state of

Page 44

1     Washington -- scratch that.
2         So from 2007 until Moeller came out in 2011, and
3     then forward after Moeller came out, American
4     Family's position in the state of Washington has been
5     that under its contract in the UIM coverages, if a
6     loss in market value is shown to exist on a vehicle,
7     that loss is covered under the UIM coverages?
8  A  If the loss -- if the diminished value is proven,
9     yes, it would be paid under UIM.
10 Q  And in every one of these cases where somebody's
11    raised the issue of diminished value, the discussion
12    that American Family has had with them is always the
13    question of whether an actual market value loss on
14    the vehicle exists or does not exist?
15 A  That would be the question.
16 Q  Okay. From 2010 until currently, is it correct that
17    the only tool that American Family has used to come
18    up with an actual number on diminished value is the
19    AudaSource diminished value tool?
20 A  I wouldn't say it's the only tool.
21 Q  Is there any other tool that's been used in the state
22    of Washington to your knowledge to come up with the
23    amount of diminished value other than the -- well,
24    scratch that.
25    The AudaSource diminished value tool is used both

Page 45

1  to determine if diminished value exists and then its
2  amount, right?
3         MR. BENNETT: Object to form.
4  A  I wouldn't say it's exclusively used to determine if
5     it exists. It's only when we feel that there is
6     potentially some diminished value would we use the
7     tool.
8  Q  (By Mr. Nealey) Okay. Okay. So the first thing it
9     has to do is that somebody within American Family has
10    to subjectively decide that they think that
11    diminished value exists on the vehicle, right?
12 A  Correct.
13 Q  Okay. And in making that determination whether
14    diminished value exists, does the person from
15    American Family -- do they look at the same sort of
16    criteria looked at in the AudaSource diminished value
17    tool to determine whether it exists?
18 A  Yeah. They would look at everything.
19 Q  Okay. Because under the -- under the AudaSource
20    diminished value tool, for example, if the vehicle
21    has over 100,000 miles, the AudaSource tool says
22    there's no diminished value?
23 A  Correct. And that may be the case, it may not be the
24    case.
25 Q  Okay. And, similarly, under the current damage

Page 46

1  modifier, if a vehicle has -- doesn't have sufficient
2  damage under the Audatex diminished value tool, it
3  shows zero diminished value, would you use the same
4  sorts of criteria found in the damage modifier?
5  A  We would look at the type of damage or the amount of
6     damage, not necessarily specific to what the tool
7     says, to determine whether we felt it did or did not
8     have any.
9  Q  Okay. And then, similarly, prior damage, the tool,
10    if you have a salvage title or a branded title, gives
11    you no diminished value, would that be the same
12    position that you would use subjectively looking at
13    whether diminished value might exist?
14 A  Potentially, but, again, it's not an absolute.
15         MR. NEALEY: Okay. I'm going to
16    mark, as Exhibit 7, a copy of the AudaSource
17    Diminished Value Workflow Quick Reference Guide. And
18    this is Bates No. MM 1704 to 1713.
19             (Exhibit No. 7 marked for
20              identification.)
21 Q  (By Mr. Nealey) And my first question is: This is a
22    2010 version. Are you aware of there being a more
23    up-to-date version than this?
24 A  Not that I'm aware of.
25 Q  So this is the same one you've looked at, 2010?

Page 47

1  A  Correct.
2  Q  And at the -- at the top, it says, "The normal
3     diminished value process would also include a repair
4     estimate and photos in addition to running diminished
5     value report."
6        Is that a fair summary of what's used by American
7     Family to make a determination if diminished value
8     exists and that it's a match, which is that you have
9     the repair estimate and you have photographs of the
10    vehicle and then you run the report?
11 A  Typically, yes.
12 Q  Okay. And there's no need to inspect the vehicle in
13    order to determine the amount of diminished value or
14    if diminished value exists?
15 A  There might be.
16 Q  What would be the circumstances where the statement
17    on Exhibit 7 about the normal process would not
18    apply?
19 A  I'm presuming that, where it's talking about the
20    process, would include a repair estimate in photos
21    would be the damage has not yet been repaired. In
22    some cases, we are supplied an estimate that the
23    vehicle owner's already obtained, and we may -- we
24    may evaluate and handle the claim off of that
25    estimate without an inspection. And potentially they

Page 48

1     supplied photos or the shop took photos. I mean, we
2     wouldn't necessarily always do that.
3  Q  Okay.
4  A  Sometimes it's provided to us.
5  Q  Okay. I understand. But my question is really:
6     What would be the circumstances in which -- when you
7     have the repair estimate and you have photographs of
8     the vehicle, and putting aside the issue that the
9     photos are from somebody else aren't good enough or
10    you don't believe the repair estimate, if you believe
11    the repair estimate is accurate, either American
12    Family's adjuster did it or -- or a DRP shop for
13    American Family did it or it came from a claimant and
14    you don't have a reason to doubt the accuracy of the
15    estimate, and the photos are adequate, are there any
16    circumstances where you would feel it necessary to
17    inspect the vehicle as part of the diminished value
18    process?
19 A  You're talking before the car's repaired?
20 Q  Yeah, before the car's repaired.
21 A  Prior to repair. Aside from having adequate
22    information provided to us, we would need to inspect
23    it to get that information.
24 Q  Okay.
25 A  In the majority of cases, that's what happens.

