# Exhibit "8"

Transcript of the Testimony of

## Matthew L. Fuqua
November 4, 2014

## Butler v. American Family
No. 3:14-cv-05305 RBL



## Byers & Anderson

**Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316**  Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Taccoma, WA 98403-3360
Tacoma: **253 627-6401**  Fax: **253 383-4884**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JEFF BUTLER, individually and as )
the representative of all persons )
similarly situated, )
                                  )
            Plaintiffs, ) No. 3:14-cv-05305 RBL
                                  )
      vs.                         )
                                  )
AMERICAN FAMILY MUTUAL INSURANCE )
COMPANY and AMERICAN STANDARD )
INSURANCE COMPANY OF WISCONSIN, )
foreign insurers,               )
                                  )
            Defendants.           )

DEPOSITION OF MATTHEW L. FUQUA
November 4th, 2014
Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square   2208 North 30th Street, Suite 202
600 University St.   Tacoma, WA 98403
Suite 2300        (253) 627-6401
Seattle, WA 98101   (253) 383-4884
(206) 340-1316      scheduling@byersanderson.com
(800) 649-2034      www.byersanderson.com
Serving Washington's Legal Community Since 1980

Page 1

---

APPEARANCES

For the Plaintiffs:

    Scott P. Nealey
    Attorney at Law
    593 Jersey Street
    San Francisco, CA 94114
    415.857.1934
    925.344.8599 Fax
    Snealey@nealeylaw.com

For the Defendants:

    John A. Bennett
    Bullivant Houser Bailey, PC
    888 SW Fifth Avenue
    Suite 300
    Portland, OR 97204-2017
    503.228.6351
    503.295.0915 Fax
    John.bennett@bullivant.com

Page 2

---

EXAMINATION INDEX
EXAMINATION BY:                    PAGE NO.
MR. NEALEY                         6


EXHIBIT INDEX
EXHIBIT NO.   DESCRIPTION          PAGE NO.
Exhibit No. 1  2-page Autosource document     31
        entitled, "Diminution of Value,"
        AMFAM_M000328 through
        AMFAM_M000329

Exhibit No. 2  10-page Autosource document    31
        entitled "Autosource Diminished
        Value Workflow Quick Reference
        Guide, American Family,"
        AMFAM_MM001704 through
        AMFAM_MM001713

Exhibit No. 3  1-page affidavit dated 8/12/2014   55
        with 24-page policy attached,
        POLICY_M000001 through
        POLICY_M000025

Exhibit No. 4  31-page document entitled,     70
        "American Family Insurance
        Certified Repair Program Shop
        Guidelines," dated 2/2014,
        AMFAM000001 through AMFAM000031

Exhibit No. 5  1-page document entitled, "ICS:   80
        View Vehicle 00-185-054775,"
        AMFAM_M000007

Exhibit No. 6  1-page document entitled, "ICS:   82
        FYI - Note(s) Added 00-185-054775,"
        AMFAM_M000011

Page 3

---

EXHIBIT INDEX (continued)
EXHIBIT NO.   DESCRIPTION          PAGE NO.
Exhibit No. 7  1-page document entitled, "ICS:   84
        Financial Summary &
        Transactions," prepared 7/29/2014
        by Angela M. Zitzelsberger,
        AMFAM_M000044
Exhibit No. 8  14-page document entitled, "ICS:   86
        Print Notes for 00-185-054775,"
        dated 7/29/2014, AMFAM_M000045
        through AMFAM_M000058

Exhibit No. 9  3-page document entitled, "First   87
        Notice of Loss, Claim No.
        00-185-054775," AMFAM_M000062
        through AMFAM_M000064
Exhibit No. 10  2-page ISO claim search match    88
        report summary, AMFAM_M000077
        through AMFAM_M000078
Exhibit No. 11  2-page e-mail to Carrie Bartley   89
        from Carrie Bartley with vehicle
        evaluation assessment attached,
        AMFAM_M000079 through
        AMFAM_M000080
Exhibit No. 12  13 pages of e-mail between     91
        Mike Harber, Connie Pejka,
        Stephen Hansen, Debra Hayes,
        Scott Nealey, Bryce Meyer, Mike
        Harber, Bryce Hilden and Matt
        Fuqua, HARBER000119 through
        HARBER000131
Exhibit No. 13  10-page document pertaining to   97
        Supplement 4, AMFAM_M000229
        through AMFAM_M000238
Exhibit No. 14  17-page document entitled,     98
        "Declaration of Records
        Custodian," dated 10/29/2014,
        ALLSTATE000001 through
        ALLSTATE000017

Page 4

**Page 5**

EXHIBIT INDEX (continued)

EXHIBIT NO.    DESCRIPTION                     PAGE NO.

Exhibit No. 15  3-page estimate dated 8/1/2014,    102
                HARBER000051 through HARBER000053

Exhibit No. 16  4-page document pertaining to      110
                Supplement 1, HARBER000047
                HARBER000050

Exhibit No. 17  5-page e-mail to Mike Harber from  110
                Matt Fuqua pertaining to
                Supplement 2 dated 10/31/2014

Exhibit No. 18  12 pages of e-mails between        116
                Connie Pejka, Mike Harber,
                John Roberts, Scott Nealey,
                Matt Fuqua, and Bryce Hilden,
                HARBER000134 through HARBER000135

Exhibit No. 19  2 pages of e-mails between Mike    117
                Harber and Matt Fuqua,
                HARBER000152 through HARBER000153

**Page 6**

1   BE IT REMEMBERED that on Tuesday,
2   November 4th, 2014, at 1700 Seventh Avenue, Suite 1810,
3   Seattle, Washington, at 9:35 a.m., before Laura L. Ohman,
4   Certified Court Reporter, CCR, appeared MATTHEW L. FUQUA,
5   the witness herein;
6   WHEREUPON, the following proceedings
7   were had, to wit:
8
9   <<<<<< >>>>>>
10
11  MATTHEW L. FUQUA, having been first duly sworn by the
12          Certified Court Reporter, testified as
13          follows:
14
15          EXAMINATION
16  BY MR. NEALEY:
17  Q  Mr. Fuqua, we met briefly.
18     And have you ever been deposed before?
19  A  No.
20  Q  Okay. I'm sure your lawyer told you the rules, but I'll
21     give them to you so that nobody can say that I didn't at
22     the beginning of the deposition.
23     We have a court reporter here and she is taking down
24     whatever we say. And she can only take down one person
25     at a time, so I will try to end cleanly, but you might

**Page 7**

1   wait 3 or 4 seconds before you respond.
2   A  Okay.
3   Q  Perfect. And she cannot take nonverbal responses, so
4      frequently in conversations we nod or something like
5      that. You have to say like you did; okay?
6   A  Okay.
7   Q  Perfect. And a couple seconds also gives an opportunity
8      for your counsel to object, if he wishes to. Those are
9      for the record. If he instructs you not to answer or you
10     need to take a break, you can obviously take one, but you
11     need to answer the question unless he instructs you not
12     to; understood?
13  A  I understand.
14  Q  Okay. And if anything I say is unclear to you, if I use
15     terminology -- or sometimes I mix up dates; I get the
16     year wrong. I mean, we do all these sorts of things. If
17     there's anything about my question that's unclear or you
18     don't understand, feel free to let me know.
19  A  Okay.
20  Q  Okay. And sometimes during the deposition we will answer
21     and you'll come back and realize after you left the room
22     that you've -- you either said something you think might
23     not be right or you remember some extra details. Feel
24     free to come back on. You can just say, "I remembered
25     something extra," or, "I remember a little differently,"

**Page 8**

1   and we'll just put it on the record; fair?
2   A  Fair enough.
3   Q  Okay. And then, at the end, the reporter will type up
4      the question and answer and you'll have an opportunity to
5      review that and to make any changes or additions to it
6      you think are necessary; however, if there were to be a
7      trial of this matter, we can, in the State of Washington,
8      comment on any changes or additions that are made to the
9      transcript, so to the extent you can fix something today
10     or -- accuracy is appreciated to this point; understand?
11  A  I understand.
12  Q  Okay. Any questions?
13  A  Not yet.
14  Q  Okay. And, sir, can you just spell your name for the
15     record.
16  A  It's Fuqua, spelled F-u-q-u-a.
17  Q  And then that helped me too because I was going to ask
18     you how to pronounce your name and now I know how.
19     Okay to call you "Matt"?
20  A  That's fine.
21  Q  Okay. And, Matt, what is your current title with Am Fam?
22  A  Certified repair program senior reinspector.
23  Q  Certified repair program reinspector?
24  A  Yeah.
25  Q  Okay. Is that a line position, or is that a management

Matthew L. Fuqua
November 4, 2014

1 position?
2 A It's a line, non-manager.
3 Q Non-manager; okay.
4 And what is your -- what is your territory that you
5 work within?
6 A Primarily from as far north as Auburn and then down south
7 to Longview, and there's also a handful of shops in
8 Eastern Washington in the Spokane area, Tri-Cities and a
9 couple in northern Idaho.
10 Q Okay. Now, you say as far north as Auburn.
11 Is that just that you don't have any DRP shops north
12 of Auburn, or...?
13 A We do. There are two of us in the state, and that's kind
14 of the line that divides our territories.
15 Q Okay.
16 A We back each other up whenever one of us is off, but
17 that's as far as my shops go.
18 Q Okay. And Longview is obviously on the Oregon border or
19 pretty close --
20 A Correct.
21 Q -- so... (Pause.)
22 Okay. Okay. And how many certified repair facility
23 shops are within your territory?
24 A 22 to 24.
25 Q Do you know approximately how many repairs they do a
Page 9

1 year? I just -- I don't --
2 A Right.
3 Q Just an estimate, if it's a thousand or two thousand.
4 A Between around --
5 MR. BENNETT: Well, excuse me. For Am
6 Fam?
7 MR. NEALEY: Yeah. Just for Am Fam.
8 THE WITNESS: For the whole state?
9 Q (By Mr. Nealey) Well, I mean, if you can give it to me
10 for the state, that's great. If there's two of you
11 guys --
12 A I have --
13 Q -- that's fine.
14 Yeah.
15 A I have approximately 22 to 24 hundred --
16 Q Okay.
17 A -- repairs a year.
18 Q And when you say "repairs," does that include both
19 first-party and third-party repairs?
20 A Yes.
21 Q Okay. And are half of those first party and half of them
22 third party or a few more of them are first party?
23 A I would say the majority of them are first party.
24 Q Like 60, 70 percent, or...?
25 A That's reasonable.
Page 10

1 Q Okay. Now, I know under the DRP program -- and I have
2 the guidelines that you do reinspections of a certain
3 number of vehicles.
4 What percentage of the first-party repairs do you
5 guys do reinspections on?
6 A I wouldn't be able to necessarily break it up in first
7 party versus third party.
8 Q Okay.
9 A I reinspect approximately maybe 20 a month.
10 Q Okay.
11 A And just to clarify, that's in person. I'm also auditing
12 from a desk many more than that.
13 Q Okay. And I understand that.
14 And certain -- and when you say reinspect from the
15 desk, you have access on any claim to any photographs
16 that are in the file -- to the claim file and then to the
17 repair estimates; right?
18 A Correct.
19 Q And so if you have a question or need to do something,
20 you can either look at the photographs, if there are any
21 in the repair estimates, or, if necessary, you can go
22 look at the car?
23 A Correct.
24 Q Okay. Now, when you do the reinspections, 20 per month,
25 what portion of those are just reinspections that you do
Page 11

1 to see if the shops are doing what they need to do as
2 opposed to reinspections because there's a particular
3 issue that's arisen with the customer or the shop that
4 needs to be addressed?
5 A Majority are just random reinspections.
6 Q Okay. And those are to see that the shops are doing what
7 they're supposed to be doing?
8 A Correct.
9 Q Okay. And when say a "majority," are we talking 12, 13 a
10 month or 14 a month or almost all of them?
11 A I wouldn't give a number, but maybe more of a percentage
12 of 90 percent.
13 Q Okay.
14 A There might be a month where I've looked at more or,
15 depending on my vacation schedule or workload, maybe I've
16 looked at less, but I would say a high percentage of them
17 are just random reinspects --
18 Q Okay.
19 A -- that were at the shop while I was there.
20 Q Okay. And you don't go to look at a particular repair;
21 you go to the shop and see, knowing that there might be a
22 couple of Am Fam vehicles in the shop, and you just look
23 at those?
24 A Not every time. Sometimes I'm going to a shop for a
25 particular repair.
Page 12

1 Q  Okay.  And that wouldn't be one of these random ones;
2   those would be -- or would they be random?
3 A  No.  If I'm going to a shop to look at a particular
4   repair, it's probably not for a random reason.  I've
5   identified some reason I want to see it in person.
6 Q  Okay.  So, for example, in this -- well, the vehicle
7   involved in this lawsuit, Bryce Meyer's car, when you
8   went, that wasn't a random inspection; you just went
9   because there were issues with the Bryce Meyer repair and
10   you wanted to look at the car?
11 A  When I looked at it the first time while the repairs were
12   in process, it was a random reinspection.
13 Q  Okay.  When did you do a random reinspection of it?
14 A  I would have to look at the date.  It was while the
15   repairs were in process.  I would say somewhere in I
16   think May.
17 Q  Okay.
18 A  I would have to double-check when it was.
19 Q  Okay.  That's a detail that I guess I missed, so I'm
20   happy to know it.
21     So you did a random reinspection of the vehicle when
22   it was in Barrett's originally?
23 A  Yeah.
24 Q  Okay.  Did you take photographs at the time?
25 A  I typically take one or two photographs just to show I

Page 13

1 A  I don't recall if -- how far along the repairs were,
2   but it's a situation while I was at the shop and they had --
3   that vehicle was there, so I got a copy of their estimate
4   just to look it over to make sure I agreed with the
5   estimate.  And, at that time, I didn't make any changes
6   to their estimate.  I don't remember the particulars of
7   what I -- of -- let me rephrase it.  Basically, I didn't
8   see anything that warranted changing of the estimate.
9 Q  Okay.  Now, when you look at the estimate, was the
10   vehicle partially disassembled at the time, or was it in
11   its crashed condition?
12 A  I believe it was torn down.
13 Q  Torn down?
14 A  Disassembled.
15 Q  Okay.  But they hadn't actually started to reassemable
16   the car and do the repair work on it?
17 A  I would have to review the photos.  I -- if I remember
18   correctly, it was not started yet, but I could be wrong
19   about that.
20 Q  Okay.
21 A  It was either in the early stages of the repair or they
22   hadn't started.
23 Q  So when you're doing the reinspection, are you inspecting
24   to see if the damage shown on the estimate reflects the
25   damage you see on the vehicle, or are you reinspecting

Page 15

1   was there and I looked at it.  Almost every time -- there
2   are occasional times where the photographs don't make it
3   in or I forgot to, but I would say out of almost nearly
4   all, I'll take one or two photos.
5 Q  Okay.  So you did look at Bryce Meyer's vehicle when it
6   was in the process of being repaired?  Is it -- the first
7   time -- let me -- so that the questions are a little
8   clearer, there was a first repair that took place in the
9   time frame of April to May 2014 at Barrett's; correct?
10 A  That sounds about right.
11 Q  And just for ease, can we just call that the first
12   repair, the Barrett repair?
13 A  That's fine.  Either --
14 Q  Okay.
15 A  -- is fine with me.
16 Q  Okay.  And then there's a second set of repairs which
17   took place in the -- in the July and forward which were
18   done at Metro Auto Rebuild?
19 A  Correct.
20 Q  Okay.  And we'll call those the second repairs.
21 A  Okay.
22 Q  So in the first set of repairs, you looked at the vehicle
23   when it was at Barrett's.
24     At the time, what were you inspecting the vehicle
25   for?