Page 49

13 (Pages 46 to 49)

1  Q   Okay.  Well, I'm asking you to assume that you have a
2      repair estimate that you don't doubt the accuracy of
3      the repair estimate, and you got photographs, and you
4      don't doubt the -- the photographs are good enough
5      and you could see what the car looks like, is there
6      any circumstances that you would feel the need to
7      inspect the vehicle as part of determining the
8      existence or amount of diminished value?
9  A   We wouldn't be -- we wouldn't be talking about
10     diminished value if the vehicle had not been repaired
11     yet.  I'm not sure we're on the same page.
12 Q   Okay.
13 A   That's why I asked.  If you're talking about a repair
14     estimate and photos before the car is repaired, there
15     would be no diminished value at that point.  It
16     hadn't been fixed yet.
17 Q   Okay.  So once the car is fixed, whether it's fixed a
18     week later or two weeks later or a month later,
19     you're going to determine the diminished value loss
20     as of the date of the accident, right?
21 A   Correct.
22 Q   Okay.  So what does fixing the car have to do with
23     it?
24 A   It hasn't been restored.  It hasn't been put back to
25     preaccident condition yet.

Page 50

1      would be appropriate.  If there's nothing to indicate
2      there's any issue with the repair at all, an
3      inspection may not be necessary.
4  Q   Okay.  So if -- put another way, if everybody says
5      that the repairs were properly done, done to industry
6      standards, and you have a repair estimate showing you
7      the extensiveness of the damage and the type of
8      repairs that were done, and you have photographs, and
9      you have the AudaSource diminished value tools been
10     run, then there would no need to look at the vehicle?
11 A   More than likely not.
12            MR. BENNETT:  Scott, whenever you
13     get -- just because I need to go to the bathroom.
14            MR. NEALEY:  This is as good a time
15     as any.
16            MR. BENNETT:  Okay.
17               (Recess 1:12 to 1:21 p.m.)
18            EXAMINATION (Continuing)
19 BY MR. NEALEY:
20 Q   Now, looking at, just quickly, Topic 21, I want to
21     find out what you know about AudaSource.  And -- and
22     what -- what do you know about the methodology that
23     supports the accuracy of the estimates of diminished
24     value that are produced by the AudaSource tool?
25 A   I don't have really any information or specifics on

Page 52

1  Q   Okay.
2  A   I'm not sure anyone could determine diminished value
3      on a car that's sitting there wrecked.  It's
4      diminished value by the nature of the fact that it
5      has damage.
6  Q   So what you're saying is that when the car is -- has
7      been damaged and it's sitting there and it's damaged,
8      it has loss that comes from diminished value and loss
9      that comes from the fact that it's unrepaired at that
10     point?
11            MR. BENNETT:  Object to the form.
12 A   I don't believe it has any diminished value at that
13     point.  It has not been repaired.
14 Q   (By Mr. Nealey)  Okay.  So taking your answer then
15     after the car has been repaired, and the repairs are
16     done, and you have photographs of the car, and you
17     have the repair estimate, and you have the AudaSource
18     diminished value tool, what would be the circumstance
19     where you would feel it necessary to go beyond the
20     normal diminished value process and actually inspect
21     the car?
22 A   If somehow or if information was available that
23     indicated there was a question about the repair
24     itself, or a complaint by the owner of the car
25     regarding some of the repair work, an inspection

Page 51

1      the methodology that they use for the tool.
2  Q   Okay.  And so it's fair to say, obviously, American
3      Family buys the tool or rents the tool, I should say,
4      but American Family doesn't know what underlies the
5      estimates that are produced by it?
6  A   To my knowledge, no.
7  Q   Okay.  And similarly then, American Family, although
8      they buy and use the AudaSource tool, they don't have
9      any information on the accuracy or the error rates
10     that are -- that are in the tool?
11 A   I'm not aware of any studies or any analysis done on
12     that.
13 Q   Okay.  And you're unaware of anyone at American
14     Family ever looking at the accuracy of the AudaSource
15     tool to see if it's actually giving accurate or fair
16     or reasonable values as to the amount of diminished
17     value?
18 A   I don't know that we've looked at that at American
19     Family.  We rely on the product that's being provided
20     to us.
21            MR. NEALEY:  Okay.  Okay.  I'm
22     going to mark, as Exhibit 8, a copy of an ISO claim
23     search report.  This is the one for Bryce Meyer.  I'm
24     sorry I don't have an extra copy for you.
25     ////

Page 53

14 (Pages 50 to 53)

Page 54

1    (Exhibit No. 8 marked for
2    identification.)
3  Q  (By Mr. Nealey)  This is Bates No. M 589 to 591.  And
4    whenever you do a diminished value assessment or have
5    a diminished value claim, one of the things that
6    American Family does is it runs a search in the
7    insurance service office database to look for any
8    prior accidents; is that correct?
9  A  Correct.
10 Q  Okay.  And looking at this, that includes -- the ISO
11   database includes information from the National
12   Insurance Crime Bureau; is that correct?
13 A  Yes.  I believe they're affiliated, yeah.
14 Q  Okay.  And one of the things that comes up in the ISO
15   search is any other repair estimates on that vehicle
16   that insurers have provided; is that right?
17 A  Correct.
18 Q  Okay.  So although Mr. Meyer is an American Family
19   insured, the second match, for example, on Exhibit 8,
20   is an estimate on the repair of damages from Allstate
21   Insurance Company, right?
22 A  Correct.
23 Q  And then Match 4 is the estimate that was prepared by
24   American Family on the vehicle, right?
25 A  Would appear so, yes.