Page 14

1   for some other reason?
2 A  There's a variety of reasons I would reinspect it.  One
3   is to make sure I agree with the shop's decisions of the
4   repair or replace decision; their part usage, used
5   aftermarket OEM to make sure they're following our
6   guidelines; and then also looking to see if there's any
7   damage that they may have put on their estimate that I
8   don't -- that I'm questioning as it relates to the loss.
9 Q  Okay.
10 A  So on a random inspection, I don't -- I'm looking for
11   anything, but typically find nothing of -- in this case,
12   I made no changes.
13 Q  So if I were to summarize, the first thing you mentioned
14   is you're looking to see if they're making what you would
15   consider to be appropriate decisions on replacing parts
16   as opposed to repairing them, and that's because when you
17   replace parts, it tends to be more expensive than to
18   repair them all?
19 A  It's not an issue of cost.  It's an issue of what's the
20   right repair for this job.
21 Q  Well, would you agree that especially if they're not --
22   they are a non-OEM replacement, that buying new parts, on
23   average, is going to be more expensive than repairing
24   them?
25 A  It would depend on how much repair.  There are some

Page 16

4 (Pages 13 to 16)

1  panels that would cost more to repair, and there's
2  also -- there's more factors than just repairing versus
3  the cost. There's associated operations with replacing a
4  panel that would make it more costive [sic] to replace,
5  or if it's a -- not a very expensive panel, it's a
6  bolt-on versus a weld-on, it might be more cost-effective
7  to replace versus repair; however, it's still more of a
8  decision of what's the best decision for that repair.
9  Q  But when you're making that decision and looking at the
10  estimate, I mean, are you often finding yourself in a
11  situation where you think they're, for instance,
12  repairing the part or replacing the part and you think
13  they should do the opposite that would cost more money?
14  Does that happen more often?
15  A  Can you rephrase -- can you repeat that?
16  Q  Do you find yourself on reinspections very often in a
17  situation where you look at the estimate and the estimate
18  done by the DRP shop calls for, say, repairing the par
19  and, yet, when you look at it, you decide that you should
20  spend more money and replace the part that you're --
21  you're changing the estimate to do a more expensive
22  repair process?
23  A  I can't recall off the top of my head times I've done
24  that, but there have been times when they might have
25  repaired a part and I'll ask the technician or the -- or
Page 17

1  the estimator, "Are we going to repair this panel," and
2  he says, "Well, we're going to do an attempted repair,"
3  and then might put an hour or two into it and change
4  their mind. I would not -- I don't recall a time where I
5  have seen a repair decision made by the shop where I
6  adamantly disagreed with their decision, because
7  ultimately they stand behind their work and they're not
8  going to do a repair if they can't end with a quality
9  product, but, once again, there have been times where
10  they have attempted a repair and then changed their mind.
11  Q  Okay. So would it be fair to say that the vast bulk of
12  time when you're look at the distinction between repair
13  and replace you're finding that the estimate is going the
14  direction that is going to end up costing more money than
15  a different course and... (Inaudible.)
16         THE COURT REPORTER:  What was that
17  last part?
18  Q  (By Mr. Nealey)  That it will -- the repair shop is going
19  a direction that will end up costing more money and you
20  intervene and suggest they go a different direction.
21  A  Could you rephrase the question?
22  Q  Okay. Yes, I can.
23  A  I think I understand your question, but I want to --
24  Q  Yes. I want to be clear.
25     If I'm understanding your testimony, there are a few
Page 18

1  times when you've come and had discussions with them and
2  it looks like the repair shop might be going down a
3  repair route and it's been a couple of hours and spent
4  some money trying to repair and end up having to replace
5  anyway and you intervene at that point because you think
6  it would end up costing more money to do that.
7  A  No. I would disagree with that.
8  Q  Okay.
9  A  There might be times when I've questioned "is this the
10  right thing to do for this job? Is repairing or
11  sometimes replacing the right thing to do?" And I will
12  discuss it with the slop. But the cost -- what's the
13  least expensive option is not a very important factor for
14  me. It's what's right for the job.
15  Q  And I understand that in the overall.
16     My questions are a little more specific. And maybe
17  I'll just ask it this way:  Can you recall a time when
18  you have come and you've got an estimate in front of you
19  from the DRP shop and you have said, "No, instead of
20  repairing it, I want you to replace it," or, "Instead of
21  replacing it, I want you to repair it," and you increase
22  the amount of the estimate because you think it should be
23  done a different way; you actually increased the amount
24  you're going to pay on the repair?
25  A  There have been times when, after my reinspection, the
Page 19

1  estimate has gone up because of changes I've identified
2  or made, either additional damage that I found or parts
3  decisions that I've not agreed with. I would say my goal
4  is not to make the estimate go down but to make sure it's
5  following our guidelines and is accurate.
6  Q  And I understand that you may when you look at the things
7  see something that somebody has missed, but putting aside
8  when you see something they've missed, when you've gone
9  and the decision is being made to repair or replace a
10  part on a vehicle and the body shop -- the DRP shop has
11  made a recommendation, can you think of a time when you
12  said, "No, I want you to do it the opposite way," repair
13  versus replace, and then as a result of that, you had
14  increased the amount that would be on the estimate?
15         MR. BENNETT:  Object to asked and
16  answered.
17         THE WITNESS:  I can think of times
18  where I have questioned their decision to replace a
19  panel, and after discussing it with the shop, I
20  ultimately agreed with their decision. I cannot think of
21  a time where I've disagreed with a shop and they've
22  disagreed with me and they conceded to what I wanted and
23  then repaired something they didn't feel comfortable
24  repairing.
25  Q  (By Mr. Nealey)  Can you think of a time where you've
Page 20

1   gone and increased the estimate for the repair by
2   disagreeing with the decision of repair versus replace?
3  A  I cannot think of a specific time, no.
4  Q  Okay.  Now, the second one you did was parts usage, and
5   that involves whether you use recycled or aftermarket or
6   new parts; correct?
7  A  Correct.
8  Q  And when DRP shops are doing repairs for Am Fam, they're
9   supposed to use recycled parts, if they're available, and
10  then non-OEM and then only then new parts; correct?
11 A  We have guidelines to follow that when we want them to
12   look for used or aftermarket or reconditioned parts over
13   new OEM.
14 Q  And one of the issues you're looking for in a
15   reinspection is whether they inspect -- checked to see if
16   there are recycled parts or new aftermarket parts, and if
17   they fail to do so, that's one of the things you flag on
18   your inspections; right?
19 A  If there are times when there's an aftermarket or
20   recycled part available and it's not on the estimate, I
21   ask for a reason why.  And there's plenty -- there are
22   acceptable reasons why not.  It starts as a question why,
23   and then I'll determine if they've made the wrong
24   decision or not.
25 Q  But -- and I recognize that.  I mean, sometimes the part

Page 21

1   turns out not to be available or sometimes it's so far
2   away that it will delay the repair.  I mean, there's a
3   lot of reasons, but one of the things you're looking for
4   when you're doing these inspections is not just repair
5   versus replace, the second thing you're looking for is
6   whether they've followed the American Family guidelines
7   for use of recycled or used parts and then non-OEM parts
8   before using OEM parts; right?
9 A  I would agree with that.
10 Q  And the third thing you mentioned is you want to check
11   the damage on the vehicle.
12     Is that to make sure that things aren't on the
13   estimate that don't need to be repaired?
14 A  Correct.
15 Q  Okay.  Okay.  How often when you go out and do a
16   reinspection -- and I'm just talking about the random
17   reinspections, not when you have a particular issue, but
18   when you do a random reinspection, how often when you
19   look at the car do you find additional damage that's not
20   listed on the estimate and you add it?
21 A  I wouldn't be able to give you a percentage.  It's not
22   common, but it is something that happens a few times, and
23   it would be hard to put a number or a percentage.  It's
24   not a rare thing, but it's not uncommon either.
25 Q  Okay.  Now, when you're doing these reinspections, during

Page 22

1   the repair process, your goal is to see if the Am Fam
2   guidelines have been followed; is that correct?
3 A  Correct.
4  Q  And do you have a particular standard that you're trying
5   to meet in the repair process?
6 A  What do you mean by "standard"?
7  Q  Well, are you familiar with the term pre-loss condition?
8 A  I am.
9  Q  Okay.  Are you doing an inspection when you do a
10   reinspection to see if the vehicle is in pre-loss
11   condition?
12 A  Some of my reinspections may be done after the repairs
13   are completed, so I am looking over that -- the items on
14   the estimate have been addressed and look over it for any
15   defects in the repairs to bring it to the shop's
16   attention so they can correct them before the customer
17   picks them up.
18 Q  Okay.  But when you're doing these reinspections when the
19   vehicle is in the process of repair, that's not an
20   inspection to see if the vehicle is in pre-loss
21   condition; right?
22 A  I can see on the -- I'm looking at the estimate to make
23   sure that all the items that will be addressed will bring
24   it to pre-loss condition, but since the repairs are in
25   process, I won't know everything is done until the

Page 23

1   repairs are done.
2  Q  Okay.  How often do you go and inspect cars as part of
3   this process that have been completely repaired and look
4   at the finished car?
5 A  Once again, that's random.  If I'm at the shop and there
6   happens to be one that's done and happens to be out in
7   front before the customer picks it up, which might be a
8   one-day window, then I would on some of these reinspect
9   it, so a few a month.
10 Q  Do you note someplace in the file if -- when you do that,
11   a vehicle has been fully restored to pre-loss condition?
12   Do you make any notations or any indications about that?
13 A  I don't use that terminology.  If it's -- the repairs are
14   done, I'll typically say something like, "I inspected the
15   vehicle after repairs completed.  No issues found."
16 Q  Okay.
17 A  Or just, "I reinspected the vehicle.  No issues."
18 Q  Now, you are currently the -- one of the two certified
19   repair program reinspectors.
20     How long have you worked for Am Fam?
21 A  Approximately, six years.
22 Q  So that takes us back to 2008, approximately.
23 A  Approximately.
24 Q  What did you do before 2008?
25 A  I worked at Progressive Insurance.

Page 24

6 (Pages 21 to 24)

1  Q  Okay. Same job with Progressive?
2  A  Similar. I was a claims adjuster.
3  Q  Okay.
4  A  I had a few different roles.
5  Q  How long did you work for Progressive?
6  A  Approximately, five to six years.
7  Q  Okay.
8  A  I believe from '02 to '08.
9  Q  Okay. And what did you do before '02?
10 A  I was in college.
11 Q  College. Where did you go to college?
12 A  University of Washington.
13 Q  Okay. Have you ever had any -- have you ever worked in a
14    body shop or ever worked in auto collision repair?
15 A  No.
16 Q  Okay. What was your undergraduate in?
17 A  Computer science.
18 Q  Okay. Have you ever taken any courses on auto body
19    repair or auto body techniques?
20 A  I've taken I-CAR classes as well as a Chief class on
21    frames.
22 Q  Okay. Which I-CAR classes did you take?
23 A  I couldn't remember, but I think I took 20 to 15 total
24    over maybe a two- to three-year period. There was a
25    period where I was I-CAR-certified, and the only reason
Page 25

1  I'm not, I believe there's continuing education you need
2  to do, but I don't remember every class I took.
3  Q  Okay. And the I-CAR classes are usually a couple of
4    hours?
5  A  Yeah. I think they're one to two hours in a classroom.
6  Q  Okay. And the Chief is a particular type of frame
7    machine; correct?
8  A  I believe so, yes.
9  Q  Okay. And you had a -- you take the introductory courses
10    and then the hour course, or did you take a longer --
11 A  I took -- I took the long course. It was several days.
12 Q  Several days; okay.
13    Did any of your I-CAR courses, did they involve
14    painting?
15 A  I believe I took one on refinishing.
16 Q  Okay. And you understand that the aftermarket collision
17    repair, the paint process is different than that used in
18    the original OEM factories; right?
19 A  My understanding, yeah, it's not painted the same way as
20    from the factory.
21 Q  Yeah. And when they build it in what's called a body
22    shop in the original OEMs, they heat the entire vehicle
23    and then spray the paint on them; right?
24 A  Can you -- what was the question?
25 Q  I said the -- the process is not the same and one of the
Page 26

1    differences is when they paint in the factory, they paint
2    without anything inside and they paint just the bare
3    metal and they heat the whole thing up to a very high
4    temperature; right?
5  A  I don't know.
6  Q  You don't know. Okay. You just know it's different.
7    Do you know the differences?
8  A  I believe in the factory they dip -- for one, they dip
9    the entire body of the car, and then I believe when it's
10    painted, it's painted on a factory line all at the same
11    time.
12 Q  Yeah, okay. And obviously you can't -- there's only so
13    much you can do in repainting a car in the aftermarket.
14    You've got to mask. And you can only get it so hot or
15    you set the thing on fire; right?
16 A  I couldn't speak to the temperature, but yes, there's
17    only so much you can do.
18 Q  Yeah, okay.
19    Okay. Now, so the few a month that you inspect
20    vehicles that have been completely repaired, do you just
21    note in the file that you reinspected and that you saw no
22    issues with the repair, or do you include photographs?
23    Is it just a notation in the record?
24 A  I'll typically take one or two photos not to document the
25    repairs so much as to document I was there, and then I'll
Page 27

1    make a note that I reinspected it.
2  Q  Okay.
3  A  And just to clarify, it may have been a month or two
4    since I've done one. There was a period of time where we
5    did a lot more reinspections and I probably looked at
6    them more frequently, but, once again, it's a random
7    number. I could look at three this week. I could look
8    at none for the next month --
9  Q  Okay.
10 A  -- unless it's a targeted inspection and there's a reason
11    for me to go look at it.
12 Q  And obviously -- maybe I'll put it this way, that since
13    the only time you do a reinspection that wasn't targeted
14    of a completed vehicle is more fortuitous, you happen to
15    get there, the repairs are done and the customer hasn't
16    picked it up, so... (Pause.)
17 A  Correct.
18 Q  But you're looking -- when you do those reinspections,
19    you're looking to see if there are any obvious repair
20    quality issues; correct?
21 A  Correct.
22 Q  Now, when you do a reinspection, do you walk around and
23    look at the repair work, or do you actually do any
24    disassembly on the vehicle?
25 A  I just walk around.
Page 28

1  Q  Okay. Do you look underneath panels or remove anything,
2     or do you just look at it visually?
3  A  Look at it visually.
4  Q  Okay. Do you use a -- do you know what a mil gauge is?
5  A  I believe that's to measure the depth of the paint.
6  Q  Yeah.
7  A  No, I do not.
8  Q  Okay. So you know what they are, but you've never used
9     one?
10 A  Correct.
11 Q  Okay. Now, we've used the term "diminished value" in
12    this lawsuit.
13    You've obviously heard the word "diminished value"
14    before; right?
15 A  Yes.
16 Q  Okay. What does "diminished value" mean to you, so I can
17    use your terminology?
18 A  I would say it's the potential loss in value of the
19    vehicle from before the loss to after the loss.
20 Q  Okay. So it's the potential difference between the
21    pre-accident value of the vehicle and its -- the value it
22    would have as a fully repaired vehicle?
23 A  I would agree with that.
24 Q  Okay. Now, have you received any training on the issue
25    of diminished value from Am Fam?

Page 29

1     stickers?
2           THE COURT REPORTER: Go ahead.
3           MR. NEALEY: Thanks.
4     If I don't mark numbers, I'll forget which I've
5     used.
6              (Exhibit No. 1 marked for
7               identification.)
8
9  Q  (By Mr. Nealey) I'm going to mark as Exhibit 1 a copy of
10    a --
11          MR. NEALEY: I actually happen to have
12    an extra one.
13 Q  (By Mr. Nealey) -- of a diminished value assessment that
14    was prepared on Mr. Meyer's vehicle, and it lists here
15    Matt Fuqua as the administrative data.
16    And I take it you're the one who had this run?
17 A  Correct.
18 Q  Okay. Did you receive any training on how to -- how to
19    use the Autosource diminished value tool, or how did you
20    learn how to use this?
21 A  There was training done by Autosource, if I recall. I
22    mean, those have a document on how to -- the process of
23    how to determine what modifiers to select.
24             (Exhibit No. 2 marked for
25              identification.)