Page 55

1  Q  Okay.  So -- so when looking at diminished value,
2    American Family has the capacity, if it wishes to, to
3    run the VIN number of any of its insureds' vehicles
4    and determine if an insurance company has reported a
5    prior claim and ascertain the repair estimate on that
6    car?
7  A  Correct.
8  Q  Do you know how many insurers participate in the --
9    and put data into the ISO database?
10 A  I do not.
11   (Exhibit No. 9 marked for
12   identification.)
13 Q  (By Mr. Nealey)  I'm going to give you Exhibit 9.
14   This is a memo.  It's dated [sic] MM 1715.  I'm just
15   wondering if you know when this was issued
16   approximately?
17 A  (No response.)
18 Q  Have you seen this before?
19 A  I have, but I don't recall when it was -- when it was
20   sent.
21 Q  Well, and it says, "To be consistent in determining
22   the value, the diminished value tool and Audatex
23   should be used."
24   Would it be fair to say that this thing came out
25   in 2010 or later?

Page 56

1  A  I believe that's correct, yes.
2  Q  Okay.
3  A  It came out, I think, in conjunction with the
4    availability to that tool.
5  Q  Okay.  And of course, in running the Audatex tool,
6    the Audatex tool can be run whether the vehicle has
7    been repaired or not repaired, right?
8  A  I'm not sure.  I've never personally run one through
9    the tool, but we wouldn't run the tool again until
10   after the vehicle's repaired and diminished value has
11   been requested.
12 Q  Understanding that, but if you have the final repair
13   estimate on the vehicle, meaning any supplements have
14   been done, you have the final repair estimate, you
15   can actually physically run the tool, the Audatex
16   tool, whether the car's been repaired or not, right?
17 A  You could, yeah.
18 Q  Okay.  Going back a couple questions about the policy
19   which has been marked as Exhibit 2, and we asked a
20   couple questions on the notice about arbitration or
21   appraisal.  And my first question for you is, if you
22   look at Page 24 if you look at the little numbers on
23   the bottom -- let's see if I got the right page here.
24   I'm sorry; it's Page 25.  So last page of Exhibit 2,
25   in reading this, the arbitration clause says the

Page 57

1    matter may be arbitrated.  And then 2b says, "The
2    arbitration shall commence within a reasonable period
3    of time after there is mutual consent of both
4    parties."
5    Does American Family interpret its arbitration
6    clause in the Washington UIM policy to require mutual
7    agreement to arbitrate?
8  A  That seems to be the way it's worded, so I would say
9    yes.
10 Q  Okay.  So meaning that both parties have to agree to
11   an arbitration before one can take place under the
12   American Family policy in Washington?
13 A  Yes.
14 Q  And this at the bottom says, END, and it's got an Ed
15   date of 1/06.  And does that mean that the UIM
16   endorsement that we're referring to, which would be
17   pages Bates No. 23 to 25 of Exhibit 2, that this has
18   been in effect since January of 2006?
19 A  Correct.
20 Q  So for the entire proposed class period of 2007 until
21   the present, this language found in the uninsured
22   motorist endorsement in Exhibit 2 would have been in
23   effect?
24 A  Correct.
25 Q  Now, second of all, if you go to Page 24, there is a

1    provision under C, "Insuring Agreement," that says 3.
2    If -- it says, "If any suit is brought by you to
3    determine liability or damages, the owner or operator
4    of the uninsured motor vehicle must be made a
5    defendant and you must notify us of the suit."
6       My question is: If you look, obviously, at the
7    first page, 23, there is a requirement that if
8    there's no physical contact with the vehicle that you
9    have to file a police report and then have some
10   independent evidence.
11      In a circumstance where you have either physical
12   contact but -- a hit and run, so you have -- or you
13   have a phantom driver, so you don't know who the
14   uninsured motorist is, under C3, is it impossible for
15   an insured to bring a claim against American Family?
16                MR. BENNETT: Let me just object to
17   form, beyond topic, but you can certainly answer.
18   A  Can you repeat it?
19   Q  (By Mr. Nealey) Okay. You have a situation where,
20   under the UIM, you have either a phantom vehicle, but
21   they've otherwise complied with the policy, a police
22   report's been filed, they have some independent
23   evidence to show a phantom vehicle, or you have a
24   situation with physical contact, and then you have a
25   hit and run. So, again, a police report would be

Page 58

1    filed if you have a hit and run.
2       If you look at C3, it says, "If any suit is
3    brought by you to determine liability and damages,
4    the owner/operator of the insured motor vehicle must
5    be made a defendant and you must notify us of the
6    suit."
7       How does that operate in a circumstance when you
8    don't know who the owner/operator of the uninsured
9    motor vehicle is?
10                MR. BENNETT: Same objection.
11   A  To be honest with you, I'm not sure.
12   Q  (By Mr. Nealey) And I ask that question because this
13   provision says "You must notify us of the suit."
14      Does this provision apply in circumstances where
15   an American Family insured has brought a claim
16   against American Family under the policy as opposed
17   to their trying to seek a determination without
18   American Family in the courtroom?
19                MR. BENNETT: Object; beyond
20   topics.
21   A  I'm not sure. I don't recall a situation such as you
22   describe. This, to me, is talking about if you're
23   filing suit against the underinsured -- the owner or
24   operator of the underinsured motor vehicle, so it
25   presumes that you know who that is.