Page 31

1  A  No.
2  Q  Okay. Did you receive any when you were at Progressive?
3  A  No.
4  Q  Okay.
5  A  To clarify, I was trained on how to -- to follow the
6     process of evaluating them, but I haven't had any special
7     training on them.
8  Q  Okay. And I'll get to that in a second.
9     Okay. Have you ever been provided or read or heard
10    about a case from Washington State Supreme Court called
11    Mueller Versus Farmers Insurance Exchange?
12 A  I've heard of it, but I don't know all the details of it.
13 Q  Okay. You know that's a DV case?
14 A  That's a -- yes.
15 Q  That's about the limit of your knowledge?
16 A  Correct.
17 Q  Okay. When that came out in 2011, did you get some
18    guidance, or do you remember getting some guidance, or
19    you just sort of heard about it informally, or how do you
20    know about it?
21 A  I would say I heard about it informally. I don't know
22    when the first time I heard about it, but I would say I
23    don't recall any formal notification of it.
24 Q  Okay. Now, you did a DV assessment in this case --
25          MR. NEALEY: Can I get a couple

Page 30

1  Q  (By Mr. Nealey) Okay. I'm going to mark as Exhibit 2 --
2          MR. NEALEY: I only have one copy, I'm
3     afraid.
4  Q  (By Mr. Nealey) Is that the sort of guidance document
5     that you've seen and looked at?
6  A  Yes. I have a copy of that on my computer.
7  Q  Okay. So Exhibit 2, when you go to do one of these, you
8     pull up Exhibit 2 on your computer and it shows you how
9     to follow one?
10 A  Yes.
11 Q  Okay. Now, I don't want to ask you any communication you
12    might have had with counsel, so don't tell me anything
13    you might have said, but how did you come to do a
14    diminished value assessment on Mr. Meyer's vehicle?
15 A  I was made aware through -- that he was making a
16    diminished value claim from Bennett and I then evaluated
17    it.
18 Q  Okay. So is it the normal procedure whenever you hear
19    that somebody is mentioning "diminished value" or making
20    a diminished value claim that you would then go run one
21    of these?
22 A  When a diminished value claim has been assigned to me
23    because they've made a claim to maybe the casualty
24    adjuster who's assigned the claim, then I would start the
25    process --

Page 32

8 (Pages 29 to 32)

1   Q   Okay.

2   A   -- of evaluating it.

3   Q   Okay.  And so just describe for me what that process is

4       for evaluating it.  You know, in this case, an attorney

5       did it, but let's assume -- you know, take the attorney

6       out of the loop and you just hear from a claims adjuster

7       that somebody has mentioned the word "diminished value"

8       or they would like to make a claim for diminished value.

9       What process do you follow?

10  A   First I'd be notified by either the casualty adjuster or

11      my manager, and if it's appropriate for me to have it,

12      then it will be assigned to me.  I'll then send a letter

13      to the owner of the vehicle saying -- to summarize, you

14      know, "You're making a diminished value claim.  Please

15      provide us with this documentation to help us evaluate

16      that claim," and then I would wait for a response.

17  Q   Okay.  Now, do you make a coverage determination as part

18      of it, or somebody has already determined there's

19      coverage for diminished value before it gets to you?

20  A   That's been decided before it gets to me.

21  Q   Okay.  So you send the letter to them and you ask for --

22      and it's a form letter you have?

23  A   Yes.

24  Q   Okay.  And that form letter asks for any information or

25      any estimates on diminished value they might have; right?

Page 33

1   Q   Okay.  What would be the information that they would give

2       you that you might use for the Autosource tool?

3   A   Service records to see if they've maintained it; previous

4       losses, estimates that they've had in another claim that

5       American Family wasn't aware of, they send me estimates

6       so I can see what kind of damage was done.  Primarily,

7       I'm looking for the history of that vehicle --

8   Q   Okay.

9   A   -- as to how it was maintained and if it's been in an

10      accident before.

11  Q   Okay.  So I could summarize the only thing you're going

12      to use from all the information you get from the owner of

13      the vehicle in response to your letter would be any

14      service records or anything that would show a prior loss

15      on the vehicle?

16  A   I would not say that's the only.  That is primarily what

17      I'm looking for.  There's other information that we

18      require that will also give me insight as far as the

19      ownership, possibly whether they paid for the vehicle, and

20      the -- and if it's -- if it has a clear title or not.

21  Q   Okay.  So and then you run the Autosource tool.  And I

22      would just like to ask you what -- what the input

23      sources -- looking at Exhibit 1 here.

24          The first one is the total -- total condition

25      adjusted market value.  Where does that come from?

Page 35

1   A   There have been two different form letters.  One is asked

2       for -- which I don't use this one.  The one asked for if

3       they have any kind of appraisal or any kind of -- to

4       support their diminished value amount.

5   Q   Okay.  Now, when, then, do you go and run the Autosource

6       diminished value tool?

7   A   Typically, I'll do it once they respond to the letter

8       with -- and provide me with any documentation they --

9       either that's outlined in the letter or if they don't,

10      but once they respond, then we'll start evaluating it.

11  Q   Okay.  Do you use any information that you get from them,

12      the client -- well, I guess let me back up a moment.

13          You use this tool for both first-party and

14      third-party claims; right?

15  A   Correct.

16  Q   Okay.  Do you use the same process for first party and

17      third party, or is there some difference in how you

18      assess these?

19  A   Same process, so I would double-check their limits.  That

20      would be the only difference.

21  Q   Understand.

22          So when you use the Autosource tool, do you use any

23      of the information that they give you as part of running

24      the Autosource tool?

25  A   Sometimes.

Page 34

1   A   That number is derived from Autosource.  I'm honestly not

2       sure if it still uses NADA value to populate that number

3       or it does it through its own market search that it has

4       the capability to do.

5   Q   Okay.

6   A   Because, at that point, we've already entered all the

7       options of the vehicle and the mileage, but that number

8       is populated by Autosource.

9   Q   Okay.  And, at one point, you know that Autosource was

10      using NADA and you think they may sometimes be using that

11      or something different at this point?

12  A   I'm not sure what their methodology is to come up with

13      the market value for this report.

14  Q   Okay.  What input is -- do you have to put in for it to

15      come up with the adjusted market value?

16  A   I'm sorry.  Can you repeat that.

17  Q   What input do you have to put in for it to come up with

18      the adjusted market value?

19  A   Typically, that has already been inputted.  It is pulled

20      from the estimate written by the shop.

21  Q   Okay.

22  A   So it starts by decoding the VIN, and then you can

23      manually select additional options.  Some VINs now

24      automatically will decode all options on the vehicle and

25      sometimes you still have to go double-check options that

Page 36

9 (Pages 33 to 36)

1 may not have been selected, and I don't believe for the
2 market value -- I don't know if that takes mileage into
3 consideration because also there's a mileage adjustment.
4 I assume for the market value there's already been a
5 mileage adjustment for the -- for the value of the
6 vehicle.
7 Q Okay.
8 A That would be -- I guess in this case would be a pre-loss
9 value.
10 Q Okay. Now, so that market value then is pulled from the
11 information off the estimate, so you don't even have to
12 input anything, it just populates the field?
13 A That is correct. There might be circumstances where I
14 double-check the options, but, otherwise, if it's simply
15 I take the shop's estimate and start this report or if
16 it's an estimate that a field adjuster has written, that
17 number would already -- there would be -- it is potential
18 that I'll make no changes to the existing estimate to get
19 that number.
20 Q Okay. Now, is that adjusted market value, is that a
21 market value as of the time of the accident or the time
22 of the report being run?
23 A My understanding, it's based on the date of loss. So on
24 this report, it says 4/14, so that would be the value at
25 4/14.

Page 37

1 Q Okay. And so that's because when you're assessing a
2 loss, you don't assess it at the date the claim is being
3 made, months or -- or sometimes years later; you assess
4 it as of the date of the loss; right?
5 A That is correct.
6 Q Okay. So Mr. Meyer's vehicle, according to this report,
7 would have had a value on 4/14/14, which is the date of
8 his accident, of $24,225?
9 A According to this report, yes.
10 Q Okay. And these are reports that you run -- that Am Fam
11 uses day in and day out in its normal business; right?
12 A I don't know how often Am Fam uses it, but this is the
13 report that I use.
14 Q Okay. Okay. And, well, these values that are used for
15 market value at the time of the accident, you also use
16 these in settling total losses; right?
17 A That's where I would say I don't know if the same
18 methodology is used for this -- for a DV report versus a
19 total loss report. It very well could be.
20 Q Okay. Do you also use Autosource for total losses?
21 A Yes, we do.
22 Q Okay. Now, then there's a value adjustment, and that's
23 10 percent.
24 That is just a number that's thrown in there of a 10
25 percent loss of value; right?

Page 38

1 MR. BENNETT: Object to the form.
2 THE WITNESS: That is the starting
3 point that Autosource uses for its methodology.
4 Q (By Mr. Nealey) Okay. And that has been preset by Am
5 Fam; right?
6 A I don't know where that -- how --
7 Q Okay.
8 A -- to determine if that's Am Fam or Autosource.
9 Q Okay. I'll direct you to Page 4 here and see if this
10 reflects -- refreshes your recollection. If you look at
11 Item 16, it says, "American Family has preset" [sic] "to
12 use Autosource values and has" -- it's hard for me to
13 read upside down, "and the starting diminished value is
14 based on 10 percent of the fair market value of the loss
15 vehicle."
16 Does that refresh your recollection whether 10
17 percent is set by Am Fam or it's set by Autosource?
18 A I don't recall.
19 Q Okay. That's fine.
20 A I probably read this whole document early on and now use
21 it as a reference, but that's the first time that part
22 has been pointed out to me.
23 Q Okay. But another way of putting it, whether 10 percent
24 was set by Am Fam or it was set by Autosource doesn't
25 really matter; you're using the tool that you've been

Page 39

1 given?
2 A Correct.
3 Q Okay. And, similarly, you have no information whether 10
4 percent is a starting point for diminished value for Mr.
5 Meyer's vehicle, whether that is accurate or not
6 accurate? You don't have any information?
7 A Can you rephrase the question?
8 Q If we're going to start looking at a -- what they just
9 call a value adjustment for diminished value, you don't
10 know whether the value adjustment in reality on Mr.
11 Meyer's particular vehicle, whether that would be 10
12 percent or 20 percent or 5 percent or 15 percent?
13 A I personally do not know.
14 Q Okay. You're just relying on the number that's in the
15 computer that -- you don't know whether it's accurate or
16 not?
17 A Well, I will clarify this is a guide for evaluating, but
18 that is the number it starts with.
19 Q Okay. Good.
20 And then there's obviously a mileage modifier, and
21 that would have been the mileage at the time of the
22 accident on 4/14/2014; right?
23 A Correct.
24 Q Okay. And then there's a damage modifier, and you
25 actually put in the damage modifier, and you picked that

Page 40

10 (Pages 37 to 40)

1    based upon the estimate; right?
2  A  Correct.
3  Q  Or does the computer do that?
4  A  No.  I select which modifier to use for the current
5    damage.
6  Q  Okay.  And you determine then that looking at the
7    modifier options that Mr. Meyer's vehicle had major
8    damage to structure and panels; right?
9  A  Based on the description given by Autosource, I selected
10    that modifier.
11  Q  Okay.  And you're -- you're not doing this by looking at
12    the vehicle; you're doing this by looking at the repair
13    estimate; right?
14  A  Yes, and also the photos of the damage at the time, but
15    primarily looking at what was done on the vehicle.
16  Q  Okay.  So put it another way, you can run this Autosource
17    diminished value without ever looking at the vehicle?
18  A  I'm sorry.  What?
19  Q  You can run this Autosource diminished value report
20    without ever looking at the vehicle?
21  A  Without looking at it in person, yes.
22  Q  Yes.  And, in fact, you've done that number of times;
23    right?
24  A  Correct.
25  Q  Okay.  So you picked a -- the damage modifier of major

Page 41

1    damage to structure and panels, and there's a description
2    down here.
3  A  Are you looking for the description of the modifier?
4  Q  Yes.
5  A  I think it's the last -- close to the last page.
6  Q  There you go.  You're right.
7    What about Mr. Meyer's vehicle led you to say that
8    it had major damage to structure and panels as opposed to
9    having moderate damage to structure and panels or severe
10    damage to structure and panels?
11  A  Well, what I would do is typically start the most severe
12    one and see if it qualifies.  In this case, it did not
13    qualify for severe damage based on their description.
14    For major damage, it says it requires to replace in three
15    or more panels, which it did, which his vehicle did have
16    done, and -- and use the word "and" "repair or
17    replacement of a frame assembly or repair to frame or
18    unibody," which, in this case, his vehicle did.
19  Q  Okay.
20  A  And for moderate, it -- once it qualifies for major, it's
21    obviously beyond moderate damage.
22  Q  Okay.  So you work up and -- and since he had three or
23    more panels and frame or structural damage, it was major.
24    What -- what caused you to say that it was not
25    severe damage to structure and panels?

Page 42

1  A  Well, it says a lot of components, so I'll just take them
2    one at a time.  It says, "Replacement of one or more
3    major components required": "Engine," which it did not;
4    "complete corner suspension," which I don't believe it
5    did; or front and rear assembly, which it did not; and --
6    well, now that it has the word "and," it had none of
7    those components in it, so, therefore, it did not qualify
8    for severe.
9  Q  Okay.  Okay.  And moderate damage to structure and panels
10    is a 50 percent adjustment, can just be body damage
11    without frame and structure; is that correct?
12  A  Can you repeat the question?
13  Q  The difference between moderate damage and -- and major
14    damage is that major damage has additional structural
15    frame damage; right?
16  A  Correct.  In addition to that, it says -- for moderate,
17    it says repair to three or more panels or replacement of
18    two, while major requires replacement of three or more
19    panels.
20  Q  Okay.  How about a vehicle that had like eight panels on
21    it that were repaired, none of them replaced and you had
22    frame and structure damage; would you consider that to be
23    major damage or moderate damage?
24  A  Where no panels were replaced, so it's exterior damage to
25    every panel, let's say, and there was frame damage of

Page 43

1    some kind?
2  Q  Yeah.
3  A  By this terminology, that would not be major damage
4    because there was no replacement of any panels.
5  Q  Okay.  Okay.  But in drawing a distinction between
6    moderate damage and major damage, what puts Mr. Meyer's
7    vehicle in major damage versus moderate is the fact he
8    had frame or structural damage as well?
9  A  That is one of the differences in addition to three or
10    more panels being replaced.
11  Q  Okay.  Okay.  And then prior damage, you found that there
12    was no prior damage of Mr. Meyer's vehicle; is that
13    correct?
14  A  Correct.
15  Q  Okay.  And how did you go about finding there was no
16    prior damage to Meyer's vehicle?
17  A  After the vehicle was repaired, there was not any prior
18    damage that I was aware of.
19  Q  Okay.  I don't -- you mean as part of the repair process,
20    nobody noted that there had been prior damage?
21  A  I don't recall.  I don't know.  I would have to review
22    the initial claim when they took the file if they noted
23    any prior damage, but when the repairs were completed, I
24    don't recall there being any remaining damage on the
25    vehicle.  Now, there may be very minor like a -- it might

Page 44

11 (Pages 41 to 44)

1  be a door ding I didn't see, but I didn't see any major
2  prior damage that would warrant a deduction.
3  Q  Okay.  And when we look at a prior deduction, that
4  would -- a prior damage, that would be prior damage to
5  the vehicle's frame, body, or structure; right?
6  A  I would have to see the terminology used by Autosource.
7  Q  You want to --
8  A  There's a similar document like this which I'm not sure
9  if you have.  It looks similar to this, but it says
10  "prior damage modifier."  (Indicating.)
11  Q  Okay.
12  A  Let's see if you have it.
13  Q  I'm not saying we haven't been given it.  We probably
14  have, but I don't recall seeing it, but --
15  A  And --
16  Q  -- we'll start there.
17     But you remember there's also a page -- there's also
18  a page like the last page of Exhibit 2, which is Page 10,
19  that would also list modifiers for prior damage?
20  A  Correct.
21  Q  Okay.  Okay.  And then, obviously, you're looking at the
22  title, and that's to see if it has a salvaged title;
23  right?
24  A  Correct.
25  Q  Okay.  And then these numbers are spit out of here.