Page 59

1    Q  (By Mr. Nealey) Okay.
2    A  That we need to be --
3    Q  Okay. This is a provision that applies when you want
4       to bring suit against the uninsured vehicle driver,
5       this provision is here to make sure that American
6       Family gets notice of the suit so they can either
7       intervene or protect their rights?
8                MR. BENNETT: Object to the form,
9       beyond topic.
10   A  That's my understanding.
11   Q  (By Mr. Nealey) If we look at Topic No. 9 -- jump
12      around a little bit here -- what -- what training are
13      American Family adjusters and claims agents given in
14      the state of Washington on the contents of the
15      Washington Administrative Code provisions that
16      address first-party insurance claims?
17   A  There's no formal classes or anything of that nature.
18      They're provided with our corporate claim guidelines
19      which are in compliance with each of our operating
20      states' regulations. We have reviewed in meeting
21      sessions periodically, also in presentations with our
22      in-house legal staff various Washington
23      Administrative Codes and RCWs that were applicable to
24      our claims handling.
25   Q  If we go to Topic Nos. 11 and 12, is there any policy

Page 60

1    or procedure within American Family to reinspect in
2    the state of Washington auto physical damage claims
3    to determine if the vehicles were in -- and this is
4    exact language -- "pre-loss condition"? Was there
5    any policy or procedure to do that from 2007 to the
6    present?
7    A  This presumes they were already repaired?
8    Q  Yeah. After they've been repaired.
9    A  There's no policy or procedure to do that with the
10      exception of vehicles repaired through our certified
11      repair program.
12   Q  And whenever there is a reinspection for a certified
13      repair program, is that reinspection to determine if
14      the cars are restored to the pre-loss -- or
15      preaccident condition, or is that to see if the
16      estimating guidelines and the requirements of the DRP
17      program have been followed?
18   A  I would say primarily to ensure that they've followed
19      the guidelines that we have in place, which includes
20      repairing the vehicle correctly within industry
21      standards, so I would say both.
22   Q  Well, and I've got the guidelines. I'm happy to hand
23      them to you. The guidelines require that the vehicle
24      be restored. They don't mention anything about
25      pre-loss condition, right?

Page 61

16 (Pages 58 to 61)

1  A  It's either pre-loss or preaccident or before the
2     loss to the condition it was before the loss.
3     Something to that effect.
4         MR. NEALEY: I don't want to make
5     it a memory quiz.
6         I'll mark, as Exhibit 10, a copy of the DRP shop
7     guidelines. Here's the guidelines for February 2014.
8     I don't -- I don't have one for you. Got a
9     staple in it and thought there were two, but it's
10    really just one.
11            (Exhibit No. 10 marked for
12            identification.)
13 Q  (By Mr. Nealey) I've gone through this pretty
14    carefully, and I might just direct you, to speed
15    things up, to Page 4, where it says, "We expect all
16    repairs you do for our customers will be done safely
17    and within industry standards."
18    And then it says, on Page 5 at the top, "CRP Shop
19    Expectations." Vehicles must be repaired following
20    original equipment manufacturer recommendations and
21    Interindustry Conference on auto collision repair
22    I-CAR standards.
23    I don't find anything in here that talks about
24    repairing cars to pre-loss condition. I'm happy to
25    have you correct me, but my question is: Is it a

Page 62

1     fair statement that the requirements of the DRP
2     program are that vehicles -- I'll use the language --
3     must be repaired following original equipment
4     manufacturer's recommendations and I-CAR standards?
5  A  It doesn't appear that they use the specific words
6     "pre-loss or preaccident condition." But if they do
7     the repairs as indicated in here, that's effectively
8     what they've done.
9  Q  What's the basis for the statement that you're making
10    that if people follow I-CAR standards that it's
11    effectively restoring to pre-loss condition?
12 A  That's what the I-CAR service bulletins, technical
13    bulletins, and those from the manufacturer are
14    designed to do.
15 Q  Do you know does I-CAR use the terminology that using
16    I-CAR procedures will restore a car to its pre-loss
17    condition? Does I-CAR say that?
18 A  I'm not sure that they do.
19 Q  Okay. And do the manufacturers say if you follow
20    their recommended procedures it will restore the car
21    to pre-loss condition?
22 A  I couldn't say what terminology they have.
23 Q  Okay. But it's fair to say there's certainly no
24    retirement in the DRP guidelines that American Family
25    does that requires DRP shops to restore to pre-loss