Page 45

1  Do you do anything to modify or -- scratch that.
2  Bad question.
3     You said that this Autosource diminished value was a
4  guide for you.
5     What training have you received as to how to modify
6  or change the numbers put out by the Autosource
7  diminished value tool in determining how much diminished
8  value there is?
9  A  I don't change the numbers put out by the Autosource
10  tool.
11  Q  Okay.  So when you use it, whatever the number the tool
12  does, that's what you'll offer and what you'll pay on the
13  claim?
14  A  Not always.  I just -- to your question, I don't modify
15  the numbers that it gives out.
16  Q  Okay.  Well, what would be a circumstance that you -- is
17  there a circumstance where you would offer a different
18  number?
19  A  Yes.
20  Q  And what would be those circumstances?
21  A  If the owner of the vehicle is providing me with
22  documentation that gives a different amount, I will
23  review that and consider it.
24  Q  Anything else?
25  A  I have also looked -- depending on what the expectations

Page 46

1  of the owner are, the owner may be, I have also looked up
2  Kelley Blue Book values for -- to determine -- Kelley
3  Blue Book will rate a vehicle "fair," "average," "good,"
4  "excellent."  And it has a tool that says "how would you
5  rate my vehicle" -- "how would I rate my vehicle," so if
6  you answer that questionnaire before the loss, and then
7  one of the questions I believe is repairs that -- has it
8  been repaired -- and I don't remember the exact way it
9  words the question -- it will downgrade the rating of
10  that vehicle, and then so there's a difference of value
11  based on how Kelley Blue Book will rate it.  And it might
12  give me a number -- and typically within a ballpark.  It
13  may be a little lower.  It may be a little higher, but it
14  gives me something if I'm going to increase my offer
15  to -- to look at and say "here's another source that gave
16  me a number to work with."
17  Q  Okay.  So what you've told me is you'll look at the --
18  any estimate that they've given you as to the amount of
19  the loss, and sometimes you'll go to Kelley Blue Book,
20  and under Kelley Blue Book, if a vehicle has had prior
21  damage to it, Kelley Blue Book reduces the condition
22  rating the vehicle; right?
23  A  Not prior damage, but prior repairs.
24  Q  Prior repairs.
25  A  I think -- I believe it says it has been repaired.  I

Page 47

1  don't remember the exact wording, but it's another tool
2  for me to use in addition to this to help me reach an
3  agreement with the owner.  (Indicating.)
4  Q  Okay.  Does that just bump down the condition?  So if
5  your car was originally good, it becomes fair.  If it was
6  excellent, it becomes good?
7  A  Correct.  It might bump up from either excellent to fair
8  or good to fair.
9  Q  Okay.  Okay.  Does Kelley Blue Book draw a distinction
10  between -- like the Autosource does, between the
11  extensiveness of the damage?
12  A  I believe there's one or two questions.  Once again, it's
13  a "check the boxes that apply to your vehicle and we'll
14  tell you what the rating is."  And I don't recall exactly
15  the way it's -- the terminology used.
16  Q  Okay.  So but you'll go and pull the Kelley Blue Book
17  "rate my vehicle" and then see what difference that makes
18  in the vehicle's value; right?
19  A  Sometimes.
20  Q  Sometimes?
21  A  It's another resource I can use.
22  Q  Okay.  How did you hear about that?  Did somebody at Am
23  Fam tell you you can do that, you could use it, or is it
24  just something you've used more --
25  A  I've learned and reviewed it with my manager.

Page 48

12 (Pages 45 to 48)

Matthew L. Fuqua
November 4, 2014

Page 49

1   Q   Okay.  Do you know other people in American Family do
2       that?
3   A   I have -- I have showed other people how to do it.
4       Whether or not they've implemented it, I don't know.
5   Q   Okay.  But, certainly, you're not doing this without
6       authorization?
7   A   No.  I review -- before any numbers are -- any offers are
8       made, I review my methodology with my manager.  I might
9       have a range depending on what this says, what Kelley
10      Blue Book say, based on what the owner has provided me,
11      and any other documentation I have.  I'll review it with
12      my manager either in person or over the phone, and he
13      will either agree or modify my -- my offer.
14  Q   Okay.  Now, what are you looking at when you look at a --
15      an estimate of loss for diminished value that a client
16      has given you?  I'm using the term "client."  It can be
17      either your insured or a claimant.  What are you looking
18      for and what are you looking to see in an estimate of
19      loss that somebody provides to you?
20  A   Like some kind of an appraisal they've provided?
21  Q   Yeah.  I mean, what -- I mean, you said you'll look at
22      whatever they give you.  What's going through your mind
23      and what are you looking for?  What are you wanting to
24      see or, you know, find credible or not credible when you
25      look at an appraisal of loss or an estimate of loss or

Page 50

1       whatever they submit?
2   A   I'm looking at who it's from and what's their
3       methodology.  The two ones I've typically have seen,
4       maybe the only two I've seen is maybe something from a
5       dealership that says "we will give this much less on a
6       trade-in," and then I've seen actual appraisals done
7       where they will have numbers.  I'm not sure where they
8       come up with all their numbers.  They come up with a lot
9       of numbers to say, "In our opinion, this is the loss of
10      value."
11  Q   So what do you -- when you get dealer quotes saying "this
12      is how much less we give on a trade-in," what do you do
13      with those?
14  A   What do you mean?
15  Q   I mean, do you credit them?  Do you not credit them?  I
16      mean, how do you... (Pause.)
17  A   I review them as part of the overall analysis, and some
18      are reasonable and some I think are unrealistic.  I
19      also -- during the conversation with the owner, I'll say,
20      you know, "This is a negotiation as you" -- "once you're
21      trading in your vehicle.  I don't believe this is set in
22      stone, but rather something to negotiate with the
23      dealership," so it's part of my overall evaluation.
24  Q   When you're evaluating the dealer quotes, are you looking
25      also at the same time at how severe the damage was to the

Page 51

1       vehicle that was repaired?
2   A   Well, that's already been taken into consideration with
3       the Autosource tool.
4   Q   I understand that.
5       The Autosource tool does it, but I'm saying when
6       you're looking at a -- trade-in quotes from a dealership,
7       are you also considering that as part of it?
8   A   I have always taken into consideration the severity of
9       the damage to the vehicle.
10  Q   Meaning, for instance, if you're getting some dealership
11      quotes on trade-in and if a car has been pretty severely
12      damaged, you know, the same way the Autosource tool would
13      say you've got frame damage or structural damage and, you
14      know, major panels have been repaired or replaced, you're
15      going to review that and expect to see a higher number
16      than, for instance, a car that has had minor damage to
17      it?
18  A   I don't know what methodology the dealership did to write
19      up their letter, but I do take into consideration the
20      severity.  Now, whether -- how much the dealership knows
21      is purely based on what the customer has told them, and
22      it may not be -- it may or may not be accurate
23      information.
24  Q   Okay.  Now, when you get an appraisal, how do you deal
25      with those?

Page 52

1   A   I review them.  And they're -- I take them into
2       consideration.  I have seen some that have been extremely
3       high and unrealistic, and I've seen some that are
4       right -- that I think is a reasonable amount.  And I will
5       review those with my manager, and if -- at times we have
6       gone with what the appraisal has said, if we think it's a
7       reasonable amount and their methodology makes sense.
8   Q   What do you want to see in a methodology that makes
9       sense?
10  A   I've seen some with very unrealistic numbers where it
11      seems like they're just pulling numbers.  They're basing
12      it on their opinion versus -- I've also -- I believe I've
13      seen some based on more historical data, and I
14      typically -- those seem to be more realistic numbers
15      versus, "in my opinion, it's gone down this much."
16  Q   Historical data of the sales of repaired cars that have
17      been sold versus non-repaired cars that have been sold,
18      or what historical data?
19  A   It's hard to say because I'm trying to remember one that
20      I saw a while ago that did have reference to some kind of
21      historical data, so I don't want to speak to exactly what
22      it said.
23  Q   Are you looking at appraisals to see if they're listing
24      particular comparable sales of vehicles that have been
25      damaged and repaired versus undamaged vehicles?  Have you

13 (Pages 49 to 52)

1    seen any like that?
2 A  Can you rephrase that?
3 Q  Have you seen any appraisals that have been based upon
4    comparable sales, sales of vehicles that have been
5    damaged and repaired versus the same vehicle that has
6    been undamaged?
7 A  Not that I can recall.
8 Q  Would you want to see that?
9 A  If -- I would be -- I would review anything they provide.
10 Q  Okay.  Well, when you do total losses and you're
11   assessing a total loss, you're looking to find comparable
12   vehicles; right?
13 A  Correct.
14 Q  And one of the ways you can assess the value of something
15   is to look at comparable sales; right?
16 A  Yes.
17 Q  So that -- in this case, you want to look at comparable
18   sales of vehicles that have been damaged and repaired as
19   compared to the same type of vehicles that hadn't been
20   damaged and have been sold; right?
21 A  It depends on the data, if it's good comparables.
22 Q  Yeah.
23 A  I mean, we're talking about looking at the same year,
24   make, and model, similar mileage, similar condition with
25   or without prior damage with similar repair damage.
                                                  Page 53

1 Q  Do you know what a regression analysis is?
2 A  I've heard of it but couldn't define it for you.
3 Q  You're a computer science major, so I thought maybe you'd
4    know.
5 A  There's probably a class I took of it somewhere many
6    years ago.
7 Q  Okay.  I won't --
8          MR. BENNETT:  Do you want to hire him?
9          MR. NEALEY:  No.  I won't ask any more
10   questions.  If he knew something about regression
11   analysis, I'd ask him.
12 Q  (By Mr. Nealey)  Okay.  I'm going to switch to another
13   area here.
14       We can take a short break, if you want to, or we can
15   just keep going.
16 A  I'm okay.
17          MR. NEALEY:  You okay?  (Indicating.)
18          THE COURT REPORTER:  Uh-huh.
19          MR. NEALEY:  I have to be careful of
20   our court reporter here.  The reporter has a couple more
21   weeks before she's still here.
22          MR. BENNETT:  Is that how close it is?
23          THE COURT REPORTER:  Yeah.  Well, I'm
24   due in a month, but I take maternity leave in two weeks.
25          MR. BENNETT:  All right.
                                                  Page 54

1 Q  (By Mr. Nealey)  I'm going to give you a copy of Bryce
2    Meyer's policy, which I'll mark as Exhibit 3.  And I have
3    some questions about the policy, and if you -- if you're
4    familiar with it, great, I'll ask you; and if you're not,
5    feel free to tell me.
6 A  Okay.
7              (Exhibit No. 3 marked for
8               identification.)
9
10 Q  (By Mr. Nealey)  I'm not -- I mean, I know you handle
11   certain portions of claims.  I'm not sure exactly what
12   you handle, so let me ask -- this is -- Exhibit 3 is
13   Bates No. Policy M-001 to 0025.
14       And have you read the Am Fam policy?  You've
15   probably done so a number of times.
16 A  I refer to it as needed on a case-by-case basis.
17 Q  Okay.  This has a -- this appears to be the policy that
18   was enforced on Mr. Meyer's accident of April 14th, 2014,
19   so it would be the current policy.  And if you look at
20   Page 5 of 8, which is Bates No. 008 -- there's little
21   numbers at the bottom which lawyers put on them to make
22   it easy to find things -- and under here, it says, "Loss
23   means direct and accidental loss of or damage to your
24   insured car and its equipment.  Loss does not mean any
25   difference in the market value of your insured car
                                                  Page 55

1    immediately prior to the loss and the market value of the
2    insured car after repairs from the loss are completed."
3        Are you familiar with this as a language to exclude
4    diminished value from coverage in the first-party
5    comprehensive and collision coverages?
6 A  Yes.
7 Q  Okay.  And is it fair to say that damage to the vehicle
8    under the comprehensive and collision coverages is a
9    trigger to coverage?
10 A  I don't know if it's the only trigger, but it is a
11   trigger for coverage.
12 Q  Okay.  And that's because you can have a trigger --
13   trigger the vehicle -- damage to the vehicle can trigger
14   coverage, but I guess also the vehicle being stolen or
15   lost can trigger coverage; right?
16 A  Correct.
17 Q  So one way you get coverage is to have physical damage to
18   the vehicle that triggers coverage; right?
19 A  Correct.
20 Q  And the second way is you can have -- the vehicle could
21   be lost, which would be a theft; right?
22 A  Correct.
23 Q  Okay.  Okay.  And here it says, "Loss does not mean any
24   difference in the market value of your insured car," so
25   this means that diminished value is not triggered by loss
                                                  Page 56

1    of the vehicle?
2  A  It's saying -- my understanding, it's saying loss of
3     value is not covered under first-party coverage.
4  Q  Okay.  Okay.  And if we look at the definition here, we
5     talk about the market value of the insured car
6     immediately prior to the loss and the market value of the
7     insured car after repairs.
8        That would be the same definition of diminished
9     value that you gave me earlier; right?
10 A  Yes.
11 Q  Okay.  Now, moving forwards to Page 23 of this, which is
12    Bates No. 23, I should say, and under Page 23, this is
13    the uninsured motorist coverages, and if we look at Point
14    2, which would be B(2), which is only -- right there,
15    yes, you found it, it says, "Property damage means damage
16    to or destruction of your insured car.  It does not
17    include loss of use."
18       UIM coverage is triggered by property damage to the
19    vehicle?  That's the trigger?  (Indicating.)
20 A  I would agree with that.
21 Q  Okay.  And there is one -- you said there are multiple
22    triggers.  And in the case of a vehicle that has not been
23    touched in a hit and run, the trigger for coverage in
24    addition to there being property damage to the vehicle
25    would be found under A(2)?

Page 57

1  A  Where are you looking?
2  Q  We're looking right here?  (Indicating.)
3  A  Right here.  (Indicating.)
4  Q  A(2), so in addition to the requirement of property
5     damage to trigger coverage, the second trigger would be
6     in the event of a hit-and-run accident where there was no
7     physical contact, you would have to notify the police and
8     then have the facts of the accident corroborated; right?
9  A  Correct.
10 Q  Okay.  But, obviously, if there has been physical contact
11    between the vehicle, the only trigger coverage under UIM
12    is property damage to the vehicle?
13 A  Based on this right here, I would agree with that.
14    (Indicating.)
15 Q  Okay.  Now, in the insuring agreement under the UIM is
16    found on Page 24 under C; correct?
17 A  Correct.
18 Q  "We will pay compensatory damage an insured person is
19    legally entitled to recover from the owner or operator of
20    an underinsured motor vehicle because of" -- in this
21    case, it's "B" -- "property damage caused by an accident
22    and underinsured motorist - property damage is shown on
23    the declarations."
24       So the insuring agreement pays for property damage
25    that is caused by the accident; right?

Page 58

1  A  Can you repeat the question?
2  Q  The -- under UIM under the American Family policy, you
3     can recover for property damage caused by an accident;
4     right?
5  A  Correct.
6  Q  Okay.  And in Mr. Meyer's case, because his vehicle was
7     involved in an accident that was UIM and had property
8     damage, he has coverage for uninsured -- he has coverage
9     for diminished value, which is why you ran the tool;
10    right?
11 A  He has coverage for property damage.  And in this case,
12    after evaluating, I determined there was a loss of value
13    that, in my opinion, was considered some property damage.
14 Q  Okay.  Well, and that's sort of my question.
15       The Autosource tool doesn't ask you if you've got
16    property damage on the vehicle; right?
17 A  Well, it asks for the severity of damage, so what do you
18    mean by the question?
19 Q  Well, okay.  And when we say -- the Autosource tool is
20    asking you whether the vehicle has property damage;
21    right?
22 A  The Autosource tool is asking for the severity of the
23    repairs.
24 Q  Yes.  Yeah.  And those repairs are because the vehicle
25    has property damage; right?