Page 63

1     condition?
2  A  Specifically using those words, no.
3  Q  And then on Topic 13, I'll kind of just ask it the
4     same which the topic does, Does American Family have
5     any information or knowledge if vehicles that are
6     less than six years old with less than 90,000 miles
7     and with over $1,000 in body or paint damage can be
8     fully restored to their preaccident condition? And
9     that's a direct quote, "fully restored."
10            MR. BENNETT: Let me just object to
11    the extent that it calls for expert testimony.
12 A  Does American Family have any specific information
13    outside of the various resources available to us
14    within the industry? With rare exceptions that I
15    can't think of, every vehicle can be restored to
16    pre-loss condition if you follow the guidelines
17    outlined by the manufacturer.
18 Q  (By Mr. Nealey) Okay. My question's a little more
19    specific. What -- what information does American
20    Family have, like, you know, actual information, you
21    know, studies, documents, analysis, that's within
22    American Family's -- in American Family, not somebody
23    you could go out and hire, but actual information
24    within American Family that vehicles that are less
25    than six years old, have less than 90,000 miles, and

Page 64

1     that have over $1,000 in paint or body or frame and
2     structural damage can be fully restored to their
3     pre-loss condition?
4  A  American Family has not done any studies or analyses
5     to that -- to that specific of a nature.
6  Q  Okay. Have any -- has American Family done any
7     studies that address the ability of repairing a
8     vehicle with body paint or frame or structural damage
9     fully to pre-loss condition?
10 A  None that I'm aware of. We rely on, obviously,
11    industry for that type of information.
12 Q  Okay. Topic 15, we're on to metrics.
13 A  Okay.
14 Q  I'll see if I can get through this pretty quickly.
15    I take it that American Family can, in generating
16    a list of uninsured motorist claims in the state of
17    Washington from 2007 to the present, can determine on
18    those claims the particular deductible that was
19    applicable to the loss, right?
20 A  We can generate a list of claims under the UIM
21    coverage for that time period. Simply looking at
22    that list, we cannot tell what the deductible amount
23    was. We'd have to look at each claim individually.
24 Q  You know how much was paid on the claimant, right?
25 A  Correct.

Page 65

17 (Pages 62 to 65)

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Q And your coverage -- you have a coverage database, and the coverage database tells you what the deductible is for each policy, right?

A It's written into the policy language, yes.

Q Absolutely. And so you can actually go to a -- as American Family, if you have a claim, you can go look in your coverage database and you'll see that, for instance, Bryce Meyer has a policy, and his policy has a $100 deductible for UIM, right?

MR. BENNETT: Object.

A No.

Q (By Mr. Nealey) No?

A The deductible amount is determined by the facts of the loss. It's either $100 if the underinsured motorist is known or $300 if they are unknown. The facts of the loss would dictate that.

Q (By Mr. Nealey) Oh, but it's written someplace in the --

A It's in the policy language.

Q Okay. I know that. But you have an estimate of the loss. And the estimate -- say the repair estimate on a car might be $2,000. You know whether -- with a repair estimate of $2,000, you know the amount on the repair estimate, right?

A Correct.

Page 66

Q And you know at the same time the amount that is actually paid by American Family, right?

A Correct.

Q And so if you put those two together, you know what the deductible was that was charged?

A Correct.

Q Okay. So you can directly tell the amount of the repair estimate without even having to look at what the deductible is, right?

A The estimate should reflect the appropriate deductible that was taken.

Q Okay. I understand that. So that the record is clear, you have two ways of determining -- you can directly determine what the actual repair estimate was by just looking at the repair estimate, right?

A Mm-hm.

Q Okay.

A Yes.

Q And then you can determine the amount of the deductible by taking the amount of the repair estimate and then looking at the amount that American Family actually paid, and whatever the difference of the two would be the deductible?

A Correct.

Q Okay. And of course on each of those UIM claims,

Page 67

you're going to know the name and address of the insured, right?

A Correct.

Q Okay. And you have the capacity to update those records to whatever the most current address you have for the insured, right?

A Presuming they are still insured with us, yes.

Q Absolutely. Through the last date of insurance, the last contact you had with the insured, you would be able to pull that most recent address?

A Yes.

Q Okay.

MR. BENNETT: Scott, may I just -- this isn't in the line of an objection so much as a clarification. Your question here is can we just run a deductible for you?

MR. NEALEY: Yeah.

MR. BENNETT: His answer is no.

MR. NEALEY: Yeah. Yeah. Let me -- this is an example where his answer is exactly what's needed. It's better -- his answer's better than the question, the way it was written. We're on the same page.

Q (By Mr. Nealey) So can you tell from your computer databases whether a vehicle that is the subject of

Page 68

the claim is owned by the insured or leased by the insured?

A Possibly.

Q Possibly.

A I don't -- just in running a list of claims, no. If we can run a list that would show a lienholder or an other insured -- other named insured would usually be the leasing company, then yes.

Q So you have to cross -- you have to -- you have to cross-reference the list of claims with the -- with the field of whether there's another insured or a -- or a lessor in the insured database?

A Correct.

Q Okay. Now, if you have a person who makes a claim under the UIM coverage, but they are driving a nonowned vehicle, for instance, they're driving a rental car, do you have a way in your system of telling that the claim is made on a rental car or a nonowned vehicle?