Page 59

1  A  The damage to his vehicle was caused by a hit-and-run
2     vehicle which sustained property damage.
3  Q  Okay.
4  A  But the Autosource tool isn't making coverage decisions.
5     It's simply asking for what is the repairs done to the
6     vehicle.
7  Q  I understand that.  So -- but in the case of Mr. Meyer's
8     vehicle, Mr. Meyer had property damage on his vehicle?
9     He had damage; right?
10 A  There was damage done by another vehicle.
11 Q  Okay.  Agreed.
12       And he had property damage which required repair;
13    right?
14 A  Yes.  I would agree with that.
15 Q  And that triggered coverage for, in this case, diminished
16    value?
17 A  That, in itself, did not trigger the coverage.  He made a
18    claim that his vehicle had gone down in value.  And after
19    it was evaluated, it was determined it did go down in
20    value, which does fit the definition, which does, in my
21    opinion, qualify as property damage.
22 Q  Okay.  Because his car was worth less afterwards as a
23    result of the fact that it had had property damage done
24    to it?  It had property damage, it was repaired, and it's
25    worth less as a result, and, therefore, that loss was

Page 60

15 (Pages 57 to 60)

1    caused by the property damage?
2    A  Is that a question?
3    Q  Yeah.  Is that a correct --
4    A  Can you repeat the question?
5    Q  -- statement?
6       Well, yeah.
7       So when we look at this, Mr. Meyer's vehicle had
8    property damage which triggered coverage.  It was
9    repaired, but it's worth less after the repairs according
10   to the tool, and, therefore, that property damage caused
11   the reduction in value, and, therefore, there's coverage?
12   A  I would say the reduction in value is caused by the
13   market's opinion that it has gone down in value.  The
14   damage in and of itself did not cause it to go down in
15   value, in my opinion, but, rather, the marketplace saying
16   after a vehicle has been in a loss, we'll pay less for a
17   vehicle.
18   Q  The market value though is reflecting what's actually on
19   the vehicle; right?
20   A  The market value is determined by the market.
21   Q  Yeah.  But let me put it this way:  If you go out and
22   look at a vehicle, you do reinspections, you can go look
23   at a vehicle and you can tell where it's been repaired;
24   right?
25   A  Not always.
                                               Page 61

1    Q  Not always, but most of the time; right?
2    A  No.  I can tell where it's been repaired because that
3    area usual looks nicer than the rest of the vehicle, but
4    I can't -- I wouldn't say -- I'm not looking -- I'm not
5    seeing defects that say, "Yeah, it's clear it's been
6    repaired."  I can have the estimate showing where the
7    repairs were done and look at the area and tell repairs
8    were done there because usually it's newer paint and
9    newer parts and -- and recently all cleaned, but I cannot
10   typically look at a car and see that there has been
11   repairs done.  To put it another way, a month later, I
12   cannot walk -- in my opinion, probably not walk up to a
13   car and tell repairs have been done.
14   Q  Have you ever looked at vehicles and done reinspections
15   several years down the road?
16   A  Not that I can recall.
17   Q  So you've never done circumstances where you've looked to
18   see what happens to repaired areas of a vehicle two or
19   three years down the road?
20   A  I've had -- they're rare, but under the CRP warranties,
21   some repairs might fail, could be a part failed, it could
22   be a failure of the paint and they've come back for
23   warranty work, but those are particular situations where
24   there's a -- I would say an untypical failure of the
25   repair.
                                               Page 62

1    Q  And, of course, to the extent that a vehicle has been
2    meanwhile sold, people don't know who did the repair
3    work, and the warranty doesn't follow to a new owner
4    anyway; right?
5    A  To my understanding, it doesn't transfer with ownership.
6    Q  Okay.  So the only time you're ever going to see a
7    vehicle was if somebody wanted -- number 1, knew that it
8    was repaired; and, number 2, it was the person who had it
9    repaired?  Once the vehicle has been sold or transferred,
10   that warranty no longer exists; right?
11   A  I've never had any dealings with that situation, with
12   transferred ownership.
13   Q  And, of course, if it was transferred ownership, they
14   wouldn't know to come to American Family anyway; right?
15   A  Unless the seller disclosed it, they wouldn't know.
16   Q  Okay.  Well, you've got a tool that says that the market
17   value has decreased.
18      How does the -- how does the market know to decrease
19   the value of a vehicle then?
20          MR. BENNETT:  Object to form;
21   foundation.
22   Q  (By Mr. Nealey)  To the extent you know.
23   A  Could you say the question again?
24   Q  Let me ask it a different way.
25      Okay.  We've got Mr. Meyer's vehicle, which you've
                                               Page 63

1    inspected multiple times, obviously, and you know what
2    the issues are, and let's assume that we had Mr. Meyer's
3    exact same vehicle but had never been in an accident,
4    okay, the two vehicles are next to each other and you're
5    given a choice of taking one vehicle or another, which
6    are you going to take?
7    A  Well, I disagree they would be identical in every way.
8    Q  I'm just saying somebody searched the entire country.
9    They found the exact same tri-coat yellow, same
10   options -- they made I think 2,500 of the tri-coat yellow
11   color -- and it has the same mileage, same car but one is
12   Mr. Meyer's car that's been through the accident that
13   you've seen and had the repair work done on it and the
14   other one hasn't been in a wreck.
15      Which one are you going to take?
16   A  One, it would depend on the repairs that were done.  You
17   gave me one specific example, but I wouldn't make this
18   blanket statement over all repairs.  If they were
19   identical in every way, which I don't think is possible,
20   and -- I would -- and if they were the same price, I
21   would take the one that was not -- ever been repaired.
22   Q  And is that because if you took the one that's been
23   repaired, you may have issues with the paint down the
24   road, you may have issues with the repair down the road?
25   A  No.  Rather, it's -- I think a car is best when it's --
                                               Page 64

**Page 65**

```
 1   let me rephrase.  If it's not broke, don't fix it, so if
 2   I have one that's never been damaged and somehow I have
 3   the choice of having the two, I'll choose the one that
 4   hasn't been damaged.  It's very possible there won't be
 5   any problems ever down the road with the other one, but
 6   the other one is still in its undamaged state, so to
 7   speak.  It's never been in an accident.  There's no
 8   reason to -- that's all I'm saying.
 9   Q   Okay.  And whenever you start repairing things and you
10       don't have the factory paint on it and you've -- you've
11       put Bondo on it or straightened parts and moved things
12       around, you don't quite know what's going to happen to
13       that vehicle in use down the road as opposed to an
14       undamaged vehicle; right?
15               MR. BENNETT:  Objection; form,
16       foundation.
17               THE WITNESS:  I don't necessarily
18       agree.  Any reparable shop gives you a lifetime warranty.
19       Then there's no reason to think it is going to happen.  I
20       would take the vehicle that's been in the repairs that
21       this one has been done in, but in your hypothetical, I
22       had an option of having a completely identical one.
23   Q   (By Mr. Nealey)  I'll put it another way.  If you've got
24       a completely identical vehicle to Mr. Meyer's vehicle
25       that's been undamaged in Mr. Meyer's vehicle, the only
```

**Page 66**

```
 1       reason -- the only way you're going to take Mr. Meyer's
 2       vehicle is if you get a discount on the price on it as
 3       opposed to undamaged; right?
 4   A   If everything was identical, then it would be a
 5       negotiation tool to possibly lessen the price.
 6   Q   But, of course, if you're buying Mr. Meyer's vehicle as
 7       opposed to somebody else's vehicle, you don't get any
 8       warranty on those works because whatever the body shop
 9       did, that warranty doesn't transfer to you; right?
10               MR. BENNETT:  Object to form;
11       foundation.
12               THE WITNESS:  It's up to the specific
13       shop's warranty and also if I knew who did the shop -- if
14       I knew what shop did the work.
15   Q   (By Mr. Nealey)  but you're in the real auto market.
16       When Mr. Meyer goes to sell his car or someone else goes
17       to buy it, they're not going to know who repaired it and
18       who the insurance company was.  They're going to know
19       they have a vehicle in front of them that they can tell
20       has had certain particular types of damage to it; right?
21   A   I disagree the he'll be able to tell it has had damage to
22       it unless it was disclosed by the owner, in which case,
23       they would have the information of where it was repaired.
24   Q   Have you ever -- have you ever bought and sold cars?
25   A   Other than maybe my personal vehicles, no.
```

**Page 67**

```
 1   Q   Okay.  Do you know -- do you know what steps dealers take
 2       to inspect vehicles to look for prior damage?
 3   A   Not specifically, no.
 4   Q   Okay.  So whether auto dealers -- certainly a middleman
 5       in the market -- whether they look for prior damage and
 6       how they look for prior damage, that's not something you
 7       know one way or the other?
 8   A   Correct.
 9   Q   So but if you get two vehicles -- you go to a, you know,
10       car dealer out on International Avenue -- International
11       Boulevard here and you've got two vehicles, one is Mr.
12       Meyer's with the damage that Mr. Meyer's has had that you
13       know that you wouldn't have a warranty on because you
14       have second position and an undamaged vehicle, would you
15       have a concern about what might happen to the repaired
16       areas of Mr. Meyer's vehicle three years from now, four
17       years from now, five years from now?
18   A   I would have concerns about both vehicles because neither
19       one would have any kind of a warranty on them at that
20       point.  I'm assuming these are identical.  And I've seen
21       failures of OEM vehicles' quality, so I would have the
22       same concerns for both.
23   Q   But you're going to pay less for Mr. Meyer's vehicle?
24   A   I would negotiate -- if -- once again, you added a level
25       into your hypothetical that now it's at the same
```

**Page 68**

```
 1       dealership, these exact identical cars.  My opinion, this
 2       is an unrealistic hypothetical because one might have a
 3       stain in the carpet and I might choose the other one that
 4       has been repaired because I don't have to deal with the
 5       stain in the carpet, but if there are two identical cars
 6       at the dealership and I have full disclosure and know
 7       that this one has been repaired and the extent of the
 8       damages and where it was fixed, I would use that as a
 9       negotiation tactic to see if I could get a lower price.
10   Q   And as far as the -- as far as what would happen to a
11       vehicle three, four, five years after repair, you've
12       never checked that or studied that?
13   A   I've never studied it, no.
14   Q   Okay.
15   A   Other than my personal -- my work experience.  I mean, we
16       do have a lifetime warranty on our work, and I don't know
17       of any that have come back for that period of time.
18   Q   Okay.  Looking at Page 24 of the policy, which I think
19       you have in front of you, there is a -- under "C" under
20       the insurance agreement, C(3), it says, "If any suit is
21       brought by you to determine liability or damages, the
22       owner or operator of the uninsured motorist vehicle must
23       be made a defendant and you must notify us of this suit."
24         That provision is there to deal with the insured
25       trying to bring an action without American Family being a
```

1    part of it?
2    A  I've never been involved in that process, so I'm not
3       exactly sure what the intent of that is.
4    Q  Okay.
5    A  I understand your reading of it, but what --
6    Q  Okay.
7    A  -- the reading intends, I --
8    Q  Okay.
9    A  -- couldn't tell.
10   Q  Okay. I understand. If you don't know, you don't know.
11      Okay. Now, then looking at Page 25 of the policy,
12      it's under "B" at the top right here. It says, "The
13      arbitration shall commence within a reasonable period of
14      time after there is mutual consent of both parties."
15      Is it your understanding that the arbitration clause
16      in the UIM coverage requires both parties to agree?
17   A  I have never been a part of the arbitration clause, but
18      the reading does make it sound like both --
19   Q  Okay.
20   A  -- parties need to agree.
21   Q  Okay. So you've never been involved in one?
22   A  No.
23   Q  Okay. Now, since you are, in fact, the person for the
24      dedicated repair program, I will hand you Exhibit 4,
25      which I think is your guidelines.

Page 69

1                (Exhibit No. 4 marked for
2                   identification.)
3
4    Q  (By Mr. Nealey)  Is that your current guidelines that
5       cover DRP programs in Washington?
6    A  I believe so, yes.
7    Q  Okay. I would just like to ask a couple of questions
8       about it.
9       If you turn to Page 4, if you look at -- yeah, I
10      think the Bates numbers line up, yes, Page 4, right under
11      it says "keys to customer service." The point right
12      here, it just says, "We expect all repairs you do to our
13      customers will be done safely and within industry
14      standards."
15      Is that the requirement that you put -- the actual
16      language there, that DRP shops have to do safely and
17      within industry standards?
18   A  Well, this is the document we give to the shops --
19   Q  Yes.
20   A  -- so that's what we do expect from the shops.
21   Q  Yes. Okay. So you're expecting that any DRP shop is
22      going to repairs cars within industry standards; right?
23   A  Yes.
24   Q  Okay. And by that, you mean I-CAR standards or -- or
25      just general body shop industry standards? What do you

Page 70

1    mean by "industry standards"?
2    A  I would say -- well, the industry standards are
3       determined by the industry and we also wanted to follow
4       I-CAR standards and OEM recommendations --
5    Q  Okay.
6    A  -- or take them into consideration.
7    Q  Okay. If we go to the next page on Page 5 under CRP
8       shops, that's exactly what it says: "Vehicles must be
9       repaired following original equipment manufacturer
10      recommendations and I-CAR standards."
11      So the repair requirement that you place on your DRP
12      shops is that they follow OEM requirements or
13      recommendations if there are any and then I-CAR
14      standards?
15   A  This says "taking into account," so how that's
16      translated, but we do want them to take into account OEM
17      recommendations.
18   Q  Okay. Okay. And then if you go to Page 12, there's a
19      list here of information that must be on the estimates,
20      themselves, and when we go through this list, when you do
21      reinspections, do you check to see if this information is
22      on the estimate?
23   A  Sometimes.
24   Q  Sometimes.  Okay.
25      But the date of loss has to be on there; right?

Page 71

1    A  Yes.
2    Q  Okay. And the type of loss, whether it's a
3       comprehensive, collision, or liability, has to be on
4       there?
5    A  Correct.
6    Q  And if an estimate says "collision" and the claim becomes
7       a UIM at some point, is that changed, or would you just
8       use the terminology "collision"?
9    A  We use the terminology "collision." Sometimes it's
10      changed to "other," but we prefer it still says
11      "collision."
12   Q  Okay. So the fact that an estimate says "collision" for
13      Am Fam, that doesn't mean that it's actually under a
14      collision coverage as opposed to being UIM?
15   A  Correct, because there's no UIM option --
16   Q  Okay.
17   A  -- I'm aware of under "type of loss."
18   Q  I'm looking at it saying, "Why do these all say
19      'collision?'"
20      Okay. So no UIM coverage.
21      And then we have a VIN number will be on there and
22      the year, make, and model will be on there; right?
23   A  That will be decoded by the VIN.
24   Q  Okay. And then the points of impact, what is that
25      supposed to be?

Page 72

18 (Pages 69 to 72)

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

**Page 73**

1    A    There is a part -- like a diagram of the car, and you can
2         put a checkmark check of where the impact was, so front
3         right, front rear --
4    Q    Okay.
5    A    -- something like that.
6    Q    So, in this case, Mr. Meyer's car, for instance, would
7         have a check for the front and a check for the rear?
8    A    I would have to see the estimate. A lot of these are
9         mandatory, meaning the system makes you. I believe it
10        might be possible to not have the point of impact
11        checked --
12   Q    Okay.
13   A    -- and not forced in the shop --
14   Q    Okay.
15   A    -- so I would have to see what the estimate says.
16   Q    Okay. And then it says "loss designation," and then it
17        says, "Note," "When a vehicle originally thought to be
18        repairable is later determined to be a total loss, you
19        must go back to change the loss designation to total
20        loss."
21           Is that actually carried out, in your experience?
22   A    The system does it automatically. It's flagged at a
23        certain percentage --
24   Q    Okay.
25   A    -- and it will say "this has been flagged as a total

**Page 74**

1         loss," and it will put a checkmark on the "total loss"
2         indicator.
3    Q    Okay.
4    A    There are -- have been times where shops have, after
5         completing the estimate, unchecked it because it was
6         below that, and then it will go -- once again, maybe they
7         find more damage, it goes back above it, and they might
8         have to manually check it back on, but the initial time,
9         it's typically done automatically by --
10   Q    Okay.
11   A    -- the system.
12   Q    Okay. And then one of these things is actual mileage.
13           Is that generally put in?
14   A    Very high majority of the time. If there's not, there's
15        usually an exception like the display wasn't working.
16        Very rarely is it an oversight. If it's not there,
17        usually there's a reason why it's not there.
18   Q    Okay.
19   A    And I believe it's mandatory field, so the system is
20        going to force them to put something there.
21   Q    So if it's broken, for example, or the battery power is
22        dead and it's got an electronic one, then you put "zero"
23        or something like that?
24   A    Yeah, not so much for the battery because we expect at
25        some point they will have power to it if it's repairable,

**Page 75**

1         or if it's a total loss, as long as they can get power to
2         it, but if they say "zero" and they can select "not
3         readable" as an option, for Audatex to accept their
4         "zero," then they'll typically have a comment somewhere
5         explaining why --
6    Q    Okay.
7    A    -- they have that.
8    Q    Okay. Okay. Now, under Page 13, it says under
9         "repairs" -- there's a thing that says "repair approach,"
10        and it lists three in order, to repair damaged parts,
11        replace with alternative parts, and replace with OEM
12        parts.
13           Is that -- is that's what is done in practice by the
14        DRP shops?
15   A    In general, yes.
16   Q    Okay. Okay. And then if we look at Page 14, it says
17        "repairing unrelated damage" -- and I've actually
18        highlighted it there because we get lost in all kinds of
19        things -- and it says, "The repair of unrelated and prior
20        damage is the sole responsibility of the owner.
21        Unrelated prior damage should be noted in the Audatex
22        comments section."
23           That addresses some unrepaired damage from a prior
24        accident that comes in?
25   A    Correct.