A Yes, you can tell by looking at the claim because the rental car company would be listed as a party to the claim because they're the ones that would have the damage claim.

Q Okay. So to use a hypothetical, assuming I'm an American Family insured, I get in an UIM accident,

Page 69

1  somebody else is at fault and I'm driving a car from
2  Hertz, if you look at the claims database, you'd
3  have -- Hertz would be listed in there, and you'd
4  know because there's information on another owner of
5  the vehicle that was a nonowned vehicle?
6  A  Correct.
7  Q  And I take it that you know from your claims database
8     whether the claim was -- the vehicle was declared to
9     be a total loss?
10 A  Correct.
11 Q  Okay.  And do you have a field in your claims
12    database when you can determine if a claim is glass
13    only?
14 A  It's not a field.  Glass-only claims are paid under a
15    completely different code.
16 Q  Okay.  So you have a code for glass only?
17 A  Correct.
18 Q  And is there a way in your claims system with the
19    estimates to run and determine whether particular
20    parts or items were repaired or replaced?
21 A  Not within our claims system, but within Audatex
22    database, yes.
23 Q  Okay.  So you could, for instance, run a list and
24    find out if there were structural members that were
25    replaced or framework that was done?

Page 70

1  A  Correct.
2  Q  And, similarly, can you determine on an estimate
3     whether there has been a body or paint repair?  Can
4     that be run in the Audatex system?
5  A  Correct.
6  Q  And I take it that the way that you would determine
7     if a vehicle has a prior accident would be by running
8     that vehicle in the ISO system?
9  A  Correct.
10 Q  And so you could, for instance, on a list, flag those
11    claims on a list of UIM claims that had hits for
12    prior accidents in the ISO system if you wanted to?
13 A  We could.  We'd have to look at each claim
14    individually.
15 Q  Okay.  The ISO system, you plug in my individual VIN
16    number?
17 A  Yes, but it's not -- it's not captured in a
18    searchable field within our claims system.
19 Q  Well, if you -- if you had a list of VIN numbers that
20    fell within a particular group of UIMs, you could
21    just match run those VIN numbers --
22 A  We could.
23 Q  -- for hits?  Okay.
24    Topic No. 22, who is -- who is your total --
25    scratch that.

Page 71

1  Q  Who is your current contact person for AmFam at
2     AudaExplore for the diminished value tool?  Do you
3     know who that is?
4  A  At AudaExplore?
5  Q  Yeah.
6  A  I do not.
7  Q  You do not.
8     Who's the person who's -- from AmFam who's
9     responsible for interacting with Audatex for the
10    diminished value tool?
11 A  Mark Follmann.
12 Q  And this asks for the total number of assessments
13    received and information prepared.
14    Do you have an estimate of the number of
15    diminished value assessments in the state of
16    Washington that have been run?
17 A  I believe the number was 280-some maybe.
18           MR. BENNETT:  244.
19 A  244.
20           MR. NEALEY:  Counsel's always good
21    for these things.
22 Q  (By Mr. Nealey)  So 244, which I think is -- 244.
23    And that would have been since approximately 2010?
24 A  I believe so, yes.
25 Q  Okay.  Because sometime in 2010 was when the

Page 72

1     diminished value tools started to be used.  Okay.
2     Let me look quickly at my notes, but I think I
3     may be done.
4     Oh, yeah, I do have a couple quick questions.  I
5     have to look over there.
6     I'm going to give you Exhibit 11.
7              (Exhibit No. 11 marked for
8               identification.)
9  Q  (By Mr. Nealey)  This was produced.  It's Bates No.
10    MM 1726 to 1736.  And this is an analysis done in
11    2009 by the Property Casualty Insurance Association
12    of American in October 2009, a diminished value state
13    by state.
14    Have you seen or are you aware if there's an
15    updated version of this?
16 A  I'm not aware.
17 Q  Okay.  Have you seen a more recent sort of summary of
18    diminished value or heard of one?
19 A  I don't believe so, no.
20 Q  Okay.
21              (Exhibit No. 12 marked for
22               identification.)
23 Q  (By Mr. Nealey)  I'm going to mark, as Exhibit 12, a
24    copy of an exemplar letter that's dated American
25    Family MM 812.

Page 73

19 (Pages 70 to 73)

1     And is it correct to say that a letter that would
2  contain these eight points or similar to these points
3  would be sent to any insured that had requested
4  diminished value in the state of Washington?
5  A  This is the letter, yeah, that we used.  It didn't
6     necessarily always contain eight points.
7  Q  Okay.  Meaning that somebody could -- the letter
8     changed a little bit over time, right, except it
9     might have --
10 A  Depending on the case.
11 Q  Okay.  Is this letter or a letter similar to it still
12    being used today?
13 A  To my knowledge, yes.
14 Q  Okay.  And then I only have one copy of this, so I'll
15    just give you my copy because I couldn't find another
16    one.  This is Exhibit 13.  It's American Family B 87.
17    And this a letter that was sent to Christina Bower in
18    2011.
19                   (Exhibit No. 13 marked for
20                   identification.)
21 Q  (By Mr. Nealey)  Does this, to your knowledge, look
22    like a standard form letter?  Does this text look
23    familiar to you?
24 A  (Witness peruses document.)  It's not familiar to me
25    as a standard form letter, no.  It appears to be
                                                    Page 74