**Page 76**

1    Q    Okay. And do you actually see that people put that in
2         the comment section, if there's some prior damage on the
3         vehicle?
4    A    I have seen it, yes.
5    Q    Okay. And you could tell that by, for instance, on the
6         rust around an area of prior damage or bad sheet metal?
7         I mean, how would you tell?
8    A    Tell what?
9    Q    Tell that there's been prior damage.
10   A    This is something the shop puts in there. And some shops
11        are more specific. Some might list a door ding while one
12        may overlook it, or if it's more extreme damage, like one
13        corner is smashed in and we're repairing the other
14        corner, they'll have that noted typically. Some shops
15        are more particular about noting than others.
16   Q    Okay. But they're supposed to note certainly if there's
17        some kind of --
18   A    We --
19   Q    -- unrepaired damage?
20   A    We do ask them to note it, yes.
21   Q    Okay. And if you were doing a diminished valued
22        assessment using the Audatex system as one of the things
23        you do, you check that field to see if the body shop
24        spotted any prior damage?
25   A    That would be part of my analysis, yes. I may miss it,

Page 77

1    but that would be something I would look.
2  Q  Okay.  Okay.  So it's not just that -- when you're
3     running the Audatex diminished value tool, one of the
4     things you're looking at is what the body shop actually
5     saw on the vehicle when they started the repairs; right?
6  A  Yes.  I'm looking, but I can't recall a time that's come
7     into a factor where I've seen prior damage that's
8     warranted a deduction on a DV that I have handled.
9  Q  Okay.  Okay.  And one of the other things you look for
10    for prior damage is you run the -- you run the vehicle's
11    VIN in the insurance databases you have to see if there's
12    a prior loss on it; right?
13  A  Yes, I'll run it in ISO.
14  Q  In ISO, okay.
15      When you run these DV assessments, have you ever
16    come up with a car that shows up in ISO?
17  A  Have I seen a prior loss on a vehicle?
18  Q  Yeah.
19  A  Yes.
20  Q  Yes.  And then you consider that as part of the Audatex
21    tool?
22  A  I consider that as part of the DV evaluation and how
23    we'll handle it.
24  Q  Understand.  Understand.  Okay.  Does -- by the way, when
25    you do a designated repair program -- and you may know

Page 78

1     this or may not -- American Family requires the body shop
2     to use in addition to their guidelines to accept American
3     Family's labor rates; right?
4  A  Could you repeat the question?
5  Q  In addition to following American Family's guidelines on
6     adjusting, which we've just looked at, a body shop that's
7     part of the DRP program for American Family has to accept
8     American Family's labor rates; right?
9  A  Well, we pay up to the global prevailing rate to any
10    shop.  Whether it's a DRP or non-DRP, we pay the
11    prevailing rates.  The shops have an option of giving us
12    a discounted rate, but we will pay them up to the global
13    rate which we pay any shop --
14  Q  Okay.
15  A  -- and not more than that.
16  Q  What do you mean they have the option of giving you a
17    discount?
18  A  They have an option -- for instance, in the Tacoma area,
19    the global rate I believe is 50 for sheet metal.  They
20    have the option of giving us a discount of let's say 48.
21  Q  Why would they do that?
22  A  When we rate shops, we use a tool called Performance
23    Gateway, and it has many metrics to rate them.  One of
24    them is discounts the shop may or may not give us, and
25    they are optional --

Page 79

1  Q  Okay.
2  A  -- so it can increase their rating if they give us a
3     discount on labor rates.
4  Q  Okay.  So if I've got two shops and, you know, Shop A is
5     charging the prevailing labor rate of $50 and Shop B next
6     door is giving you a discount to 48, when recommending
7     where to go to, American Family is going to recommend
8     somebody go to the 48 shop because it has a lower labor
9     rate?
10  A  No.  If we're looking to add a new shop in my territory,
11    I typically have a pretty high say in it because I've
12    worked in this area for a long time.  That's probably the
13    last thing I would look at.  There's much more factors
14    I'll look at than who will give me the cheapest rate.
15      MR. BENNETT:  Let me just say for one
16    second, I'm going to designate the deposition
17    confidential under a protective order.
18      MR. NEALEY:  Yeah.
19      MR. BENNETT:  It just seems to me
20    we're getting into competitive things here.
21      MR. NEALEY:  No problem.
22      (Discussion off the record.)
23      (Recess from 11:04 a.m. to
24        11:12 a.m.)
25  ///

Page 80

1      (Exhibit No. 5 marked for
2      identification.)
3
4  Q  (By Mr. Nealey)  I'm going to hand you a couple of
5     documents from the claim before you were directly
6     involved, although I know you reinspected the vehicle,
7     and I'm going to go back and look again.  I have sections
8     of the file, and I'll find where it is, but good to know
9     you reinspected it.  I'm going to hand you a page out of
10    the file that was produced, Page 7, and ask you if you
11    know what this is.  This is Exhibit 5.
12  A  This looks like it's basically a total loss indicator --
13  Q  Okay.
14  A  -- to determine if it's okay for CRP or what to do next
15    with the vehicle when they first report the claim.
16  Q  Okay.  And this is very early in the file, although, for
17    some reason, the way these things they print out at the
18    bottom, it doesn't always tell you the add date on
19    here --
20  A  Okay.
21  Q  -- but that was what my question was, is this done -- it
22    says 4 to 5 panels damaged, 6 or more panels damaged.
23      Is this just done when the claim is first reported?
24    It's a rough check to see if it's going to be a total
25    loss or not?

20 (Pages 77 to 80)

Matthew L. Fuqua
November 4, 2014

1   A   Yes. I believe it's called a VEA.
2   Q   Okay.
3   A   I don't remember what the acronym stands for, but it's
4       basically to help -- and which I've never done one of
5       these. It's basically when they first report the claim
6       so the person who is at the call center who is taking the
7       claim can determine what is the best thing to do with the
8       vehicle now.
9   Q   Okay. Okay. And under here, it says, "Vehicle damage
10      and/or comments." It says, "Front bumper hood crushed in
11      a little and has a crack both rear fenders dents and
12      trunk is pushed in and driver side wheel is turned in a
13      little," and it says, "No prior damages."
14          Does Am Fam ask whenever a claim is made if the
15      vehicle has prior damage?
16  A   I believe so, and I believe all this comes from what the
17      owner is telling us when he --
18  Q   Okay.
19  A   -- reports the claim.
20  Q   Okay.
21          MR. BENNETT:  Are you going to do the
22      claim file for a bit?
23          MR. NEALEY:  Yeah.
24          MR. BENNETT:  Give me 60 seconds.
25          MR. NEALEY:  No problem.

Page 81

1   as "UIM," that American Family makes a determination
2   based upon the facts of the accident that it is, in fact,
3   an UIM claim?
4   A   Can you repeat the question?
5   Q   Is that because whenever a claim that comes in that might
6       be a UIM, American Family makes a determine whether it is
7       or is not an UIM claim?
8   A   Yes. They want to do a little more investigation.
9   Q   Okay. So this is just a note then you believe that would
10      be escalating it so that it has that determination made
11      internal to American Family that it is, in fact, a UIM
12      claim?
13  A   Yes. I would agree with that.
14  Q   Okay. And then the file is then noted that that
15      determination has been made and it's handled from that
16      point on as a UIM claim?
17  A   I have seen rare circumstances where they might change
18      the... (Inaudible.)
19          THE COURT REPORTER:  Can you slow down
20      just a little bit.
21          MR. NEALEY:  Yeah.
22          THE WITNESS:  Oh, yeah.
23          THE COURT REPORTER:  Repeat that.
24          THE WITNESS:  I've seen rare times
25      when they may have changed their mind, so I wouldn't have

Page 83

1           MR. BENNETT:  I'm going to grab my
2       copy.
3           MR. NEALEY:  Perfect. It makes it
4       easier.
5               (Pause in the proceedings.)
6               (Exhibit No. 6 marked for
7                   identification.)
8
9   Q   (By Mr. Nealey) Okay. I'll give you Exhibit 6, which is
10      Page No. 11, and it's a note from it looks like Carrie
11      Bartley.
12          Is that a person who does coverage for Am Fam?
13  A   I don't know.
14  Q   You don't know; okay.
15          And it just says, "Hi, Jennifer, I apologize this
16      insured has UMPD coverage. I should have escalated to
17      branch. I just now did."
18          Are UIM claims handled differently? Do you know
19      what's being referred to there?
20  A   I believe what's happening is it probably started at a
21      call center which handles, for lack of a better word,
22      simpler claims, and I think something like a UIM claim,
23      that's escalated to a casualty adjuster to do a little
24      bit more investigation.
25  Q   Okay. Is that because before a UIM claim is categorized

Page 82

1   a blanket statement they says once they decide it's a
2   done deal, but typically once the casualty adjuster says,
3   "Okay. This is a UM claim," it proceeds as a UM claim.
4   Q   Okay. And what could be the type of information you
5       might get -- have you ever found a situation after a
6       vehicle has been repaired that they've gone back and
7       reassessed that determination?
8   A   Not that I can recall.
9   Q   Okay.
10              (Exhibit No. 7 marked for
11                  identification.)
12
13  Q   (By Mr. Nealey) Now, I have -- I'm going to mark as
14      Exhibit 7 a financial summary and transactions. And
15      there may be a newer version of this. I apologize.
16      There was a new link sent to the thing and it didn't work
17      for me, so this is the old one, but have you seen these
18      before? And it's just the rundown of what's been paid on
19      the claims.
20  A   Yes.
21  Q   Okay. So obviously, in this case, a check was cut for
22      whatever it is -- whatever the DV assessment was, 1,200
23      and change, so that would then be listed on here; is that
24      correct?
25  A   It's not listed on here, but yes --

Page 84

21 (Pages 81 to 84)

1  Q  Yes.
2  A  -- it would typically be on here.
3  Q  Okay.  So if you wanted to find out if DV was paid on a
4     claim, you would look at the financial summary and
5     transactions page and it would tell you?
6  A  I would not look at this.  I would look at the notes to
7     determine that.
8  Q  Okay.
9  A  It could simply just say uninsured motorist payment and
10    you may not know what that's for.
11 Q  Okay.  You would want to look at the notes in the file
12    and see it was a DV?
13 A  I would want to see what that payment was issued for.
14 Q  Okay.  Okay.  I have a series of e-mails that are back
15    and forth between you and Mike Harber.
16    Would those have been incorporated into the "notes"
17    section of the claim file, or, because of the way this
18    claim was handled, was it handled a little differently?
19 A  I believe I put most if not all -- I copied and pasted
20    the e-mails into the claim notes.  I also put most --
21    there's a lot of overlapping e-mails --
22 Q  Yeah.
23 A  -- with the replying.  I copied the e-mail, itself, into
24    the documentation section of ICS.
25 Q  Okay.  And you're supposed to do that, but understanding

Page 85

1     it doesn't happen 100 percent of the time?
2  A  Not 100 percent.
3  Q  Okay.  Okay.  Okay.  But if you do -- as a field
4     inspector, if you do a reinspection, that wouldn't show
5     up in the notes section on this, right, or would it?
6  A  It would.
7  Q  It would.
8     Okay.  Well, then I'll hand you this and mark it as
9     Exhibit 8 and see if we can find when you did your
10    reinspection.
11              (Exhibit No. 8 marked for
12                  identification.)
13
14 Q  (By Mr. Nealey)  This is Bates No. 45 through 58.
15        MR. BENNETT:  And I brought just the
16    one where you -- where we reproduced it to you.
17        MR. NEALEY:  I'm sorry.
18        MR. BENNETT:  Because your --
19        MR. NEALEY:  Yes, I know.
20        THE WITNESS:  This comment was made
21    through Audatex.
22 Q  (By Mr. Nealey)  Okay.
23 A  So I made the comment in Audatex.
24 Q  Okay.
25 A  Which transferred it into ICS which is why the author is

Page 86

1     estimate, because it came from Audatex.
2  Q  Okay.
3  A  But Audatex stamps it me --
4  Q  Okay.
5  A  -- with the note.
6  Q  Okay.  Okay.  I -- okay.  So this would have indicated
7     that you -- your inspection of the vehicle when it was
8     being repaired would have happened on approximately April
9     24th, 2014?
10 A  Correct.
11 Q  Okay.  And so you would have entered into Audatex and
12    then it's just transferred automatically into the
13    "comments" section?
14 A  Correct.
15 Q  And that is on Bates No. 49 of Exhibit 8.  Okay.  Good.
16              (Exhibit No. 9 marked for
17                  identification.)
18
19 Q  (By Mr. Nealey)  I'm going to give you Exhibit 9 and just
20    ask you if you -- what this is.  It's Bates No. 62 --
21    M-62 to 64.
22 A  This appears to be a first notice of loss when the person
23    first reported the claim.  I have never seen these
24    particular -- filled these out.
25 Q  Are these generated by the insured, or this is generated

Page 87

1     by Am Fam when somebody calls in or initially does the
2     claim?
3  A  I'm guessing -- I am guessing this is from ICS.  You can
4     click on one of the links in ICS and it gives you this
5     report.  I know the term "first notice of loss" and I
6     know there's a link in ICS that says "first notice of
7     loss" which likely gives you this --
8  Q  Okay.
9  A  -- but this is generated by American Family.
10 Q  Okay.
11              (Exhibit No. 10 marked for
12                  identification.)
13
14 Q  (By Mr. Nealey)  I'm going to mark as Exhibit 10 Bates
15    No. 77 and 78 and ask you what this is.
16 A  This would be an ISO claim search I'm guessing ran by the
17    casualty adjuster or the call center to look for any
18    prior hits -- prior claims on the vehicle.  I believe
19    they do this on every vehicle.
20 Q  Okay.  When you went and ran the -- the Audatex
21    diminished value tool, did you use this search that was
22    already in the file, or do you run your own search?
23 A  I run my own.
24 Q  Okay.  So -- but this is the same database that you would
25    have used?

Page 88

22 (Pages 85 to 88)

1   A   Yes.

2   Q   Okay.  Do you know what the source of data is for the ISO
3       claim search?

4   A   My understanding, it's by other insurance companies
5       provide this information to ISO.

6   Q   And Am Fam does as well?

7   A   As far as I know, yes.  I've seen Am Fam losses on these,
8       so I'm assuming that comes from American Family.

9   Q   Okay.  And then I'm going to ask you what this is,
10      Exhibit 11, if you know.  It's American Family M-79 and
11      80.

12          (Exhibit No. 11 marked for
13          identification.)

14

15          THE WITNESS:  I believe these are the
16      questions that we were looking at the prior document.
17      This is the VEA.  This does help them determine if it's a
18      total loss or not and what the appropriate thing to do
19      with the vehicle.  And I believe this is during first
20      notice of loss.

21   Q  (By Mr. Nealey)  Okay.  So this is run -- Exhibit 11 is
22      run, and then when we see the output of that -- we see
23      that several places, including Exhibit 9, where it shows
24      up on Page 2 right here.

25          Is that where the output is?  (Indicating.)

Page 89

1   A   It appears so, but, once again, this is an area I don't
2       do, but --

3   Q   Okay.

4   A   -- I would assume that, yes.

5   Q   Okay.  So I take it that you became more deeply involved
6       in Mr. Meyer's claim and were contacted when Mike Harber
7       sent a letter in and he indicated that he was acting as a
8       public adjuster for Mr. Meyer?

9   A   Yes.

10   Q  Okay.  What's your understanding of what a public
11      adjuster is?

12   A   My understanding, it's an individual that an insured can
13      hire on their behalf --

14   Q   Okay.

15   A   -- to adjust their claim.

16   Q   Okay.  Do you treat -- how often do you have claims where
17      the public adjuster gets involved?

18   A   Very rare, just a few times in my career.

19   Q   Okay.  Did you talk with anyone -- putting aside lawyers,
20      did you talk with anyone about that this claim should be
21      handled differently or how to handle this claim since a
22      public adjuster was involved?

23   A   No.

24   Q   I have a series of e-mails which I've taken from Mr.
25      Harber's production because they're sequential, and I'm

Page 90

1       going to mark it as Exhibit 12.  And this is e-mails.
2       The last one is August 28th, 2014, from Mike Harber, and
3       it starts with an e-mail that you sent to Mr. Harber on
4       July 29th, 2014.

5          (Exhibit No. 12 marked for
6          identification.)

7

8          MR. NEALEY:  Feel free to -- oh,
9       you've got them.

10          MR. BENNETT:  Well, yeah.

11   Q  (By Mr. Nealey)  The Bates number here I'll read, Bates
12      No. HARBER-119 to 131.

13          Did you review any of these e-mails or any of the
14      correspondence before coming here to testify?

15   A   Yes, I did.

16   Q   Okay.  Did you review the -- the e-mails back and forth
17      between you and Mr. Harber?

18   A   What do you mean?

19   Q   Did you review the e-mails between you and Mr. Harber
20      before coming here to testify?

21   A   I refreshed my memory what was in them.

22   Q   Okay.  Okay.

23   A   Not every one, but I refreshed them.

24   Q   Okay.  I'd like you to turn to, if you can, Bates No.
25      126.

Page 91

1   A   (Witness complies.)

2   Q   And there is -- which is a July 30th e-mail from Mr.
3       Harber to yourself and with a cc to Mr. Meyer, and at the
4       bottom of the page, do you see the e-mail from Mike
5       Harber to yourself?