1     written ad hoc by the -- by the writer.
2  Q  Okay.  And Ms. McNalty writes here, she says, "All
3     damages to your vehicle were properly repaired, and
4     there are no indications that repairs occurred."
5     And my question is related to what Ms. McNalty
6     writes there, which is that there are no indications
7     that repairs occurred, is whether you can -- whether
8     there's an indication on the vehicle that repairs
9     occurred or not occurred, is that something that
10    American Family considers in determining whether
11    diminished value exists on a vehicle?
12 A  And I'm sorry.  To clarify, you were asking if it
13    affected diminished value if they were properly
14    repaired or not?
15 Q  No, I'm asking about the second thing.  Ms. McNalty
16    writes, quote, "And there are no indications that
17    repairs occurred."
18    And my question to you is that in determining
19    within American Family whether you believe that
20    diminished value or a loss in market value on a
21    vehicle exists whether you can determine that repairs
22    occurred on a vehicle by looking at it, is that one
23    of the things that you look at?
24 A  If the repairs to the vehicle from the loss had not
25    been done, you would have to look at it to know that,
                                                    Page 75

1  I would think.
2  Q  Once it's been repaired, is whether you can -- and
3     she says --
4  A  These statements almost seem contradictory to each
5     other, like it's a typo or something.
6  Q  Well, she says, "All damages to your vehicle were
7     properly repaired and there's no indication that
8     repairs occurred."
9     So my question is -- she writes "no indication
10    that repairs occurred."
11    Does whether you can, by looking at the vehicle,
12    detect that there are areas of repair, is that part
13    of your analysis versus repairs that would be
14    invisible?
15 A  I wasn't interpreting this --
16 Q  Okay.
17 A  -- this way.
18 Q  Okay.
19 A  But yes, it sounds like she's evidently looked at the
20    car and said that there was no way to tell that this
21    vehicle had been in a loss and repairs had been
22    completed.
23 Q  And is that part of what you understand to be the
24    assessment made at American Family, which is when
25    you -- when you look at the car, actually look at the
                                                    Page 76

1  car, whether you can detect that there are areas of
2  repair, and the repairs had been done as opposed to
3  the repair being completely invisible?
4  A  That could have an impact to diminished value --
5  Q  Okay.
6  A  -- yes.
7  Q  Okay.  Because, obviously, if you can't see there are
8     areas of repair, and the vehicle's been repaired,
9     then you would expect probably not to have any market
10    loss, right?
11 A  Potentially, yeah.
12 Q  Okay.  But if you can detect and tell that there are
13    areas of repair in the vehicle, or knowledgeable
14    people can detect, then you would expect there to be
15    some kind of a market effect?
16              MR. BENNETT:  Object to form.
17 A  Either an effect to the market value or corrected
18    repairs need to be made to the vehicle, workmanship
19    issues need --
20 Q  (By Mr. Nealey)  Okay.
21 A  -- to be done.
22 Q  And in looking at two situations, I mean, just like
23    to give you a hypothetical, you have a vehicle that
24    the only thing that's been damaged in the car and
25    wrecked are what I might call bolt-on/bolt-off parts.
                                                    Page 77

1  No paint work's done, no body work's done. You have
2  damage to parts like headlights, the windshield, et
3  cetera, but everything is just replaced. No paint
4  work's needed. Would you expect there to be any
5  diminished value on the car?
6  A  No.
7  Q  And when we look at the opposite extreme, which is
8  you can tell the paint work has been done because the
9  paint -- you get buildup in the repair areas, you had
10  Bondo on the car, you have straightening of the
11  frame, et cetera, would you expect there to be
12  diminished value in the market when you can tell, by
13  looking at it, a knowledgeable person, that there are
14  areas that have been repaired in the car?
15  A  Again, it would depend on the car. What's the age?
16  What's the mileage? What's the condition of the car?
17  Potentially, there could be, yes.
18  Q  And to try to answer that, if we're dealing with a
19  car that falls well under the requirements that we
20  talked about, and you got a car that's got a lot less
21  than 100,000 miles on the car, much less than seven
22  years old, and -- and nothing abnormal about the car
23  before its loss, and you have a car that, after
24  repair, when you look at it, it's got Bondo on it if
25  you look real carefully, and it's got paint buildup,

Page 78

1  it's got areas of panels that have been blended, and
2  you've got framework that's been done on it so that
3  somebody who's knowledgeable can tell, it's properly
4  repaired, but they can tell, would you expect that
5  car to have diminished value?
6  A  It could.
7  Q  Okay. Let me look quickly at my notes and I think
8  I'm done.
9             (Pause in the proceedings.)
10            (Exhibit No. 14 marked for
11             identification.)
12  Q  (By Mr. Nealey) Okay. One more document and then
13  we're done.
14     I'm going to hand you what I'm marking as
15  Exhibit 14 which is Document M 766. And this is a
16  copy of a certified repair program guarantee that was
17  received by Bryce Meyer.
18     Is this the same guarantee that American Family
19  has given to people at its DRP shops since 2007 in
20  the state of Washington?
21            MR. BENNETT: Object; beyond topic.
22     You can answer.
23  A  I'm not certain that it is. I know there was some
24  changes made to some things. Whether this particular
25  letter was changed or not, I don't know.