6   A   Uh-huh.

7   Q   And he listed a couple of things, and I would like to
8       just ask you about the eventual outcome of those.

9   A   Okay.

10   Q  Mr. Harber listed that the trunk in Mr. Meyer's vehicle
11      had standing water in it.

12          Would you attribute the fact that Mr. Meyer's trunk
13      had standing water in it to anything other than the
14      possible issues with the first repair of the vehicle?

15   A   I was never given any evidence other than his claim that
16      he saw it, the standing water, and he never provided me
17      with any documentation or photos to show that it was --
18      that there was standing water in the trunk, so I don't
19      know when or why there was standing water in his trunk.

20   Q   When you inspected the vehicle -- you inspected this
21      vehicle on the 28th; right?

22   A   I would have to -- the first time I inspected it was once
23      it was dropped off at Metro.

24   Q   Uh-huh.

25   A   And it would have been on or about the 28th.

Page 92

1  Q  Okay. So, I mean, you've already inspected the vehicle
2      at this point.
3        Did you look for standing water?
4  A  Yes. There was no standing water.
5  Q  Did you see moisture in the trunk?
6  A  No.
7  Q  Okay.
8  A  It had been a very hot summer.
9  Q  Okay. How about that the tail lamp pockets had mounting
10     holes slotted to make the lamp lights fit; did you find
11     that in the vehicle?
12 A  I saw damage to the holes around where the taillights go
13     in. I don't -- I don't agree that they were slotted. In
14     my opinion, they were more likely from the new loss.
15 Q  So we understand here, the taillight pockets have a
16     mounting hole, and that is a round hole; right?
17 A  Correct.
18 Q  Okay. And when you looked at the vehicle, the hole is no
19     longer round? It's been pulled out one direction; right?
20 A  There was damage to the hole.
21 Q  Okay. And your contention would be that that damage to
22     the hole was in the second accident?
23 A  Let me rephrase. I don't believe it was done by
24     Barrett's Collision, by the previous repairs as he was
25     claiming. To me, it was more likely a result of the

Page 93

1      second loss unless there's a third factor I'm not aware
2      of.
3  Q  Are you aware of a collision like Mr. Meyer's vehicle a
4      second time to the rear that that would have enough force
5      that it would cause the bolts to sheer through sheet
6      metal off to the side?
7  A  Can you rephrase?
8  Q  Let me back up and see if I can lay a foundation in an
9      appropriate way, not a way certain judges think of it.
10       So you would agree that the -- that where the --
11     that where the lamp light pockets were and the mounting
12     holes were there, that the holes are no longer round but
13     they have been pulled off to one side; right?
14 A  I would say they have been damaged.
15 Q  Okay. They've been damaged.
16       And there's two possible explanations for why
17     they're that way. The first one is that in the -- one of
18     the collisions, the first collision or the second
19     collision, that the whole light assembly moved over and
20     the bolts that are through there had then pulled the
21     sheet metal off and tore it in one direction; right?
22 A  Say that again.
23 Q  One of the explanations is that an accident, either the
24     first accident or the second accident, that the bolts had
25     actually -- the whole assembly had been hit hard enough

Page 94

1      that it pulled the bolt through the sheet metal off to
2      the side; right?
3  A  That is one possibility.
4  Q  Okay. And the second possibility is that in order to get
5      it fit, somebody put a screwdriver on there and hammered
6      the screwdriver which moved it over so you could tighten
7      it up outside of the normal area where the hole would be;
8      right?
9  A  That is possible.
10 Q  Okay. Do you have any evidence that the force of the
11     second collision was great enough that it would have
12     caused the whole taillight assembly to move over and
13     sheer through sheet metal?
14 A  No.
15 Q  Okay. And, in fact, in the rear of this vehicle in the
16     first accident that was done -- the repairs were done by
17     Barrett's -- the bumper cover was replaced but also the
18     energy absorbers and the piece under the bumper; right?
19 A  I would have to check the estimate, but I believe the
20     bumper cover was repaired.
21 Q  But the energy absorbers and pieces underneath it were
22     replaced?
23 A  I would have to double-check the estimate. I believe
24     they were.
25 Q  Okay. I'd be happy to pull the estimate --

Page 95

1  A  Okay.
2  Q  -- to help you. I've got a copy of it here. Of course,
3      that requires me to find it.
4        I'm sort of mystified here. Sorry. I'm trying to
5      find the final estimate. I am used to seeing what is
6      called an "estimate of record."
7  A  If I may, I believe that was the final estimate that you
8      have there.
9  Q  Okay. I'll ask you to go through this. This is the
10     whole packet of all the estimates, but it's listed as
11     Supplement 4. And I'm used to seeing the terminology
12     "estimate of record" on there, and maybe you just used
13     different terminology.
14 A  (Witness peruses document.) This one. (Indicating.)
15 Q  Okay. So the final estimate is what is marked -- what is
16     marked as Supplement 4?
17 A  It appears, so, yes.
18 Q  Okay. And that is Bates No. 229 through 238, which has
19     the reconciliation --
20         THE COURT REPORTER: Has the what?
21         MR. NEALEY: Has the reconciliation on
22     it.
23 Q  (By Mr. Nealey) Okay. So we'll call this the final
24     estimate. And if -- and let me mark that as Exhibit 13.
25     ///

Page 96

24 (Pages 93 to 96)

Page 97

1    (Exhibit No. 13 marked for
2         identification.)
3
4    THE WITNESS:  So to answer your
5  question, there was a 1-hour repair to the rear bumper
6  cover, itself.  We did replace the reinforcement and the
7  absorber.
8  Q  (By Mr. Nealey)  Okay.  And, obviously, as the damage in
9  the back gets more severe, you replace -- you do work on
10  bumper cover and then you have to do work on the pieces
11  underneath it if the energy of the accident is great
12  enough to damage them; right?
13  A  If there was damage to the -- behind the bumper, then,
14  yeah, we would address it.
15  Q  Okay.  Understand.
16    So the damage was severe enough in the first
17  accident repaired by Barrett's that you had to go in and
18  replace the energy absorber and the -- and the -- the
19  energy absorber and the support bar under the bumper;
20  right?
21  A  The bumper reinforcement, yes.
22  Q  Okay.  And you have seen, have you not, the -- the
23  estimate that All State has repaired for the second
24  repair?
25  A  Yes.

Page 98

1  Q  Okay.  I'm going to mark as Exhibit 14 a copy of the
2  estimate that was actually produced in a discovery
3  request by American Family to All State, which is the
4  estimate of record on the second accident, All State 2
5  through All State 17.
6    (Exhibit No. 14 marked for
7         identification.)
8
9  Q  (By Mr. Nealey)  And apart from the first page, which you
10  may not have seen, are you familiar with the rest of the
11  estimate?
12  A  I have looked it over one time.
13  Q  In the second accident that All State repaired part of,
14  did they have to repair the energy absorber or any of the
15  parts underneath the bumper cover?
16  A  The only -- the damage behind the bumper, they have
17  repairs to the floor and the rear body panel, which is
18  behind the reinforcement, but it looks like they just
19  removed and installed the reinforcement.  I don't see
20  they replaced the reinforcement or the absorber.
21  Q  Okay.  Would you agree with me that in an accident where
22  you have to replace the energy absorber and the -- and
23  the support bar is more severe than one where you don't
24  have to replace it and you can just removed those parts
25  and reinstall them?

Page 99

1  A  Not necessarily.
2    MR. BENNETT:  I was just going to
3  object.
4    Objection to form.
5    Go ahead.
6  Q  (By Mr. Nealey)  What would be your explanation for --
7  for -- what would be your explanation for how it is that
8  on the American Family accident, the first one, that they
9  had to replace the energy absorber and replace the
10  support bar and, yet, those parts could just be pulled
11  off and reinstalled without any repair in the second
12  accident other than the fact that the second accident had
13  less energy than the first?
14  A  Where it was hit.  Possibly if -- in our case, ours was
15  pushed up against a wall, if I remember correctly.  It's
16  possible a vehicle could have rear-ended it and gone
17  underneath those, which would explain the damage to the
18  rear body panel and the floor but not to the
19  reinforcement.  It's possible that ours was more severe.
20  I just say there are other factors other than the
21  severity to determine what we replace because I have seen
22  a lot of damage where we've missed bumper reinforcements
23  and they weren't replaced only because they were missed,
24  not because the damage was less or more severe -- I'm
25  sorry, not because the impact was less or more severe.

Page 100

1  Q  Okay.  Now, the third thing that -- going back to Exhibit
2  12, Page 8, Mr. Harber, in his e-mail to you, lists that
3  the bumper cover was glued into place to satisfy the
4  vehicle owner with the fit.
5    Did you ascertain whether that was correct or not
6  correct?
7  A  I questioned the Barrett's shop about it.  And after
8  talking with them, I had no reason to believe that they
9  did do that.  And I have no explanation as to why that
10  glue is there.
11  Q  So but you would agree that there was glue underneath the
12  bumper cover?
13  A  I did see a blob of glue on the bumper cover.
14  Q  To hold the bumper cover in place?
15  A  I don't know why it was there.
16  Q  Okay.
17  A  I saw it off the vehicle.
18  Q  Okay.  Well, do you have any -- other than gluing the
19  bumper cover in place so that it would try to fit,
20  although the pieces underneath it didn't fit, can you see
21  any reason why the glue would be there, other than to
22  hold the bumper cover in place?
23  A  I don't know why someone put glue on it.
24  Q  Do you think Mr. Meyer put glue on there?
25  A  I don't know why somebody put glue on there.

25 (Pages 97 to 100)

Matthew L. Fuqua
November 4, 2014

1   Q   But you would agree that there was glue underneath the
2       bumper cover when the bumper cover was removed after the
3       second accident -- scratch that.
4           You would agree that there was glue under the bumper
5       cover and you would agree that Barrett's had put that
6       bumper cover back on the vehicle after repairing it;
7       right?
8   A   They did put the bumper cover back on the vehicle after
9       repairing it.
10  Q   And you would agree that when you looked at it, there was
11      glue underneath that bumper cover when it was taken off?
12  A   I saw glue on it when it was at Metro.
13  Q   Okay.  And you would agree that gluing the bumper cover
14      on to try to get it to fit over the repairs is not an
15      appropriate repair?
16  A   I agree with that.
17  Q   Okay.  Now, Mr. Harber then mentions there's also concern
18      with the movement of the right fender to make the hood
19      gaps acceptable.
20          What was your response on that point?
21  A   There was paint missing on one of the bolts that hold the
22      fender in place which I did agree to pay to touch that
23      fender jam up.
24  Q   Okay.  And I'm going to mark as Exhibit 15 -- and I take
25      it that this is the amount, Exhibit 15, that you agreed

Page 101

1       that you would pay to fix that -- touch up that fender
2       jam, which is $91.81?
3                   (Exhibit No. 15 marked for
4                   identification.)
5
6               THE WITNESS:  Yes.
7   Q   (By Mr. Nealey)  Okay.  Now, moving forward, if you go to
8       Page 6 of Exhibit 12, Mr. Harber then raises with your
9       that -- that the right and left quarter glass was not
10      repaired -- was not removed and installed nor was the
11      back glass.
12          Had you noted that when you had inspected the
13      vehicle on the 28th?
14  A   No.  When I inspected it, I believe it was just before
15      they started repairs.  I didn't know anything about the
16      quarter glass.
17  Q   Well, you said there were paint issues around the quarter
18      glass; right?
19  A   I was able to see minor paint issues where the quarter
20      glass meets the quarter panel.
21  Q   Okay.  So let me see if I can lay the foundation a little
22      bit here.
23          So you went and looked at the vehicle on around the
24      28th of July.  And when you went and looked at the
25      vehicle around the 28th of July, you noticed there were

Page 102

1       paint issues around where the quarter glass is and around
2       where the back glass met the sheet metal; right?
3   A   No.  That was not brought up by Mr. Harber at that time.
4       That was on a second inspection of the vehicle, he had
5       asked me to come out to -- this e-mail was addressing
6       something that he found, and then I came out a second
7       time --
8   Q   Okay.
9   A   -- and he pointed that out to me because he did not point
10      those out to me the first time.
11  Q   Okay.  Now I think I understand your answer a little bit
12      better.
13          My question was a little different, which is that
14      when you looked at the vehicle -- you went out and looked
15      at the vehicle on the 28th, did you look around and see
16      if there was something else?  Did you look at the quarter
17      glass?  Did you look at the back glass?  Did you look at
18      the paint?
19  A   I inspected -- I did look over the whole vehicle, and I
20      had a long -- an estimate from Metro, and I was mainly
21      there to find out what his concerns were with the repair
22      and quality issues.
23  Q   Okay.
24  A   The quarter glass issue, once he did point them out,
25      are -- they are visible, but you have to be looking

Page 103

1       pretty hard, and he, I'm assuming, was not aware of them
2       at the time of our original inspection, and I did not see
3       them when I inspected it either.
4   Q   Okay.  And that is because if you try to paint around the
5       glass and you just mask instead of removing it, you end
6       up with paint edge and paint problems; right?
7   A   It can happen.
8   Q   And you were -- they were already beginning to see that a
9       couple months later on Mr. Meyer's vehicle; right?
10  A   It's possible it left that way.  I don't know if that
11      happened when it left or later.  I will add our estimate
12      does have to remove -- does have to mask off the quarter
13      glass.  When I reviewed the photos, it does look like
14      they did pull the quarter glass off, and but the estimate
15      does say mask them off, but when we look at the
16      in-process photos at the shop, it does look like they did
17      removed the glass.  With that said, I'm not disputing
18      that there was paint issues where the quarter glass meets
19      the --
20  Q   Well, would you see the same paint issues that you saw
21      around the -- where the quarter glass meets the body work
22      that you had failed to remove the glass?
23  A   It's hard to say, because even when you pull the glass,
24      you still have to mask off the opening.  And, honestly, I
25      couldn't tell exactly what caused what I saw, other than

Page 104

1    say I did see an issue that needed to be corrected.
2  Q   Okay. And there was also issues round where the back
3    glass was; right?
4  A   There was a very fine white line. I don't know if it was
5    primer. There was an area where there wasn't yellow
6    paint. Once again, I don't know if it needed repainting
7    or rebuffing. I just saw an issue that needed to be
8    addressed --
9  Q   Okay.
10  A   -- near the back glass.
11  Q   And the back glass was not removed by --
12  A   It was not -- it was not removed.
13    Sorry.
14  Q   Okay. Okay. Now, would it be traditional in typical
15    repair process that when you're painting around a glass
16    area like the back glass or the side glass that you would
17    remove those and then paint and then reinstall them? Is
18    that the typical process?
19  A   It's typical both ways. I've seen probably all shops do
20    it both ways. It depends if there is room to mask it.
21    It's pretty rare, in my experience, to remove a back
22    glass unless they have to get paint there as opposed to
23    just clear coat. Because what's involved in pulling a
24    back glass, it's better to -- most shops will mask off a
25    back glass if they can --

Page 105

1  Q   Would --
2  A   -- and same with -- sorry. Same with quarter glass. If
3    it can -- if they can do it, most shops will -- in my
4    experience, will mask it off. I've seen some shops make
5    the decision to mask the same car that some shops might
6    make the decision to pull the glass.
7  Q   And, of course, if you don't pull the glass and you mask
8    it, you can end up with white lines of primer showing
9    through or problems with the paint later; right?
10  A   Once again, I don't know exactly what I saw, what caused
11    that, if it was a result of not pulling the glass. What
12    I saw on the back glass was near the top lip, not really
13    down in the groove, so whether the glass was pulled or
14    not, it doesn't appear it would have hindered that area,
15    so there could have been another cause from that, not
16    solely that they did not pull the back glass.
17  Q   Okay. Now, on Mr. Meyer's vehicle when it was reported
18    to you that the connector points for the heating elements
19    in the back glass were not working and they had Super
20    Glue on them, right, did you check those? Did you
21    actually look at the points, the contact points?
22  A   I had the shop send me photos, and I could clearly see
23    what they were referring to.
24  Q   So the connector points were Super Glued?
25  A   I don't know. I see that the connector point was broken