Page 79

1  Q  (By Mr. Nealey) Okay. And when I look at this
2  guarantee, would you agree with me that it doesn't
3  mention restore to pre-loss condition? It says that
4  American Family guarantees that the workmanship will
5  be of a quality generally accepted in the vehicle
6  repair industry.
7            MR. BENNETT: Object to form.
8  A  That is what it says.
9  Q  (By Mr. Nealey) Okay. And are you aware of American
10  Family ever guaranteeing that vehicles of its
11  insureds are fully restored to the pre-loss
12  condition?
13  A  I'm not aware that we ever guarantee that. We're not
14  the ones fixing them.
15  Q  Yeah. And the guarantee that's provided as to
16  workmanship by American Family goes away when the
17  vehicle is resold, right?
18  A  Correct.
19            MR. NEALEY: I have no further
20  questions. Thank you very much.
21            MR. BENNETT: I do, oddly, have one
22  question. I hope to prevent any confusion in the
23  future.
24            EXAMINATION
25  BY MR. BENNETT:

Page 80

1  Q  Once -- Mr. Nielsen, once American Family contracted
2  for the AudaSource tool that we have looked at as the
3  explanation as Exhibit 7, and a copy of the tool as
4  Exhibit 5, at least as run as to, I believe,
5  Mr. Meyer's vehicle, from 2010 through today, does
6  American Family rely on anything else other than the
7  AudaSource tool in making its diminished value
8  assessment?
9  A  Yeah. This is just -- this is just one tool of many
10  that are still currently used to determine the amount
11  of the diminished value.
12  Q  Okay. And those other tools would be, I think what
13  you explained to Mr. Nealey, for example, Kelley Blue
14  Book or NADA?
15  A  Correct.
16            MR. BENNETT: That's all I have.
17  Thank you.
18            FURTHER EXAMINATION
19  BY MR. NEALEY:
20  Q  And just to follow up so that the record's clear, so
21  you are still using the Kelley Blue Book approach of
22  looking at that tool, and it's been used since 2010
23  in the state of Washington?
24  A  Not necessarily in every case, but it's certainly a
25  tool that could be utilized, yes.

Page 81

1  Q  Is there any other, other than using the conditioning
2     tool and the Kelley Blue Book and then looking at the
3     different values that are produced, is there any
4     other tool other than the AudaSource diminished value
5     tool and that Kelley Blue Book tool that you're aware
6     of being used in the state of Washington to determine
7     the actual amount of loss?
8  A  **I don't know if it's still currently being used, but**
9     **we have, on occasion, used the formula that came out**
10    **of the Georgia case.**
11 Q  Okay.
12 A  **It kind of depends on the car and the facts and what**
13    **seems to be the most appropriate.**
14 Q  Okay.  So you've used the Georgia formula at times.
15    You obviously now use the AudaSource on every case
16    where it's claimed.  And you use this Kelley Blue
17    Book different conditioning tool.
18       Any other source that you're aware of used in the
19    state of Washington to determine the amount of
20    diminished value?
21 A  **Well, again, it's not really a source, but it was one**
22    **of the exhibits we talked about earlier, that**
23    **spreadsheet.**
24 Q  Yeah.  And my question wasn't clear.  After 2010.
25 A  **Oh, yeah.  And they may still use the spreadsheet.**

Page 82

1  Q  Okay.
2  A  **I don't know.**
3  Q  Okay.
4  A  **In some other format.**
5  Q  Okay.  Something like that.
6       Are you aware of American Family hiring in the
7     state of Washington individual adjusters to determine
8     the amount of diminished value on any loss?
9  A  **Specific to UIM?**
10 Q  Yeah.
11 A  **I'm not aware of us doing that on a UIM, no.**
12          MR. NEALEY:  No further questions.
13          MR. BENNETT:  Nothing.
14             (Signature reserved.)
15             (Deposition concluded at
16             2:07 p.m.)
17
18
19
20
21
22
23
24
25

Page 83

1    STATE OF WASHINGTON )   I, Eva P. Jankovits, CCR,
                        )   a certified court reporter in
2    County of King     )   the State of Washington, do hereby
                             certify:
3
4
        That the foregoing deposition of WADE A. NIELSEN
5    was taken before me and completed on November 6, 2014, and
     thereafter was transcribed under my direction; that the
6    deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
7    objections, motions and exceptions;
8        That the witness, before examination, was by me
     duly sworn to testify the truth, the whole truth, and
9    nothing but the truth, and that the witness reserved the
     right of signature;
10
        That I am not a relative, employee, attorney or
11   counsel of any party to this action or relative or employee
     of any such attorney or counsel and that I am not
12   financially interested in the said action or the outcome
     thereof;
13
        That I am herewith securely sealing the said
14   deposition and promptly delivering the same to
     Attorney Scott P. Nealey.
15
        IN WITNESS WHEREOF, I have hereunto set my hand
16   and affixed my official seal this 11th day of November,
     2014.
17
18
19
20
21
22
23
        Eva P. Jankovits, CCR
24      Certified Court Reporter No. 1915
        (Certification expires 7/3/14.)
25