Page 106

1    off. And their claim was that it had been glued back on.
2  Q   Did you ever go look at it to see if it had been glued,
3    to check for glue?
4  A   I did not look at it for that time --
5  Q   Okay.
6  A   -- for that particular issue.
7  Q   Okay. Did you doubt that there was glue on it?
8  A   I'm not saying that there was or wasn't. I'm not saying
9    that they're lying, and so, in that case, no, I'm not
10    saying there wasn't glue on it. I was never disputing
11    that.
12  Q   Okay. So let's see if we understand.
13    So definitely you would agree that the connector
14    points were broken, and that makes -- that makes the --
15    the functioning of the rear window defogger doesn't work
16    unless you put a whole new back glass in; right?
17  A   My understanding is that's what they did to correct it,
18    was to buy a new back glass.
19  Q   Which is a pretty expensive item on that car; right?
20  A   I believe it was. It was like $400 or something.
21  Q   Okay. And it's clearly broken and you don't -- you don't
22    have any reason to dispute that there was, in fact, Super
23    Glue on there that was holding it in place at some point?
24  A   I have no reason to dispute it.
25  Q   Okay. Do you have any reason to suspect that somebody

Page 107

1    other than Barrett's put that Super Glue on there?
2  A   I don't know how that was broken. I have no reason to
3    think it was Barrett's any more reason than I have to
4    believe it was somebody else.
5  Q   Okay. Well, who else would it have been?
6  A   I mean, we want to talk hypotheticals?
7  Q   Yeah.
8  A   I can load something in my car and break it myself and
9    glue it myself. It could have been a previous owner. It
10    could have been a friend that borrowed the car. It could
11    have been Metro. Somehow that may have been broken by
12    somebody and somebody may have glued it back on.
13  Q   Well, why would Metro glue it back on?
14  A   I'm not saying they did. I'm just giving you
15    hypotheticals.
16  Q   Okay. Well, if Barrett's had set about to remove the
17    back glass and as part of removing it they broke that
18    connector tab, would Am Fam pay for that, or would they
19    make Barrett's eat it?
20  A   If something like that were to happen -- and similar
21    situations do happen in shops. A quarter glass can
22    break. And I know we're talking about the back glass,
23    but items can be damaged during the repair process. I
24    would typically -- I would pay for it at cost, meaning
25    they wouldn't make a profit, and that's how I've handled

Page 108

27 (Pages 105 to 108)

1   similar situations. Barrett's might make the business
2   decision to take care of it and replace it themselves,
3   but if they came to me and said, "Hey, we damaged the
4   back glass during the removal and install process," I
5   would cover that glass because, in this industry,
6   sometimes parts are broken. Molding, I have replaced
7   $500 moldings that the clip broke on. I don't care about
8   the price. It's understandable that things can break
9   during the repair process. Yes, it is. And there would
10  be no reason to cover it up because I have in the past
11  paid for items at cost that have been broken.
12  Q   Okay. Meaning that you pay for the part cost at price
13      but they'd have to do the labor on it?
14  A   No. Meaning they get it at a cheap -- at a wholesale
15      price and I pay retail. I would pay what their cost to
16      replace it was.
17  Q   Okay.
18  A   With that said, I mean -- and I would still pay the
19      remove and install, because if their intent was to remove
20      and install for the repair process, I would have been
21      paying that anyway.
22  Q   Okay. I understand.
23          Now then I'd like to give you Exhibit 16, which I
24      believe was a second supplement that you agreed to pay.
25      ///

Page 109

1               (Exhibit No. 16 marked for
2                   identification.)
3
4   Q   (By Mr. Nealey) And is this correct that then as a
5       result of the further inspection of the vehicle that you
6       agreed that these were charges that needed to be paid as
7       a result of what was not done on the first repair?
8   A   These are -- this was revised after the second
9       reinspection when I saw the paint issues on the quarter
10      glass and the back glass, and I did not disagree that
11      they are likely from the repairs that were done for our
12      loss.
13  Q   Okay. So to summarize then, when we look at Exhibit 16,
14      Exhibit 16 is what you agreed to pay for dealing with the
15      fender issues, what you agreed to pay for the back glass
16      and the quarter glass issues as a result of the paint
17      quality but does not cover the actual cost of the back
18      glass and the damage to the connector because you've
19      declined to pay for that?
20  A   Correct.
21  Q   Okay. Okay. And then I'm going to give you Exhibit 17.
22              (Exhibit No. 17 marked for
23                  identification.)
24
25  Q   (By Mr. Nealey) And this is an e-mail I forwarded to me,

Page 110

1       so I just printed it out, but it contains the text of an
2       e-mail that you sent to Mr. Harber and I had Mr. Harber
3       send to me. And this was an e-mail that you sent on
4       October 31st.
5           And is this the final estimate?
6   A   This is the latest one that I have sent to him.
7   Q   Okay. And is this cumulative?
8   A   What do you mean?
9   Q   Is this cumulative, meaning this includes the two prior
10      supplements in them?
11  A   Yes, yes.
12  Q   Okay. And the only difference between what has been
13      marked as Exhibit 17 and Exhibit 16 is you included a
14      little bit of time to repaint the roof of the vehicle; is
15      that correct?
16  A   Correct.
17  Q   And why did you agree to repaint the roof of the vehicle?
18  A   The previous e-mail to this that I got from Mr. Harber
19      was -- brought up that they -- one area that, if I
20      recall, Barrett's did not paint was the roof on this
21      three-stage paint and it was challenging for them to
22      match it because we would have the new paint job versus
23      the factory paint job and he was claiming that the shop
24      could match both, so I conceded to I will go ahead --
25      more than conceding to this, I agreed I would paint the

Page 111

1       roof to help it with the color match.
2   Q   Would you agree that the original color that Barrett's
3       put on the car is not exactly the same paint and the same
4       color as was on the vehicle originally from the factory?
5   A   I will not agree or disagree. I could not tell the
6       difference. Once again, this was more a concession item
7       I decided to make, not a I looked at the two colors and
8       agreed they did not match.
9   Q   Did you go out and they raised the issue of the -- did
10      you go out and look at the panels they shot with the --
11      the panels they shot with paint prepared according to the
12      paint numbers on the paint code versus the roof color,
13      which was original versus the Barrett's color? Did you
14      ever go look at the three of them together?
15  A   No, I did not.
16  Q   Okay. But you did know that the repair shop shot paint
17      panels using the paint code and when they placed them
18      next to the Barrett color, they were not the same?
19  A   No, I don't. They never showed me that or told me that.
20  Q   So have you looked at this vehicle after -- you've looked
21      at it twice?
22  A   Twice.
23  Q   Okay. So when this issue with the -- the issues with the
24      paint color match of the Barrett paint after the first
25      repair versus the OEM paint and them being different, you

Page 112

1    never actually went and looked at the paint panels and
2    the repair paint that was shot by Metro?
3  A  No.  The first -- the only issue that he brought up to me
4    was this -- as far as -- as far as the second time I
5    looked at the car, this was the first reference he said
6    about needing to paint the roof, which I conceded to, so
7    no, I did not go out there and look at it.
8  Q  Okay.  Okay.  So if I'm understanding, the first
9    inspection you did, you agreed to pay $91, which was the
10   fender.  The second time when it was pointed out, you
11   went out and looked at the car a second time and
12   determined that, in fact, there were issues around the
13   back glass and the side glass with the paint, and you
14   agreed that you would pay for the removal and
15   reinstallation of those back glass and the side glass;
16   right?
17 A  Correct.
18 Q  Okay.  And the third time when -- during the repair
19   process when Metro went to actually try to shoot the
20   color using the color codes and found that the Barrett
21   paint didn't match what they were getting versus the
22   factory paint, you didn't go look at those three
23   different colors and you conceded the point and agreed
24   you would pay to repaint the hood -- repaint the roof to
25   try to fix that problem?

Page 113

1         MR. BENNETT:  Object to the form and
2    foundation.
3         THE WITNESS:  I didn't agree to the
4    point there was a color match issue, but I did concede
5    that since, you know, we did not paint the roof and I
6    think that's about the only panel that has not been paid,
7    I would go ahead and take care of it.
8  Q  (By Mr. Nealey)  Okay.  But in order to dispute the point
9    about whether there was a difference in the paint, you
10   would have had to go out and looked at the actual
11   repaired panels?  The roof with the original paint and
12   then what Metro was shooting, you would have to compare
13   the three of them; right?
14 A  If I was going to dispute it, if it was not already done,
15   I would have -- I would have tried to go look at it a
16   third time.
17 Q  Okay.  So it's not fair to say then that you dispute that
18   there was a color match issue.  You would have had to
19   have gone and looked at it to see if you disputed it, and
20   you decided it wasn't worth fighting one way or another,
21   so you accepted there was a color match issue and agreed
22   to just pay to repair the roof rather than looking at the
23   car?
24 A  No.  I wouldn't say that.  A color match issue was never
25   brought up during the first inspection or the second

Page 114

1    inspection.  And it is more of a -- I would say more of
2    just a concessionary item that we elected to make in the
3    interest of getting this resolved because in his e-mail
4    prior to this did said -- his e-mail was implying that
5    there's -- because I already sent him an e-mail saying no
6    to various other items, and I get this last e-mail with
7    issues with the back glass and the roof.  And after
8    reviewing with Barrett's about the back glass issue and
9    there was no evidence that they tried to remove it and
10   the second item was the roof, I agreed to -- in the
11   interest of resolving it, to point the roof.
12 Q  Okay.
13 A  But it wasn't made to save time or avoid looking at it a
14   third time.
15 Q  No.  I'm not trying to suggest that.  But I'm saying that
16   if you wanted to make a determination whether, in fact,
17   there was a color match issue or not, you would have had
18   to have gone out and looked at the roof, which is not
19   painted with the Barrett paint, and then at what Metro
20   was shooting on blanks to see what the color match was
21   like to see if there was an issue or not; right?
22 A  It would have given me a better understanding of the
23   issue.
24 Q  Okay.  But since you didn't look at the three of them,
25   you don't know if there was or wasn't a color match

Page 115

1    issue?
2  A  Not with their final painting, no --
3  Q  Okay.
4  A  -- other than he never brought up a paint issue before.
5  Q  Okay.  Well, and, of course, you only know you've got a
6    color match issue when you go to shoot -- when you mix up
7    the paint and shoot a blank to make sure you've got an
8    okay color match; right?
9  A  Well, his contention was the roof paint was not matching
10   the Barrett's paint job, and he never pointed that out to
11   me that I can recall on the first or second inspection.
12 Q  Did you understand that the -- that the paint that was
13   being shot by Metro using the factory code was or was not
14   matching what Barrett's had put on the car?
15 A  Could you repeat it?
16 Q  Do you have an understanding whether what Metro shot
17   on -- on sheet metal to test the paint, do you know
18   whether that was or was not matching the color of what
19   Barrett's had put on the car?
20 A  I do not know, myself.
21 Q  Okay.  I'm going to mark Exhibit 18.
22        (Exhibit No. 18 marked for
23        identification.)
24
25 Q  (By Mr. Nealey)  At what one point there was a series of

Page 116

29 (Pages 113 to 116)

**Page 117**

1 e-mails. And I marked as Exhibit 18 Bates 134 to 145.
2 There was a couple of e-mails in which Mr. Harber
3 looped in a John C. Roberts. And I think I understood
4 you were on vacation at the time or not available.
5 Who is Mr. Roberts?
6 A He is my counterpart that handles the north end of
7 Washington.
8 Q Okay. And so you were out and Mr. Roberts stepped in for
9 a couple of these e-mails?
10 A Yeah. I was on vacation, and when I get an e-mail, it
11 says to contact John Roberts if you need immediate
12 assistance.
13 Q Okay. Okay. And I take it that Mr. Roberts didn't
14 eventually make any decisions at all; you were the one to
15 make the decisions on what to do in this?
16 A Correct.
17 Q Okay. The last e-mail that I find before your e-mail,
18 which I've printed out as Exhibit 17, I'm going to mark
19 as Exhibit 19, and this is Bates No. 154, which is in
20 October -- I'm sorry. Wrong e-mail. Wrong e-mail.
21 That's not what I wanted. Let's go back.
22 It's Exhibit 19 is Harber 152 and 153. It's an
23 e-mail from you and Mr. Harber on September 16th.
24 (Exhibit No. 19 marked for
25 identification.)

**Page 118**

1 Q (By Mr. Nealey) And between what has been marked as
2 Exhibit 19 and what I've marked as Exhibit 17, did you
3 have any further e-mail correspondence that you remember
4 between yourself and Mr. Harber?
5 MR. BENNETT: 17 is the --
6 MR. NEALEY: 17 is the -- is the
7 e-mail --
8 MR. BENNETT: That's the All State
9 file.
10 MR. NEALEY: No. That's 14.
11 MR. BENNETT: Oh, is that a "4"?
12 Sorry.
13 MR. NEALEY: It's okay. That is a 4,
14 but it could be construed as a 7.
15 MR. BENNETT: Okay.
16 Q (By Mr. Nealey) Do you remember any further
17 communication between yourself and Mr. Harber between
18 that September 26th e-mail that I have marked as Exhibit
19 19 and the Exhibit 17?
20 A No. I believe this is the last e-mail I got directly
21 from Mr. Harber.
22 Q Okay. Okay. Why the -- why the wait of over a month?
23 A I believe that was -- let me look. Where is that big
24 e-mail packet? All those -- there was --
25 MR. BENNETT: I think this one is the

**Page 119**

1 one. (Indicating.)
2 THE WITNESS: I believe the last
3 e-mail I sent to Mr. Harber was on September 22nd where
4 it outlined -- scratch that.
5 I'll have to see the e-mails, but basically I sent
6 him a lengthy e-mail outlining our position on the
7 various items, and I think a month had gone by where I
8 get the e-mail about the back glass, so that month I
9 believe was the time between my last e-mail to Mr. Harber
10 and when he sent me an e-mail while I was on vacation.
11 Q (By Mr. Nealey) Okay.
12 A But from my recollection, he was not waiting for any kind
13 of a response from me.
14 Q Okay. Okay. Let me take a break and let me look at my
15 notes a little bit and I may be done or either close to
16 done.
17 MR. BENNETT: Sure.
18 (Recess from 12:08 p.m. to
19 12:20 p.m.)
20
21 Q (By Mr. Nealey) When you ran the Autosource diminished
22 value assessment, did you consider anything else in
23 reaching a -- a number on Mr. Meyer's loss other than the
24 Autosource diminished value tool?
25 A Well, in addition to running the tool, I did, you know,

**Page 120**

1 run ISO. I ran the VIN. I made sure those --
2 Q Okay.
3 A -- the owner -- who the owner was, that there was no
4 prior losses, no prior repairs that I'm aware of, and
5 with that said, no, I went with the Autosource --
6 Q Okay.
7 A -- evaluation.
8 Q And if you had found there was some sort of a prior
9 accident on the vehicle, you would have reduced the
10 amount that you would have thought was the diminished
11 value on the loss?
12 A I would have reviewed it with my manage, just say, "Hey,
13 how do we want to apply this to this?" It's how bad of a
14 severe loss. Was it a minor hit? Was it a $10,000 hit?
15 And that would have come into the evaluation of it.
16 Q Okay. I have no further questions. Thank you very much.
17 (Deposition concluded at 12:21
18 p.m.)
19 (Signature reserved.)

Matthew L. Fuqua
November 4, 2014

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1    STATE OF WASHINGTON )   I, Laura L. Ohman, CCR, a certified
                       ) ss court reporter in the State of
2    County of Pierce   )   Washington, do hereby certify:
3
4          That the foregoing deposition of MATTHEW L. FUQUA
     was taken before me and completed on November 4th, 2014, and
5    thereafter was transcribed under my direction; that the
     deposition is a full, true and complete transcript of the
6    testimony of said witness, including all questions, answers,
     objections, motions and exceptions;
7
           That the witness, before examination, was by me
8    duly sworn to testify the truth, the whole truth, and
     nothing but the truth, and that the witness reserved the
9    right of signature;
10         That I am not a relative, employee, attorney or
     counsel of any party to this action or relative or employee
11   of any such attorney or counsel and that I am not
     financially interested in the said action or the outcome
12   thereof;
13         That I am herewith securely sealing the said
     deposition and promptly delivering the same to
14   Attorney Scott P. Nealey.
15         IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my official seal this 11th day of November,
16   2014.
17
18
19
20   _____
         Laura L. Ohman, CCR
21       Certified Court Reporter No. 3186
22
23
24
25
                                        Page 121

Matthew L. Fuqua
November 4, 2014