# Exhibit "9"

Transcript of the Testimony of

**Lisa M. McNally**
September 10, 2014

**Butler v. American Family**
No. 3:14-cv-05305 RBL



**Byers & Anderson**

**Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316** Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Taccoma, WA 98403-3360
Tacoma: **253 627-6401** Fax: **253 383-4884**

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JEFF BUTLER, individually and as )
the representative of all persons )
similarly situated, )
)
Plaintiffs, ) No. 3:14-cv-05305 RBL
)
vs. )
)
AMERICAN FAMILY MUTUAL INSURANCE )
COMPANY and AMERICAN STANDARD )
INSURANCE COMPANY OF WISCONSIN, )
foreign insurers, )
)
Defendants. )

DEPOSITION OF LISA M. MCNALLY
September 10th, 2014
Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square   2208 North 30th Street, Suite 202
600 University St.  Tacoma, WA 98403
Suite 2300        (253) 627-6401
Seattle, WA 98101  (253) 383-4884
(206) 340-1316     scheduling@byersanderson.com
(800) 649-2034     www.byersanderson.com
Serving Washington's Legal Community Since 1980

Page 1

---

APPEARANCES

For the Plaintiffs:
    Scott P. Nealey
    Attorney at Law
    593 Jersey Street
    San Francisco, CA 94114
    415.857.1934
    925.344.8599 Fax
    Snealey@nealeylaw.com

For the Defendants:
    John A. Bennett
    Bullivant Houser Bailey, PC
    888 SW Fifth Avenue
    Suite 300
    Portland, OR 97204-2017
    503.228.6351
    503.295.0915 Fax
    John.bennett@bullivant.com

Also present:  William G. Rasche, American Family
    Insurance

Page 2

---

EXAMINATION INDEX
EXAMINATION BY:          PAGE NO.
MR. NEALEY                  6

EXHIBIT INDEX

EXHIBIT NO.   DESCRIPTION          PAGE NO.
Exhibit No. 1  2-page notice of deposition dated    6
    9/8/2014

Exhibit No. 2  2-page document entitled,          16
    "Interrogatories #6, 7, Requests
    #8, 9," AMFAM MM001716 through
    MM001717

Exhibit No. 3  1-page double-sided document       18
    entitled, "Diminished Value
    Checklist," AMFAM_MM002745
    through AMFAM_MM002744

Exhibit No. 4  1-page double-sided document       50
    entitled, "Release of All Property
    Damage Claims, to Linda Walsh from
    Matthew R. Foley, AMFAM_MM002746
    through AMFAM_MM002747

Exhibit No. 5  1-page double-sided Audatex        52
    document entitled, "Loss of Value,"
    AMFAM_002748 through AMFAM_002749

Exhibit No. 6  1-page document entitled,          62
    "Diminished Value Schedule,"
    AMFAM_002750

Exhibit No. 7  1-page letter from William R.      62
    McCoy dated 7/29/2011, AMFAM_002751

Page 3

---

EXHIBIT INDEX (Continuing)

EXHIBIT NO.   DESCRIPTION          PAGE NO.
Exhibit No. 8  1-page double-sided letter from    63
    Paul Jones dated 7/21/2011,
    AMFAM_002774 through AMFAM_002773
Exhibit No. 9  1-page letter to Christina Bower   64
    from Lisa McNally dated 8/26/2011,
    AMFAM_B000087
Exhibit No. 10  20-page letter to Erling Jackson  64
    from Christina Bower dated
    8/5/2011, AMFAM_B000088 through
    AMFAM_000107

Exhibit No. 11  1-page letter to Brandon M.       65
    Feldman from Lisa McNally dated
    7/30/2010, AMFAM_MM000812

Exhibit No. 12  1-page document entitled,         80
    "View Vehicle," AMFAM_B000012
Exhibit No. 13  1-page double-sided document      94
    entitled, "Diminution of Value
    Worksheet," AMFAM_MM002775
    through AMFAM_MM002776

Exhibit No. 14  1-page document entitled,        101
    "FYI - Note(s) Added,"
    AMFAM_B000010

Exhibit No. 15  1-page letter to Christina D.    102
    Bower from Erling G. Jackson
    dated 8/8/2011, AMFAM_B000024

Exhibit No. 16  25-page affidavit dated          133
    8/12/2014, POLICY_M000001
    through POLICY_M000025

Exhibit No. 17  1-page financial summary &       137
    transaction prepared 3/19/2014,
    AMFAM_B000111

Exhibit No. 18  17-page document entitled,       139
    "Print Notes for 00-331-036580,"
    AMFAM_B000112 through
    AMFAM_B000128

Page 4

---

1 (Pages 1 to 4)

Page 5

```
 1          EXHIBIT INDEX (Continuing)
 2   EXHIBIT NO.    DESCRIPTION         PAGE NO.
 3   Exhibit No. 19  14-page document entitled,    156
                "Print Notes for 00-185-054775,"
 4             AMFAM_M000045 to AMFAM_M000058
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1          BE IT REMEMBERED that on Wednesday,
 2   September 10th, 2014, at 888 SW Fifth Avenue, Suite 700,
 3   Seattle, Washington, at 10:07 a.m., before Laura L.
 4   Ohman, Certified Court Reporter, CCR, appeared LISA M.
 5   MCNALLY, the witness herein;
 6          WHEREUPON, the following proceedings
 7   were had, to wit:
 8
 9              <<<<<< >>>>>>
10
11   LISA M. MCNALLY,  having been first duly sworn by the
12          Certified Court Reporter, testified
13          as follows:
14
15            (Exhibit No. 1 marked for
16              identification.)
17
18              EXAMINATION
19   BY MR. HANSEN:
20   Q  Ms. McNally, thank you for coming here today.  I've just
21     marked as Exhibit 1 for the record a copy of the notice
22     of the deposition.
23       We've asked for your deposition because you were
24     listed as a witness with knowledge but also because it
25     appears from the documents that you were the primary
```

Page 7

```
 1     person who interacted on the diminished vale claim of Ms.
 2     Bower; is that correct?
 3   A  Correct.
 4   Q  Okay.  And I also noticed that you had some interaction
 5     regarding the -- the diminished value claim with Mr.
 6     Meyer as well?
 7   A  No, that is not correct.
 8   Q  Okay.  I noticed your name; you were copied on some of
 9     the e-mails in the contacts.  And another person
10     handled -- appears to be the primary person, but you were
11     listed as the supervisor for that person.  In the log,
12     there's a Jennifer O'Malley who handled it, and you are
13     listed as being her manager.
14   A  I am Jennifer O'Malley's manager; however, she does not
15     handle diminished value claims.
16   Q  Okay.  Okay.  So who has handled the diminished value
17     portion then of Bruce Meyer's claim?
18   A  I'm unsure.
19   Q  You're unsure?
20   A  I have not reviewed that file.
21   Q  Okay.  Okay.  Well, the reason why I ask the questions
22     and I'll want to find out what your knowledge is, is
23     because several times you respond to e-mails from
24     Jennifer O'Malley about what to do on the claim, so --
25   A  If I can see the e-mails, I --
```

Page 8

```
 1   Q  I'll show it to you when we get there.  I just want to
 2     find out what your state of knowledge is.
 3       When you handled the diminished value portions of
 4     Ms. Bower's claim, were you a manager at the time or were
 5     you a line adjuster?
 6   A  I was an adjuster.
 7   Q  Okay.  And when did you get promoted to a manager?
 8   A  In January of 2012.
 9   Q  Congratulations.
10   A  Thank you.
11   Q  And how long were you with Am Fam before you were
12     promoted to a manager in January of 2012?
13   A  I started with American Family in December of 2009.
14   Q  And you started as a physical property damage adjuster?
15   A  Physical damage adjuster.
16   Q  Okay.  Now, as a physical damage adjuster, do you
17     determine liability issues on claims?
18   A  No.
19   Q  Okay.  And if a claim -- and there's a question about
20     whether it is to be categorized when it comes in as
21     comprehensive or collision or, instead, as a UIM claim.
22       Do you make that distinction, or does somebody else?
23   A  We have the ability to make some of the determinations
24     and also we're expected to look for damages to ensure
25     that they're consistent with the facts of loss, but then
```

1    we do collaborate with the casualty adjuster, who does
2    have the final decision.
3  Q  Okay.  Would it be fair if I said that if the case is a
4    clear case where it's a UIM, then you just make the
5    decision and you involve the casualty adjusters if
6    there's some question in your mind?
7  A  That's fair.
8  Q  Okay.  So if you have a situation where you've got a
9    police report and the police report says somebody is
10   uninsured and you run the VIN and don't find any
11   insurance, then you just treat it as a UIM?
12 A  We're not able to run the VINs to determine if there's
13   insurance in Washington.
14 Q  Okay.  You send a letter to the person asking if they
15   have insurance?
16 A  We do not.  The casualty insurance does.
17 Q  What would be the circumstances where you would make a
18   decision on your own; the facts were so clear that you
19   would consider a UIM claim without some investigation by
20   the casualty adjuster?
21 A  On a hit and run.
22 Q  Oh, okay.
23    Now, before starting with Am Fam in December of
24   2009, did you work for any other insurance company before
25   that?

Page 9

1  A  I did.
2  Q  And who was that?
3  A  I worked for Progressive Insurance.
4  Q  And what period did you work for them?
5  A  July 2002 until December of 2009.
6  Q  So you worked for them from -- roughly for seven years,
7    July 2002 to July 2009?
8  A  No.  It was December 2009.
9  Q  Oh, December.  Sorry.  I misheard.
10    Okay.  And you were an auto physical damage adjuster
11   for them?
12 A  By the end of my career, I was a supervisor with
13   Progressive.
14 Q  You were a supervisor of auto physical damage?
15 A  Correct.
16 Q  Okay.  And when you came to Am Fam, you were not a
17   supervisor; you were a line adjuster?
18 A  I was an adjuster once I was hired as a senior adjuster.
19 Q  Okay.  Is there some reason why you left Progressive then
20   as a supervisor and came to Am Fam as a senior adjuster?
21 A  Uh-huh, there is.
22 Q  What was that reason?
23 A  For opportunities to promote higher than a supervisor
24   would.
25 Q  Okay.  Did you take a pay cut when you made that change?

Page 10

1  A  No.
2  Q  Okay.  Now, before you worked for Progressive starting in
3    July 2002, what did you do?
4  A  I was in college.
5  Q  Where at?
6  A  Pacific Lutheran University.
7  Q  I know where PLU is.
8    And what's your degree in?
9  A  I have a business degree.
10 Q  Okay.  Where did you go to high school?
11 A  Wahkiakum High School.
12 Q  Do you have any work experience ever working in the body
13   shop industry?
14 A  I do not.
15 Q  Okay.  Now, after you got your BA in business at PLU,
16   have you had any training in auto adjusting?
17 A  Yes.
18 Q  And what?  Just a summary of what kind of training you've
19   had.
20 A  When I was hired at Progressive, I went through their --
21   their in-house training programs.  I have also attended a
22   couple of I-CAR classes.
23 Q  Anything else?
24 A  There may be other classes that I've taken that I just
25   can't think of.

Page 11

1  Q  Okay.  What I-CAR classes did you take?
2  A  I took a Chief frame class that I can recall because that
3    was the most recent one.  After that, I would have to --
4    I would have to go back and look.
5  Q  And Chief is a frame repair system, right?
6  A  It is.
7  Q  Okay.  So it's a course on how that frame repair system
8    works?
9  A  It was, yes.
10 Q  Okay.
11 A  It included other aspects of it, but yes.
12 Q  Okay.  And how many hours is that -- is an I-CAR course?
13 A  I don't remember how many hours that was.
14 Q  An hour or two or --
15 A  No.  I -- it was over a period of several days.
16 Q  Okay.  And why did you take the course on -- on the Chief
17   frame machine from I-CAR?
18 A  To continue my education.
19 Q  What did you believe that you'd gain from that?
20 A  Just a better understanding of the framing machine.  That
21   was the purpose.
22 Q  Now, have you ever received any specialized training or
23   any training at all on the issue of diminished value?
24 A  No.
25 Q  Okay.  And I take it you've not received any training

Page 12

3 (Pages 9 to 12)

Page 13

```
 1    from Am Fam on diminished value training; is that fair?
 2  A  That's correct.
 3  Q  Do you have any experience in doing market valuations of
 4    automobiles?
 5  A  Are you referencing total losses?
 6  Q  I'm referencing any training you've gotten on how to
 7    value market losses of vehicles.
 8  A  Autosource is who we do our total loss valuations
 9    through, and it would have been training put on by
10    Autosource.
11  Q  Okay.  But you've never taken any courses or education or
12    anything on -- on determining market value of a
13    particular vehicle other than what was put on by these
14    vendors to use their software?
15  A  That is correct.
16  Q  Okay.
17  A  It was how to use their software.
18  Q  Does Am Fam have any training that you're aware of on the
19    issue that they provide people on how to value market
20    values of vehicles other than the training that's put on
21    by their vendors, Autosource and Audadex?
22  A  I'm not aware of any training that's offered.
23  Q  And are you aware of any training that Am Fam offers on
24    how to adjust diminished value losses?
25  A  I'm not aware of any training that's offered on
```

Page 14

```
 1    diminished value.
 2  Q  Okay.  And I've used the term diminished value.
 3    Obviously, you've addressed it and used the term yourself
 4    in the documents, but what understanding do you have of
 5    what diminished value is?
 6  A  It can either be a loss of value as a result of a stigma
 7    because the vehicle has been in an accident or it can
 8    also be due to a possible residual metal -- loss in the
 9    integrity of the metal.
10  Q  Okay.  Where does that understanding come from?
11  A  Working insurance claims --
12  Q  Okay.
13  A  -- and being in body shops and being part of the
14    industry.
15  Q  Okay.  Because I -- I don't see the word stigma in
16    anything that you've written in any of these files.
17  A  Stigma.  Another word would be "inherent," which is
18    commonly used.
19  Q  So if you used the word "inherent" in the documents, you
20    mean "stigma" by "inherent"?
21  A  Yes.
22  Q  Okay.
23  A  I do use the word "stigma" for "inherent."
24  Q  Okay.  Just not on Ms. Bower's claim, right?
25  A  It's possible I didn't.
```

Page 15

```
 1  Q  Okay.  Now, is diminished value, is that a -- is that a
 2    loss in market value?
 3  A  Yes.
 4            MR. BENNETT:  I would just object to
 5    the extent it calls for a legal conclusion.
 6  Q  (By Mr. Nealey)  When was the first time that you
 7    addressed a diminished value claim that you can remember?
 8  A  I've handled -- excuse me.  I've handled them throughout
 9    my entire career at American Family.  I have handled them
10    at Progressive as well.  As far as when that was, I -- I
11    don't recall.  It was very early on in my career, not
12    towards the latter half.
13  Q  (By Mr. Nealey)  Okay.  Now, have you handled anything
14    other than UIM and liability diminished value claims when
15    you were at Am Fam?
16  A  I'm not aware of any other types of diminished value
17    claims.
18  Q  Okay.  I'm going to show you a document that was provided
19    in an earlier case in two thousand -- I think these were
20    provided in 2011.  And I'm going to mark it as Exhibit 2.
21    And it's a list of individuals who are, quote,
22    "diminished value experts per office."  And I'll show you
23    the second page of it, which is listed as Bates No.
24    M-1717, and Bryce -- Bryce Hilden is listed there as a --
25    as an in-house expert.
```

Page 16

```
 1    Is Mr. Hilden -- is he the person within your office
 2    in Washington who is sort of your in-house expert on
 3    diminished value?
 4            (Exhibit No. 2 marked for
 5            identification.)
 6
 7            THE WITNESS:  I was unaware that we
 8    had an in house expert on diminished value.
 9  Q  (By Mr. Nealey)  Okay.  Well, I noticed when you
10    roundtabled Ms. Bower's claim that he was one of the two
11    people that was there.
12    Was there a reason he was there?
13  A  He was my supervisor.
14  Q  Okay.  Okay.  But you don't understand him to have any
15    special knowledge on diminished value that would be
16    different than, say, what you would have?
17  A  Not that I'm aware of.
18  Q  Okay.  So his involvement in this claim was not that he
19    was an in-house expert but that he was your supervisor --
20  A  Correct.
21  Q  -- at the time?
22  A  That is correct.
23  Q  Okay.  He's not your supervisor?
24  A  He is my peer now.
25  Q  He is your peer.  That's what I thought.
```

Lisa M. McNally
September 10, 2014

1    He's a manager?
2  A  He is.
3  Q  And you're a manager now?
4  A  Correct.
5  Q  Okay.  Now, do you have any -- any written guidance that
6    you've been given on how to handled diminished value
7    claims in the State of Washington by Am Fam?
8  A  I have never received anything.
9  Q  Okay.  Now, there were some documents that were provided
10   earlier, and I'm going to mark a couple of them and just
11   ask you about them so that we can -- let me back up a
12   moment.
13    Do you have a set of form letters that you've been
14   given that you can use for purposed of diminished value
15   cases that are available to you?
16  A  Are you referencing a specific letter?
17  Q  I'm asking if you have some template letters or some form
18   letters that you have on your system that you're allowed
19   or have been told you can look at and use for diminished
20   value cases?
21  A  There is a letter that outlines information that we
22   request from the customer, but yes, that would be
23   considered a form letter.
24  Q  Okay.  Let me ask you a couple of these then, and I'll
25   pull them out and mark them.
Page 17

1  A  Uh-huh.
2  Q  There is, first of all, a -- a document, which is
3    entitled -- which is Bates-stamped MM-2745.  And I'm
4    going to -- and it was produced as to the State of
5    Washington, and I'm going to ask you about M-745.
6    What is this?
7  A  This is --
8  Q  Let me mark it as Exhibit 3 so my records are straight.
9        (Exhibit No. 3 marked for
10       identification.)
11
12       MR. BENNETT:  I don't think you put
13   the 2 on there.
14       MR. NEALEY:  And I'm going to mark
15   it --
16       MR. BENNETT:  Okay.
17       MR. NEALEY:  There's the 2.  There you
18   go.
19  Q  (By Mr. Nealey)  What is Exhibit 3?
20  A  This is a checklist as -- for diminished value claims.
21  Q  Okay.  And this was something that was prepared by Am
22   Fam?
23  A  I believe this is potentially an in-house thing.  I do
24   not know who prepared it.  It's just a checklist that
25   people can utilize if they wish to use.  It's not
Page 18

1    required to use.
2  Q  Okay.  Has this been around since you've started with Am
3    Fam in December of 2009?
4  A  Yes.
5  Q  Okay.  And was it around a couple of years before that to
6    your knowledge?
7  A  I do not know.
8  Q  Okay.  But certainly since December 2009, this checklist
9    has been available and in your -- it's contained on your
10   computer system?
11  A  Probably not in December, but potentially in January, any
12   time after that.
13  Q  Okay.
14  A  I don't know when it was on my -- when it was e-mailed to
15   me.
16  Q  Okay.  Okay.  And -- and is this a checklist which is
17   designed to be given to your insureds, or is this an
18   internal document only?
19  A  Internal.
20  Q  Okay.  Now, I'd like to ask you about what these are.
21    Now, this, of course, dates a lost of 2008 on here,
22   so we can assume since this exemplar is from 2008 that
23   the form was in use at least in 2008, right?
24  A  I don't believe the adjuster listed here was actually
25   with the company in 2008.
Page 19

1  Q  Okay.
2  A  So I'm not sure if this is an error or not.
3  Q  Well, if we have -- then let me ask a more fundamental
4    question here.
5    If I'm looking at document -- Exhibit 3, Document
6    M-2745, it lists a date of loss of 11/24/2008, but it, I
7    guess, appears to be that this has a date of 7/28/2011 at
8    the top.
9  A  Which is when this would have been filled out.
10  Q  And I take it then that you can be in a situation with a
11   UIM claim where an insured can come back and seek further
12   compensation under the policy up until the point where
13   the statute of limitation runs, right?
14  A  Yes.
15  Q  And the statute of limitations would be six years for
16   breach of contract in the State of Washington?
17       MR. BENNETT:  I'll object to the
18   extent it calls for a legal conclusion.
19  Q  (By Mr. Nealey)  What have you been trained on that?
20  A  There's a three-year statute for the customer to file a
21   claim with us --
22  Q  Okay.
23  A  -- property damage.
24  Q  Okay.  So within -- within Am Fam, you expect to -- to
25   get a claim within three years?
Page 20

**Page 21**

1   A   File a claim within three years.
2   Q   File a claim within three years.
3        Well, what do you do if somebody comes back to you
4    and they -- they say -- four years later, they say to
5    you, "Gee, I've got some further damage on my vehicle
6    that wasn't repaired and I'd like that loss covered from
7    that accident"? What do you say to them?
8   A   If there was a claim filed previous to the statute, then
9    we will address it.
10   Q   Okay. Is there a limit as to how long you'll address it
11    if the claim was originally filed within three years of
12    the date of loss?
13   A   I haven't run into that particular situation. We have
14    had that happen where claims have come after the statute
15    and we have covered it.
16   Q   Okay. Now, let me see if I understand.
17        So the three years is actually just them telling you
18    they have a loss, right?
19   A   To make their claim.
20   Q   Okay. Well, let me give you a hypothetical: This exact
21    situation, let's assume you did the physical repair of
22    the vehicle back at the time of the loss, which here
23    would be 11/24/2008, if somebody comes in four years
24    later and says, "Gee, I've had a diminished value loss on
25    my vehicle and I'd like that covered since it" -- "as a

**Page 22**

1    result of the original accident under my UIM coverage,"
2    what would Pem -- what would Am Fam say if it's four
3    years later that that's presented to you?
4        MR. BENNETT: Object to the form of
5    the question. She's not here as Am Fam's designated rep,
6    so it would be her knowledge only.
7        MR. NEALEY: Yeah.
8   Q   (By Mr. Nealey) How do you handle that?
9   A   We would address it.
10   Q   Okay. Now, and here there is a note for the statute of
11    limitations is listed, and that's the three years that
12    you stated right there?
13   A   Yes.
14   Q   Okay. Do you know if that's the three-year statute of
15    limitations because that's Washington law, or is that
16    what you understand the policy to require?
17   A   It's Washington law --
18   Q   Okay.
19   A   -- on property damage.
20   Q   Okay. Now, you want the year and -- and make and model
21    of the vehicle, right? That's one of the things?
22   A   It asks for it.
23   Q   Okay. Now, does the form also ask for the mileage?
24   A   I do see it on here.
25   Q   Okay. What's the purpose of knowing the mileage?

**Page 23**

1   A   To know how many hours were on it at the time of the
2    vehicle -- time of the accident, as mileage can impact
3    the value as well.
4   Q   Okay. Okay. Meaning that if a vehicle had, say, 100,000
5    miles on it, you're not going to be likely to view there
6    to be much, if any, diminished value; is that correct?
7   A   It depends on the circumstances.
8   Q   Okay. Well, if you've got a normal car, not a classic
9    collectible of some sort, but a normal --
10   A   It depends on the circumstances.
11   Q   Okay. But, generally, vehicles with high mileage on
12    them, you're going to treat the diminished value claim a
13    lot less seriously?
14   A   No, that's not true.
15   Q   No?
16        Okay. So if I've got the same 2005 Honda that's
17    listed here with a date of loss of 2008, if the Honda had
18    10,000 miles on it at the time of the accident as opposed
19    to 90,000 miles, would that impact your decision on that
20    claim?
21   A   It depends on the circumstances surrounding the claim.
22   Q   Okay.
23   A   We treat every diminished value claim on its own merits.
24   Q   Okay. And then you put the estimate amount.
25        What's the -- what's the reason why you have the

**Page 24**

1    estimate amount?
2   A   To give an idea of what the cost of the repairs were at
3    the time of the accident.
4   Q   What does that have to do with diminished value?
5   A   It -- it could impact if there's a diminished value claim
6    or not. If it's a larger impact, there's a potential for
7    a more diminished value since there's more loss. It's
8    also situational.
9   Q   So if I'm understanding what you're saying, the more --
10    the higher cost of repair, the likelihood is that there
11    would be more diminished value as opposed to a lower cost
12    to repair?
13        MR. BENNETT: Object to the form.
14        THE WITNESS: No. That's not what I
15    said. There's a potential that there could be, but
16    there's a potential that there could be diminished value
17    of a small repair. Again, each one is on its own
18    individual merits.
19   Q   (By Mr. Nealey) Okay. Well, then why -- why do you have
20    the amount of the -- why does the form that you have ask
21    for the -- the total amount of the estimate to repair?
22   A   This form is just a summary of what occurred on the
23    vehicle.
24   Q   Well, does this form include irrelevant things to the
25    consideration? Is this relevant or not relevant?

**Page 25**

1  A  It's not required for use.
2  Q  Well, would you ever make a diminished value decision in
3     your work with Am Fam and not consider the cost of repair
4     on the vehicle?
5  A  Yes.
6  Q  What would be the circumstances that you wouldn't
7     consider the cost of repair of the vehicle when deciding
8     whether there was diminished value or not?
9  A  The type of vehicle.
10 Q  What type of type would you --
11 A  A specialty-type vehicle, a high-dollar vehicle that's in
12    a specialty market or a classic vehicle, leased vehicles
13    as well.
14 Q  Are there others?
15 A  I'm sure there's others. I just can't think of it.
16 Q  So if you had a leased vehicle, you would not consider
17    the amount of repair cost on the vehicle in determining
18    diminished value; is that correct?
19 A  It depends.
20 Q  Well, would you reject a claim for diminished value if
21    somebody had a leased vehicle on the fact that it was
22    leased?
23 A  It would need to be the leasing company that makes the
24    claim.
25 Q  Okay. So you would be in agreement with me that unless

**Page 26**

1     it's the lessor -- the leasing company, the actual owner
2     of the vehicle, if somebody who has a leased or rented
3     vehicle presents a diminished value claim, you would
4     reject it on the grounds that it was a leased or rental
5     vehicle, correct?
6  A  It depends on the terms of the lease.
7  Q  Okay. Okay. So to put it another way, if you have a
8     leased vehicle or a rented vehicle, you don't even get to
9     consideration of the extensiveness of damage because you
10    can reject it on the grounds that it's a leased or rented
11    vehicle, correct?
12         MR. BENNETT: Object to the form.
13         THE WITNESS: No. There have been
14    circumstances where diminished value claims have been
15    paid based on the contractual obligation on the lease.
16    And that's between the leasing company, the renter, and
17    the insurance company.
18 Q  (By Mr. Nealey) Okay. But that's only on some proof of
19    the fact that the party before you making a claim under
20    the policy, your insured, is going to incur some
21    obligation; is that correct?
22 A  I'm sorry. I don't understand --
23 Q  Okay.
24 A  -- your question.
25 Q  If I understand, unless your insured, okay --

**Page 27**

1  A  Okay.
2  Q  -- who has leased the vehicle or rented the vehicle,
3     unless they can show you that they have some contractual
4     obligation to pay for the damages in diminished value to
5     the person from whom they rented the vehicle or leased
6     the vehicle, unless they show that to you, you just
7     reject those claims?
8  A  That would be a first-party claim. That is different
9     than a third-party claim.
10 Q  Okay. Well, if we're talking uninsured motorist. We're
11    talking somebody who makes a UIM claim under their policy
12    and they have a leased or rental vehicle that they're
13    making it under and they don't present some evidence to
14    you that they are going to end up having to pay for
15    diminished value to the person from whom they leased the
16    vehicle or from whom they rented the vehicle, you will
17    reject that claim under UIM?
18 A  We will investigate the claim before we make our
19    decision.
20 Q  Okay. But if you find they can't demonstrate some
21    contractual obligation to cover diminished value from the
22    person from whom they leased the vehicle or rented the
23    vehicle, then you would deny it on that basis, right?
24 A  Again, it's hypothetical. It would depend on a specific
25    situation.

**Page 28**

1  Q  Okay. Now, you also mentioned the fact that you might
2     not consider the amount of repairs on a classic vehicle.
3     Why would that be?
4  A  Some vehicles have appraisals on them where they've been
5     deemed a classic vehicle and there are show cars.
6     There's various reasons.
7  Q  Okay. And you mentioned specialty vehicles.
8     What do you mean by specialty vehicles?
9  A  More of a Lamborghini-type vehicle, very high-dollar
10    performance vehicles.
11 Q  Okay. And on those vehicles, you would consider
12    diminished value without looking at the actual cost to
13    repair the vehicle?
14 A  We always look at it. Whether or not that's the final,
15    that's a determination, so it's different.
16 Q  And then you mentioned high-dollar value vehicles.
17    What do you mean by high-dollar value vehicles?
18 A  I would put that in the same category as specialty
19    vehicles, the ones I just described.
20 Q  Okay. What would you consider a, you know, BMW 540?
21 A  It depends on what year it is.
22 Q  Do you have a cutoff for what you're talking about,
23    high-dollar value vehicles?
24 A  No.
25 Q  Okay. Now, then you look at the damage location.

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1    What's the purpose of that on the form?
2  A  Just to get an idea of where the impact was on the
3     vehicle.  Again, this is just a summary of the scope of
4     the damage.
5  Q  Okay.  And then you have a question "structural damage,"
6     yes, no, and where.
7     What's the reason for that?
8  A  So that we recognize if there was structural damage to
9     the vehicle or not.
10 Q  What do you consider structural damage?
11 A  The interior of the body of the vehicle such as the body
12    panel, the frame rails, the radiator support, anything
13    that's basically the support of the vehicle.
14 Q  Okay.  Are you familiar with the -- any DA -- the NADA
15    disclosure guidelines for structural and frame work?
16 A  Not the specific guidelines.
17 Q  Okay.  But your understanding of the structural damage
18    would be the frames, the unibody structure of the
19    vehicle, the core support?
20 A  That's correct.
21 Q  Okay.  And whether a car has structural damage or not is
22    something that Am Fam considers when it determines
23    whether it thinks there's diminished value on a vehicle,
24    correct?
25 A  It is one of the things we take into consideration.

Page 29

1  Q  Okay.  And then it says -- you have "yes, Floor and Rear
2     Frame."
3     What's the -- what does that mean?
4  A  It looks like it was filled out that yes, there was
5     structural damage, and it was to the floor and the rear
6     frame.
7  Q  Okay.  You're right.  Now I understand.
8     Now, then we get to repair location and leased
9     vehicle.  That's the question we talked about earlier.
10 A  Uh-huh.
11 Q  Okay.  Now, and then you have "OEM/LKQ/AM Parts Used?"
12    What is that about?
13 A  To know what type of parts were put on the vehicle.  Were
14    they manufactured parts?  Were they used manufactured
15    parts?  Or were they new aftermarket parts?
16 Q  What does that have to do with diminished value?
17 A  To get an idea of what parts were utilized, as some
18    people feel that could impact the value of a vehicle.
19 Q  Okay.  And, obviously, if you had a vehicle that was
20    in -- had parts that had come from the factory and you
21    put aftermarket parts not made by the original
22    manufacturer, then that car is not back in its
23    pre-accident condition, correct?
24            MR. BENNETT:  Object to form; calls
25    for a legal conclusion.

Page 30

1            THE WITNESS:  If it's an undamaged
2     vehicle with quality certified parts on it, it's back to
3     its pre-loss condition.
4  Q  (By Mr. Nealey)  So you believe if you take aftermarket
5     parts not made by the original manufacturer and you put
6     them on a car in place of factory parts, that it's in its
7     pre-loss condition?
8  A  If the part has the correct look and finish and it's a
9     certified part, it could be back to pre-loss condition.
10 Q  So you consider pre-loss condition to be that the vehicle
11    was back to its look, fit, and finish?
12 A  As part of that.
13 Q  Okay.  Is there anything else to pre-loss condition, in
14    your mind, than to put something back in pre-loss
15    condition other than it has the same look, fit, and
16    finish?
17 A  To restore the vehicle as close to the original factory
18    specifications as possible.
19 Q  Okay.  So if I'm understanding your view of pre-loss
20    condition is that you restore the vehicle as close as
21    possible to the OEM specifications --
22            MR. BENNETT:  Objection.
23 Q  (By Mr. Nealey)  -- and that it have the same -- scratch
24    that.
25    So if I'm understanding, you're saying that in your

Page 31

1     work, you view pre-loss condition is to restore the
2     vehicle as close as possible to its OEM specifications
3     and they have a similar look, fit, and finish --
4            MR. BENNETT:  Object to form.
5  Q  (By Mr. Nealey)  -- is that correct?
6            MR. BENNETT:  Object to form.
7            THE WITNESS:  I would use that as part
8     of my definition.  If I were to expand on it, I would
9     need time to think of my exact definition on it, but...
10    (Pause.)
11 Q  (By Mr. Nealey)  Okay.  Well, I don't want to -- if
12    that's part of your definition, that's fine, but sitting
13    here today, is there anything else you view that is
14    necessary to be done on a vehicle, in your opinion, for
15    it to be in its pre-loss condition, the way you're using
16    the term, other than what you just agreed to?
17 A  Pre-loss condition could be various things.  There could
18    be prior damage on the vehicle as well, and sometimes the
19    vehicle is actually restored to better than pre-loss
20    condition when the repairs take place.
21 Q  Anything else?
22 A  Not at the moment.
23 Q  Okay.  But at a minimum, in your opinion, in order to
24    restore pre-loss condition, in your work, you restore the
25    vehicle as close as possible to the OEM specifications

Page 32

8 (Pages 29 to 32)

1   and the vehicle would have a similar look, fit, and
2   finish?
3   A  In my opinion.
4   Q  Okay.  Have you been given any different -- scratch that.
5      Have you been trained or told by Am Fam that there's
6      any other definition of pre-loss condition that you
7      should be using in your work?
8   A  No.
9   Q  And that understanding that you have of pre-loss
10     condition is being to restore the vehicle as close as
11     possible to the OEM specifications and have a similar
12     look, fit, and finish, you've had that understanding of
13     what pre-loss condition is from your work at Am Fam,
14     correct?
15  A  We want to restore the vehicle to what it was prior to
16     the loss.
17  Q  The definition we've been discussing of your
18     understanding of pre-loss condition, that comes from --
19     your understanding comes from the work you've done at Am
20     Fam, right?
21  A  That's my understanding of the work that I've done in my
22     career.
23  Q  Okay.  So it's not just Am Fam; it's also what you know
24     from when you worked at Progressive?
25  A  To return the vehicle to pre-loss condition.

Page 33

1   Q  Have you ever received any guidance or documents from Am
2      Fam that described to you what -- what's required to
3      fully restore a vehicle to its pre-loss condition?
4   A  No.
5   Q  Okay.  You work with the -- with Am Fam's customer repair
6      program on a regular basis, right?
7   A  No, I do not.
8   Q  You do not?
9   A  I do not.
10  Q  Okay.  Are you familiar with the repair guidelines and
11     guidelines they have for the customer repair program?
12  A  I am not.
13  Q  Okay.  Let me understand.  Do you get involved with
14     repairs in adjusting losses if the vehicle has gone to a
15     customer repair program or just vehicles that don't go to
16     customer repair programs?
17  A  Just vehicles that do not go to customer repair programs
18     unless they're a total loss.
19  Q  Okay.  So if somebody goes to a customer repair program
20     or a DRP shop for Am Fam, you would not be involved?
21     You're only involved when it's a shop that Am Fam does
22     not have a contractual relationship with?
23  A  Correct.
24  Q  Whenever there is a loss and Am Fam does not have a
25     contractual relationship with the body shop that is going

Page 34

1   to do the repairs, will an Am Fam person adjust that
2   loss?
3   A  I'm sorry.  Can you repeat the question?
4   Q  Okay.  Let me back up.  When a person has a -- an auto
5      loss, when they go to a designated repair program shop
6      that Am Fam has an agreement with, then the designated
7      repair program shop does the estimation and repairs the
8      car pursuant to Am Fam's guidelines, correct?
9   A  Correct.
10  Q  Okay.  And if somebody chooses not to go to a designated
11     repair shop that Am Fam has a contractual obligation
12     with, in those circumstances, will an adjuster from Am
13     Fam, will there always be involved in doing an --
14     adjusting the loss from Am Fam's perspective on that
15     claim?
16  A  Not always a field inspector, no.
17  Q  Okay.  What would be the circumstances where somebody
18     like you, a field inspector, would not be involved?
19  A  If we don't staff the area, if the customer submitted an
20     estimate to our desk in Denver to review along with
21     photos or a small dollar estimate, below $1,000.
22  Q  Okay.  So if I understand, any time you have a loss
23     that's below $1,000 or if somebody submits the estimates
24     and photos to be reviewed in Denver or if it just happens
25     to be in an area in Washington where you don't have

Page 35

1   somebody who can easily get to it, that would be the only
2   circumstances that you might pay the loss without having
3   done an adjustment of the vehicle yourself?
4   A  I would like to clarify under the $1,000.  That is
5      because they have submitted an estimate --
6   Q  Yeah.
7   A  -- so those are paid by the casualty adjuster oftentimes
8      and paid as is.
9   Q  Okay.  So if somebody has a 400 or 500 dollar glass loss
10     or something, it doesn't even make it to your level?
11  A  Correct.  And glass claims don't make it to us either.
12  Q  Right.  And how often is it that you have an estimate
13     that is prepared on a loss that would be over $1,000 and
14     somebody from Am Fam like you, a field adjuster, doesn't
15     go and adjust the loss?
16  A  I don't know the percentage time.
17  Q  And I don't need to know if it's 6 or 8 or 7 exactly,
18     more like a quantum.  Is it very infrequent or every once
19     in a while, or is it something that happens often?
20  A  We have a desk team in Denver, so there's -- there are
21     claims that go there.  There are claims that come to the
22     field.  I couldn't tell you percentages.
23  Q  Well, I don't need a percentage.  I just want to know is
24     it something that happens frequently or fairly
25     infrequent?

Page 36

9 (Pages 33 to 36)

1    A  Daily.
2    Q  Daily. Okay.
3        And in those circumstances, somebody from Pemco --
4        Pemco will only pay because they have a copy of the
5        estimate and then the photos, correct?
6    A  I --
7            MR. BENNETT: American Family.
8            MR. NEALEY: I'm sorry.
9            THE WITNESS: I don't know what --
10   Q  (By Mr. Nealey) Yeah. I'm sorry. American Family.
11       I've been in a multi-day class certification for
12       Pemco, so I have Pemco on my brain.
13       In those circumstances, American Family will only
14       pay on the loss when they have photographs to document
15       what the damage is and the actual repair estimate,
16       correct?
17   A  Incorrect. There are times when we can't obtain photos
18       that we make an effort to, and there are times that even
19       if they send an estimate and photos, there still may need
20       to be a field inspection that occurs.
21   Q  Okay. So let's put it this way: The only time that
22       American Family would then pay the loss without a field
23       inspector having looked at the vehicle is when they
24       determined the photographs and the estimate to be
25       adequate to support the repair estimate?

Page 37

1    A  Correct. They also -- if the estimate is larger,
2        sometimes they'll want some eyes on the vehicle as well.
3    Q  Understood.
4        So we can -- we can summarize by saying that in the
5        State of Washington, at least, if claims are over $1,000,
6        that either it's going to be -- the estimate to repair
7        the vehicle is going to be approved by Pemco -- approved
8        by American Family because it's a DRP shop; it's going to
9        be approved because somebody like you, a field adjuster,
10       looked at the vehicle; or it's in this group where
11       American Family looked at the photograph and the estimate
12       and decided that that was sufficient to support the claim
13       being made?
14   A  Correct, or it could have been a glass claim or a towing
15       claim.
16   Q  I understand.
17   A  There's multiple losses that could occur.
18   Q  Okay. Well, let me rephrase because I like to be clear.
19       When we're dealing with a claim that there has been
20       damage to the paint or body work on the vehicle or its
21       frame or structure, not a glass-only claim or towing
22       claim only, where you have damage to the auto physical
23       structure to the vehicle and that claim will either be
24       paid based upon the estimate prepared by a DRP shop with
25       a contractual relationship with American Family, it will

Page 38

1        be paid based upon an estimate that you or a field
2        adjuster working for American Family has done, or it will
3        be paid based upon a review by American Family of the
4        photographs and the estimate prepared and a decision by
5        American Family that the estimate fairly reflects what's
6        shown in the photographs, and, therefore, it can be
7        repaired based upon that?
8    A  Correct.
9    Q  Okay. We were talking through the inspection sheet,
10       which is Exhibit 3, and I'd like to ask the next
11       question, which is 10, "Section Or Clip."
12       What does that have to do with diminished value?
13   A  That's a good question because we don't use those parts.
14   Q  Okay.
15   A  If it is a front section or a clip, we will not put a
16       full clip on a vehicle. We would total that vehicle, so
17       I'm honestly not sure why that's on there. We wouldn't
18       do that. The section is just, again, to get an idea of
19       what the damages were at the time of the accident, what
20       occurred.
21   Q  Okay. And when you section a car, for instance, you
22       could replace the whole quarter panel in the back by
23       cutting it out?
24   A  "Section" is in reference to a frame rail along with the
25       other structural components in that area. It's multiple

Page 39

1        structural components.
2    Q  Okay. Now, then you list repair quality issues.
3        If there were repair quality issues, does that go
4        into your determination of whether there is diminished
5        value or not on the vehicle?
6    A  We would ask the vehicle to be taken back to the shop to
7        fix those repair quality issues first.
8    Q  Okay. So if there's any repair quality issue, you don't
9        consider that as part of your determination of the market
10       diminished value loss? You would ask that those be fixed
11       first?
12   A  That is warranty work by the shop.
13   Q  Okay. Now, it says "Post Inspection Needed," and it says
14       "No."
15       What is that about?
16   A  There are times that we want to look at the vehicle
17       repairs to determine if there are quality issues or not
18       and to ensure that what we pay for is complete.
19   Q  Okay. So let me see if I understand.
20       So you -- when you inspect a vehicle, if you did
21       under this, you're looking to see if the repair work was
22       done correctly, meaning does it need to go back to the
23       shop, and you're asking if the repair work was done in
24       conformity with the estimate, i.e., whether what American
25       Family paid for was actually done on the vehicle, right?

Page 40

10 (Pages 37 to 40)

1   A   Correct.
2   Q   And those would be the same things you would look for if
3       you did a reinspection as part of your normal
4       reinspection of repaired vehicles, right?
5   A   That is correct.
6   Q   Okay. And you're concerned about whether the estimate is
7       complied with because you don't want to be paying for
8       more expensive operations than were actually done on the
9       vehicle? That would be, in essence, you know, not -- you
10      guys paid for some work that wasn't done on the car,
11      right?
12  A   It's about determining if the vehicle was restored to
13      pre-loss condition based upon the agreement that was made
14      with the shop.
15  Q   Now, again, though, if you did an inspection of the
16      vehicle and you found that the repairs were not done in
17      conformity with the estimate, that wouldn't factor into
18      your decision as to whether there was a market value loss
19      on the vehicle? You ask that it be re-repaired, right?
20  A   We would need to get it back to the body shop first and
21      address those issues before we could move forward with
22      addressing the diminished value claim.
23  Q   To put it another way, when you actually decide how much
24      market value loss, if any, there is in a vehicle, the
25      results of that inspection don't play a role in that

Page 41

1       decision as to the amount of the loss because they would
2       have either presumably been addressed by the shop, right?
3   A   We would want it to be addressed by the shop first.
4   Q   Okay. Okay. Now, the ISO search results, what's that
5       for?
6   A   That is to determine if the vehicle has other insurance
7       losses on it.
8   Q   You want to know through the Insurance Service Office
9       database whether there's been a prior loss report on the
10      vehicle, right?
11  A   Correct.
12  Q   Okay. And that database is far more comprehensive than,
13      say, something like, you know, the various Carfax, right?
14  A   There's insurance claim -- specific claim information in
15      the ISO report that is not on the Carfax.
16  Q   Okay. Because Carfax pulls its information from state
17      vehicle accident databases, right?
18  A   Carfax pulls its information from a lot of locations.
19  Q   Does it pull it from insurance company claims?
20  A   I believe it gets it from NICB and ISO --
21  Q   Okay.
22  A   -- and probably other locations.
23  Q   What's your basis for that?
24  A   Just my assumption.
25  Q   Okay. So you don't know one way or another.

Page 42

1           MR. BENNETT: And I would caution you
2       don't speculate.
3           THE WITNESS: Okay. Sorry.
4   Q   (By Mr. Nealey) That's okay. That's okay.
5   A   Yeah.
6       I do know that MNVTIS reports pulled from MNVTIS
7       when we report a vehicle is a total loss, it will show up
8       there.
9   Q   Okay. Okay. But only as to total losses?
10  A   Total losses.
11  Q   So you, meaning American Family, can, if you wish, on any
12      claim, run and see if there's been an insurance claim
13      ever made on that vehicle before, right? You run it by
14      VIN number?
15  A   We can search the ISO.
16  Q   Yeah.
17  A   Yes.
18  Q   And the insurance company, such as American Family, they
19      report claims on particular vehicles by VIN numbers, ISO,
20      which then allows you to query by VIN number, correct?
21  A   I do not know the reporting structure.
22  Q   Have you ran one of these things before?
23  A   They automatically come into our system.
24  Q   Okay. And do you know if they're done by VIN number
25      or...?

Page 43

1   A   You can search them by VIN or by the name of the party
2       involved.
3   Q   Okay. So you know you can either search by the VIN or
4       the party ID number, and that tells you if there's been
5       an insurance claim on the car?
6   A   It can tell you if there has been; however, it's not
7       complete because not everybody reports to ISO.
8   Q   Who doesn't report to ISO?
9   A   I don't know.
10  Q   Do most insurance companies report to ISO?
11  A   Many insurance companies do.
12  Q   Do the large insurance companies all report to ISO?
13  A   I don't know.
14  Q   American Family reports to ISO, right?
15  A   I believe -- I believe so.
16  Q   Okay. Okay. "Vehicle Sold" -- well, scratch that.
17      So what is -- what is the fact of a -- an ISO search
18      result, what does that have to do with whether there's a
19      market loss on the vehicle?
20  A   If the vehicle has been involved in prior accidents, it's
21      possible that it's already suffered a diminished value
22      prior to this occurring.
23  Q   And that would be of the damage of the prior accident
24      overlapped with the damage of the current accident?
25  A   It could be the fact that it's just been in a prior

Page 44

11 (Pages 41 to 44)

1    accident. And if the reason for the claim being made is
2    due to stigma, then it's already suffered potentially the
3    diminishment of value.
4  Q  How do you decide if a claim is being made by stigma, the
5    way you've used that term, or inherit diminished value as
6    opposed to something else?
7  A  By reading what the customer submits to us.
8  Q  Okay. Now, "Vehicle Sold," what does that have to do
9    with market value?
10  A  In order -- the vehicle loss of value is actually
11    realized if the vehicle is sold because the customer can
12    prove that they did suffer an actual loss of value by
13    determining what they would have received for the vehicle
14    had it not been involved in that particular accident
15    versus what they actually did receive.
16  Q  Does your policy require a lost to be realized in order
17    for a loss to be paid?
18         MR. BENNETT: Object to the form;
19    calls for a legal conclusion.
20  Q  (By Mr. Nealey) To your knowledge.
21  A  No.
22  Q  And you value your losses as of the date of the loss,
23    right?
24  A  Yes.
25  Q  Yeah. Okay. So, for example, going back to the earlier

Page 45

1    example that we looked at -- well, this example, we've
2    got -- Exhibit 3, we've got a date of loss of 11/24/2008
3    and a claim made in 2011.
4    To the extent that you believe that there was
5    diminished value on this claim, you would determine that
6    loss and diminished value as of the date of the loss,
7    11/24/2008, right?
8         MR. BENNETT: Object; calls for a
9    legal conclusion.
10         THE WITNESS: I believe -- yes, that's
11    what we have it here for.
12  Q  (By Mr. Nealey) Okay. Okay. So it doesn't matter when
13    the claim is made; you're going to value that loss as the
14    amount of loss as of the date of the loss --
15  A  Yes.
16  Q  -- correct?
17    Okay. Now, the "Professional Appraisal Done," yes
18    or no, why is that on here?
19  A  Just so -- again, it's a summary so we know if we have
20    one in our possession or not.
21  Q  Okay. Okay. Okay. "Round Table Comments," that's --
22    do -- does every DV claim get roundtabled?
23  A  Yes.
24  Q  Okay. How many -- how many of these do you have on a --
25    on a, say, monthly or yearly basis in Washington, to your

Page 46

1    knowledge, DV claims?
2  A  How many DV claims do we have?
3  Q  Yes. And when I say that, I'm just asking about
4    uninsured motorists. How often do you have UIM DV claims
5    in the State of Washington?
6  A  I wouldn't be able to tell you.
7  Q  How many have you had?
8  A  I wouldn't be able to tell you. I would have to pull
9    every claim I've ever handled and individually look at
10    them.
11  Q  Can you give me an estimate? 10, 15, 20, 5?
12  A  I don't feel comfortable guesstimating on that.
13  Q  Okay. Well, have you done over 50 UIM DV claims?
14  A  No.
15  Q  Okay. Have you done over 25 UIM DV claims?
16  A  I don't know.
17  Q  Have you done less than 10?
18  A  Again, I don't know the count.
19  Q  Okay. Now, is this checklist, do you create one of these
20    checklists whenever you do a UIM DV claim?
21  A  Do I personally?
22  Q  Yeah.
23  A  No.
24  Q  Okay. So you can use this or you cannot, depending upon
25    your choice?

Page 47

1  A  Correct.
2  Q  Okay. Okay. And this says -- it's got a date for the
3    roundtable, and there's -- it says William McCoy.
4    Is he still a fellow manager of yours?
5  A  No.
6  Q  He's left the company?
7  A  He did.
8  Q  Okay. And then Bryce Hilden is a fellow manager with
9    you, right?
10  A  Yes.
11  Q  And then it says PDR Matthew Foley.
12    What's PDR?
13  A  Physical damage representative.
14  Q  Is that a claims rep, or is that something else?
15  A  Physical damage adjuster.
16  Q  Okay. So Matthew Foley is in the position that you were
17    in up from 2009 to 2011?
18  A  He was when he was with the company.
19  Q  Okay. He's no longer with the company?
20  A  Correct.
21  Q  Okay. And then there's a proposed DV amount.
22    Is the proposed DV amount, is that always the amount
23    that comes from the Audatex system?
24  A  I don't know. I don't utilize this form.
25  Q  Okay. Well --

Page 48

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1  A  So I don't know where he -- where he got this number
2     from.
3  Q  Well, are you -- have you ever used any numbers for
4     diminished value other than from the Audatex system?
5  A  Yes.
6  Q  Okay.  Have you on UIM claims ever used numbers other
7     than from the Audatex system?
8  A  Yes.
9  Q  What were the circumstances when you used different
10    numbers?
11 A  There are a lot of circumstances because I look at each
12    claim individually.
13 Q  Well, other than the Audatex system, how have you valued
14    diminished value losses to actually come up with a
15    number?
16 A  I have utilized appraiser reports.  I have utilized NADA
17    differences between varying categories for the
18    definitions, Kelley Blue Book, dealership quotes, selling
19    of the vehicle.  There's all various -- there's
20    additional -- each issue is on its own merits and each is
21    looked at differently, and that information is taken into
22    account.  It's not necessarily used.
23 Q  Okay.  Okay.  The next document I'm going to mark is
24    Exhibit 4.  It was also produced to us as an exemplar or
25    a template form used in the State of Washington, and I

Page 49

1     would like to ask you what Exhibit 4, which is MM-2746
2     and 2747, what that is?
3              (Exhibit No. 4 marked for
4                  identification.)
5
6              THE WITNESS:  This is a release.
7  Q  (By Mr. Nealey)  Is this used for things other than
8     diminished value, or is this specific to diminished
9     value?
10 A  It appears this one is property damage release and
11    appears that it is just releasing all property damages,
12    not -- it doesn't specify diminishment value.
13 Q  Okay.  Is Exhibit 4, is that used on UIM claims, or is
14    that just used on liability claims?
15 A  All claims made, release for all property damages.
16 Q  Do you get releases from UIM claims?
17 A  Yes.
18 Q  Always or...?
19 A  Not on a claim.  On a diminished value, you might have a
20    claim.
21 Q  Okay.  So when do you get a release from a UIM claim?
22 A  On a diminished value claim.
23 Q  Okay.  So once you've paid and agreed to settle a
24    diminished value claim, you get a release?
25 A  On a diminished value claim, yes.

Page 50

1  Q  Okay.  So you would use this form, Exhibit 4, whenever
2     you actually paid an amount on a diminished value claim
3     and got a release?
4              MR. BENNETT:  Well, this is the
5     release.
6              THE WITNESS:  Yes.
7  Q  (By Mr. Nealey)  Right.
8  A  Yes.
9  Q  But if it wasn't a diminished value release, you wouldn't
10    get a release on a UIM claim?
11 A  Correct.
12 Q  Why is diminished value treated differently and you get a
13    release from people in a UIM situation when you don't for
14    other portions or the UIM claim?
15 A  Because the person is claiming they have suffered a loss
16    in value of their vehicle, and that way, they -- we are
17    protecting our insured from future suits.
18 Q  Okay.  Oh, so you use this Exhibit 4, you use this for
19    uninsured motorists, or do you use it for liability
20    claims?
21 A  Both.
22 Q  Both.
23    Okay.  But why do you use Exhibit 4 to obtain a
24    release when it's your insured making the UIM claim for
25    diminished value when you don't for other portions of the

Page 51

1     UIM claim?
2  A  Because it's an uninsured motorist claim, therefore, we
3     take on the tortfeasor role, which is similar to
4     liability for a property damage claim.
5  Q  Well, if you repair somebody's car, you don't get any --
6     under the UIM claim, you get an estimate, you do the
7     work, go to a body shop; you don't get a release from
8     them, right?
9  A  We don't do that on liability claims either.
10 Q  Okay.  Do you get a release when you pay a personal
11    injury claims under a UIM PI?
12 A  I do not handle personal injury claims.
13 Q  I'm going to mark as Exhibit 5 a copy of one of these
14    Audatex forms, and it's actually the -- let me ask you
15    before I mark this, there is a schedule which is listed
16    at American Family, 2750, and then there is the 2-page
17    Audatex form.
18    Does this schedule go with the Audatex form, or do
19    you know what this schedule is?
20 A  The first time I saw this schedule was while preparing
21    for this deposition.
22 Q  Okay.  So I'll mark it separately then.
23              (Exhibit No. 5 marked for
24                  identification.)
25    ///

Page 52

13 (Pages 49 to 52)

```
 1   Q  (By Mr. Nealey) I'm going to mark as Exhibit 5 this loss
 2      in value form from Audatex which is Bates-stamped
 3      MM-2748, MM-2749.
 4         When you get these Audatexs, is this always what
 5      they look like, just a 2-page form?
 6   A  I don't know the page count, but yes, this is what it
 7      looks like on the first page.
 8   Q  Okay.  How do you -- how do you run these forms, and what
 9      do you do physically to run one?
10   A  You have the estimate, and then you click on the option
11      to run a diminished value, and then you select the
12      vehicle options the best you can.  You add in the
13      mileage, make sure you have the correct vehicle, verify
14      all of that information, and then you -- there's another
15      part of this that has the modifiers and what the
16      definitions of those are, and you get those in, and you
17      assign a number based on where they fit in those
18      modifiers, and then you hit "enter."
19   Q  Okay.  So the Audatex system, you don't have to look at
20      the car to use that Audatex system; is that correct?
21   A  Are you asking if we have to inspect the vehicle to -- to
22      utilize Audatex?
23   Q  Yeah.  You don't have to inspect the vehicle to use
24      Audatex, right?
25   A  We utilize Audatex on all of our desk reviews as well.
                                                       Page 53
```

```
 1   Q  Okay.  Okay.  So meaning that the -- somebody makes a DV
 2      claim, and assuming it's UIM, and when you're looking at
 3      that, you're always going to run the Audatex on the
 4      vehicle; is that correct?
 5   A  For a DV claim?
 6   Q  Yes.
 7   A  Yes.  We will always run it.
 8   Q  And how you run it, you sit at your desk and you push a
 9      couple of buttons and the Audatex looks at the estimate
10      on the vehicle repair?  You make sure you've got the
11      mileage right, options in correctly, and then Audatex
12      prints out one of these reports, right?
13             MR. BENNETT:  Object to form.
14             THE WITNESS:  If it's an insured
15      vehicle, odds that we have seen the vehicle are there;
16      however, it could've been our DRP shop that wrote the
17      estimate, so it may not pull over to link up with the
18      estimates that they wrote and you may have to start from
19      scratch.  If it's a liability claim, it could be
20      subrogation documents that we received and we never
21      looked at the vehicle.
22   Q  (By Mr. Nealey)  I'm just interested in UIM --
23   A  Okay.
24   Q  -- so I'm not asking about liability.
25      If you've got a UIM claim, you -- you're going to
                                                       Page 54
```

```
 1      have the repair estimate because it was either done by a
 2      DRP shop by American Family, itself, or the estimate was
 3      approved by American Family, looking at the estimate and
 4      the photographs, correct?
 5   A  Uh-huh, correct; however, there won't be an Audatex
 6      report if the estimate was just paid by the casualty
 7      adjuster, if it was under $1,000.
 8   Q  Well, we're dealing with a class that requires damages
 9      over $1,000, so that doesn't apply here.
10         So if you've got over $1,000 and somebody makes a DV
11      claim in uninsured motorists, you're going to have one of
12      these Audatex reports run, correct?
13   A  Yes.
14   Q  And every time you run the Audatex reports, you don't
15      have to go look at the vehicle and don't go look at the
16      vehicle; you do it sitting at your desk, right?
17   A  We have the option to look at the vehicle.
18   Q  Okay.  Well, is there some information that you would
19      look at the vehicle to gather information for this
20      Audatex?
21   A  To get the options off the vehicle, it could be helpful.
22   Q  Anything else?
23   A  If the adjuster is there looking because they were
24      concerned about a repair issue that the customer had
25      mentioned to us, it's possible they could do it all at
                                                       Page 55
```

```
 1      the same time.
 2   Q  Okay.  Meaning they could be sitting in front of the car
 3      and hit the button on the Audatex, as opposed to doing it
 4      in their office?
 5   A  Yes.  They don't have offices.
 6   Q  The back of their car or kitchen.
 7             MR. BENNETT:  I don't want to
 8      interfere, but I think the prior damage, as I understand
 9      it, were... (Inaudible.)
10             THE COURT REPORTER:  Can you repeat
11      that?  I'm sorry.
12             MR. BENNETT:  I think prior damage, as
13      I understand it, were why they're looking, but maybe I
14      misunderstand it.
15   Q  (By Mr. Nealey)  So you said there's a -- a coding sheet
16      that goes with this?
17   A  It's not a coding sheet.  It breaks down the modifiers
18      and gives you a range of what would classify in that
19      range of modifiers.
20   Q  Okay.  Okay.  Well, I haven't seen the sheet.  That's why
21      I'm asking you.
22         Is it a 1-page sheet or a 2-page sheet or 3-page
23      sheet?  Is it --
24   A  It's part of the document on how to use this software.
25   Q  Okay.  And you've been given that as part of your work
                                                       Page 56
```

14 (Pages 53 to 56)

Page 57

1    at --
2    A   It's.
3    Q   -- American Family?
4    A   Sorry. I apologize.
5        It's an Audatex product.
6    Q   Okay.
7            MR. BENNETT:  And, Scott, I can tell
8    you it is an exhibit to Jackie Hanson's deposition.
9            MR. NEALEY:  Okay. Well --
10           MR. BENNETT:  And there's a
11   description of how it goes.
12           MR. NEALEY:  It very well may be. It
13   wasn't in any of the documents that we got earlier, so
14   anyway, we'll just --
15           MR. BENNETT:  No, just --
16           MR. NEALEY:  That's -- that's fine.
17   Q   (By Mr. Nealey)  So when we look at the Audatex system,
18   do you know what the scientific or methodological basis
19   is that Audatex uses to calculate these things?
20   A   I do not know where they -- I know that we start at 10
21   percent. I don't know how it was derived at what we were
22   going to start at.
23   Q   Okay.  Meaning that you start at an assumption that the
24   vehicle lost 10 percent of its value and that's the
25   maximum what you're going to have, right?

Page 58

1    A   That's what it is set up for based on American Family. I
2        did not have anything to do with setting that value.
3    Q   Okay.  So every time that American Family runs the
4        Audatex system, it has set the reduction in value at 10
5        percent, and then it reduces that 10 percent; is that
6        right?
7    A   Yes.
8    Q   Okay.  Do you know any studies or -- or surveys or any
9        basis that American Family has to set the default at 10
10       percent?
11   A   I do not know the reasons behind the decision.
12   Q   Okay.  Do you know who made that decision?
13   A   No, I do not.
14   Q   Is the Audatex system used all across American Family or
15       just the State of Washington for diminished value
16       purposes, if you know?
17   A   I don't know the whole country.
18   Q   Okay.  But it's certainly used throughout the whole State
19       of Washington?
20   A   Yes.
21   Q   Okay.  Okay.  So the default was set at 10 percent by
22       American Family, but you don't know the basis for that;
23       is that correct?
24   A   I'm aware of the Georgia rulings, if that's where -- what
25       you're asking.

Page 59

1    Q   Okay.  You think that's where it maybe comes from?
2    A   I am not part of the decision to decide on the
3        percentage.
4    Q   Okay.  And the adjustments, however, for the mileage
5        modifier, the current damage modifier, and the prior
6        damage modifier, that just comes from you plugging in the
7        correct modifier based upon the guidance you have from
8        Audatex, right?
9    A   Based on what the adjuster feels that it should be --
10   Q   Okay.
11   A   -- taking that guideline into account.
12   Q   And you're doing that sitting at your desk, looking at
13       the estimate on the vehicle, right?
14   A   Yes. I would do it at my desk.
15   Q   Okay.  Now -- now, I notice here it says "NADA
16       disclaimer."
17       The Audatex system uses NADA, what we call, Black
18       Book values; is that correct?
19   A   We do not use NADA any longer.  I think at the time that
20       this was run, we were still using NADA, so we don't -- it
21       doesn't show up on our values any longer.
22   Q   Okay.  Well, this says the values in the NADA guide
23       assumes a vehicle in clean condition.
24       I take it that at this time you were using NADA
25       clean retail values, correct?

Page 60

1    A   Adjusted clean retail.
2    Q   Okay.  Meaning adjusted for the options on the vehicle?
3    A   For the mileage on the vehicle --
4    Q   Mileage.
5    A   -- and options.
6    Q   Yeah.
7        Okay.  So when you're determining on the Audatex
8        system, at this time, you were determining the pre-loss
9        value, you were doing so by, when this was done, using an
10       NADA Black Book value of the vehicle at clean retail,
11       adjusting for mileage and the options on the vehicle,
12       right?
13   A   To determine the value of the vehicle was based on the
14       options and the mileage of the car.  Audatex is an
15       options-driven system.
16   Q   And you said that now you don't use NADA Black Book.
17       What are you using now to determine pre-loss value?
18   A   We use Autosource.
19   Q   Which is a product put out by Audatex?
20   A   Yes.
21   Q   Do you know what information they use?
22   A   It's a market survey based on vehicles that have been
23       listed for sale or are currently listed for sale.
24   Q   When did you make that switch over?
25   A   It was in -- I believe it was in two thousand -- no. It

15 (Pages 57 to 60)

1    was in 2011. I don't know the exact date.
2  Q  And when you're doing a market survey under the -- under
3    the new computer system, are you also giving a clean
4    retail value adjusted for the options and the mileage?
5  A  Can I clarify?  Are you asking if we're running both in
6    NADA and Autosource.
7  Q  No.  I'm not asking that.  My question was unclear.
8    My question is, with the current system you're using
9    with Autosource, you're also looking at the actual cash
10   value by looking at a retail -- clean retail value with
11   an adjustment for the mileage of the vehicle and the
12   options, right?
13 A  Adjustments are made based on vehicle comparable to the
14   market.
15 Q  And you're assuming clean retail, right?
16 A  No.  It's based on a typical vehicle --
17 Q  Typical --
18 A  -- and the market.
19 Q  Typical vehicle.  Okay.
20   Average vehicle?
21 A  Typical.
22 Q  Okay.  Okay.  Now, we looked at Exhibit 6, and you said
23   you never -- you hadn't seen this before.
24   Do you have any idea -- having seen it in
25   preparation for your deposition, any idea what this is.

Page 61

1    memory is correct, Spokane or Eastern Washington.
2         (Exhibit No. 8 marked for
3              identification.)
4
5         THE WITNESS:  That's Oregon.
6  Q  (By Mr. Nealey)  Oregon.  Okay.  You're right.  503 is
7    Portland.
8         MR. BENNETT:  So your memory was not
9    correct.
10        MR. NEALEY:  My memory was not
11   correct.  I'm forgetting my grandparents' phone number in
12   Spokane.
13        MR. BENNETT:  Let the record
14   reflect --
15        MR. NEALEY:  -- that I was incorrect.
16 Q  (By Mr. Nealey)  This has seven bullet points on it.
17   Can you tell me what -- what -- you remember eight
18   bullet points.  Can you maybe tell me, looking at Exhibit
19   7 and Exhibit 8, if there are any bullet points that
20   wouldn't be in the Washington letter there and anything
21   you can remember that should be in the Washington letter?
22 A  Is there a copy of the letter that I have written to Ms.
23   Bower?
24 Q  I didn't find one in here.  That's why I'm asking.
25        MR. BENNETT:  There should be.  If you

Page 63

1         (Exhibit No. 6 marked for
2              identification.)
3
4         THE WITNESS:  It looks like you put in
5    an ACV and it puts a number.  I don't know how it -- I
6    don't know how it calculates.  I don't know how to
7    utilize it.  I have not seen it.
8  Q  (By Mr. Nealey)  Okay.  Okay.  Okay.  I'm going to mark
9    as Exhibit 7 -- and I apologize to the reporter.  It's
10   front and back, but I'm going to mark -- 7 is
11   AMFAM_MM-2751.
12   Is this a form letter that's available for you for
13   use in handling diminished value claims in the State of
14   Washington?
15        (Exhibit No. 7 marked for
16             identification.)
17
18        THE WITNESS:  It is.  It's slightly
19   different than the one we use.
20 Q  (By Mr. Nealey)  Okay.  How is it slightly different?
21 A  There's only six bullets, and the one we use is 8.
22 Q  Okay.  I see a letter here with a -- I'm going to mark as
23   exhibit -- as Exhibit 8 a letter that's AMFAM_MM-2774,
24   and this is a letter with seven bullet points, and
25   there's a 503 number at the bottom, which is, if my

Page 62

1    didn't get that... (Pause.)
2  Q  (By Mr. Nealey)  I'm going to mark as Exhibit 9 -- this
3    is the letter that I found in the file addressed to Ms.
4    Bower.  It's AMFAM_B-87.
5    And I'll give you as Exhibit 10 a copy of the letter
6    that Ms. Bower had sent you with her diminished value
7    assessment?
8         (Exhibit Nos. 9 through 10
9              marked for identification.)
10
11 Q  (By Mr. Nealey)  Do you remember or have you seen an
12   additional letter to Ms. Bower?
13 A  There should be an eight-point letter.
14 Q  Do you remember seeing it in preparing for the
15   deposition, or do you just believe there should be an
16   eight-point letter?
17 A  I recall seeing one, outlining it, because it was also
18   referenced in my e-mails to her.
19        MR. BENNETT:  So take two minutes?
20        MR. NEALEY:  Yeah.
21        MR. BENNETT:  I've got it next door.
22        MR. NEALEY:  Okay.
23        (Recess from 11:24 a.m. to
24             11:36 a.m.)
25   ///

Page 64

16 (Pages 61 to 64)

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1   (Exhibit No. 11 marked for
2   identification.)
3
4       MR. NEALEY: When we took a break,
5   Counsel was kind enough to go look and try to find what
6   was being referred to, and I have marked as Exhibit 11
7   what I have been handed, which was actually a letter that
8   was sent to the attorney by Ms. McNally in a prior case
9   involving an insured, Maryanovsky. The record can note
10  that defense counsel has the same issue with pronouncing
11  it that I did.
12  Q  (By Mr. Nealey) So I take it that if we don't find a
13     copy in the -- in the claim file that you sent regarding
14     Mrs. Bower's claim, that a letter was not sent in that
15     case. Is that a fair statement?
16  A  I would need to look in the file to determine what
17     occurred and the sequence of events.
18  Q  Okay. Well, if you send a letter, a copy is put in the
19     file, right?
20  A  Yes.
21  Q  Okay. So if we look at the entire file and there isn't a
22     copy of the letter, then the letter wasn't sent, right?
23  A  It's possible that the appraisal had already been
24     received at the same time we found out she was presenting
25     a diminished value claim. We had already received

Page 65

1   documents from her.
2   Q  Okay.
3   A  I would need to look though to see what -- the sequence
4      of events.
5   Q  Well, when you get an appraisal -- is this letter only
6      sent when somebody tells you they're going to present a
7      claim and you send this letter to them, what's been
8      marked as Exhibit 11, as an exemplar, do you send this
9      letter to them as to what Am Fam is going to want?
10  A  When they verbally tell us that they want to present a
11     diminished value claim or seek one, we do send this
12     letter.
13  Q  Okay. And this is a template that is available and is
14     used throughout the State of Washington?
15  A  Yes.
16  Q  Okay. Now, and this reflects what American Family
17     believes what it needs to assess a diminished value case?
18  A  They're items that we request to review.
19  Q  Okay. Well, I'd like to go through this.
20     Using Exhibit 11 as a -- as an example, first of
21     all, this is your signature on this?
22  A  Yes, sir.
23  Q  Okay. Does it matter whether the person is represented
24     by a lawyer or whether they're just making a claim
25     without a lawyer whether this letter is sent out?

Page 66

1   A  No.
2   Q  Okay. And the letter says, "In order to fully
3      investigate and evaluate this claim, it will be necessary
4      to provide the following written documentation," and the
5      first item is "copies of all repair invoices for repair
6      work that's been performed on this vehicle, including
7      mechanical work."
8         How does that -- Item 1, how does that fit into your
9      consideration of the amount of market value loss on the
10     vehicle?
11  A  It gives us an idea of how the vehicle has been
12     maintained by the owner of the vehicle.
13  Q  And what does that have to do with the market value loss
14     for diminished value as a result of damage to the
15     vehicle's body, frame, and paint?
16  A  Because we're trying to determine when we are making --
17     adjusting a diminished value claim if it's a result of --
18     directly a result of our accident that occurred or
19     another factor.
20  Q  Well, let's look at Ms. Bower as an example.
21     Ms. Bower's car was hit by an uninsured motorist,
22     and -- and was damaged and then was repaired.
23     As to determining whether Ms. Bower's vehicle, with
24     149 miles on it at the time of the accident, is worth
25     less due to the damage that was done to the vehicle's

Page 67

1   frame, structure, or paint and body, how does copies of
2   any and all repair invoices for repair work that's been
3   performed on the vehicle, including mechanical work, how
4   does that relate to the market value loss?
5   A  She didn't --
6         MR. BENNETT: Object to form.
7         THE WITNESS: She did not provide us
8   with any documents of such and they weren't needed in
9   that particular case.
10  Q  (By Mr. Nealey) Why weren't they needed?
11  A  There had been no maintenance done on the vehicle yet.
12  Q  Okay. Well, why would -- why would maintenance that was
13     done on the vehicle, the maintenance work, why would that
14     have anything to do with the market loss due to the fact
15     that the car had damage to its frame, structure, paint,
16     and body?
17  A  If there was an ongoing mechanical issue preexisting to a
18     loss, it's possible that that could have impacted the
19     value of the vehicle.
20  Q  What value of the vehicle are you talking about?
21  A  The value that the customer is making a claim to us for,
22     loss in value.
23  Q  Well, okay. Let's stop for a second here.
24     I'd just like you to assume that -- we would both
25     agree, I believe, that Ms. Bower's vehicle had damage to

Page 68

17 (Pages 65 to 68)

Page 69

1    the body -- the unibody structure of the vehicle and to
2    its paint and body; is that correct?
3  A  No, it is not correct.
4  Q  Well, it had the quarter panel cut out and replaced,
5    correct?
6  A  It did not have any inner structure damage sustained
7    except for a small cosmetic piece where the corner
8    mounted to it.
9  Q  Okay. So then we would agree that Ms. Bower's vehicle
10   had body and paint damage to it?
11 A  It had body and paint damage.
12 Q  Okay. Now, if I am assessing the impact that that body
13   and paint damage has on the vehicle as of the -- and its
14   market value after repair, what is -- if the vehicle has
15   some additional mechanical issue, what does that have to
16   do with it?
17 A  That's why we look at each claim individually, and if
18   there was something impacting the value of the vehicle
19   prior to the loss, then we need to know what was on the
20   car.
21 Q  So would the mechanical issues of any of the items you
22   find in Exhibit 1, would those relate to what you believe
23   to be the vehicle's post-repair value or what you believe
24   to be its pre-accident value?
25 A  It's something that we would take into consideration in

Page 70

1    determining if we felt a diminished value claim existed.
2  Q  Why?
3  A  Because if somebody has a nonworking engine or an engine
4    that needs to be replaced soon, that's going to be an
5    impact on the value to a buyer.
6  Q  Yeah. Agree. But what is the fact that a car might need
7    engine work or a car might not have air conditioning
8    work, what does that have to do with the difference
9    between its pre-accident value and its post-accident
10   value as a vehicle that has had repair work done to
11   its -- in the case of Ms. Bower's, it's paint and body?
12 A  It assists us in determining the condition of the vehicle
13   so that we can determine if there's other items that may
14   be impacting the value of that vehicle. It may not be
15   from the accident.
16 Q  Well, does the fact that a vehicle may have some
17   mechanical work that needs done on it or has had
18   mechanical work done on it -- is the fact that a vehicle
19   has had mechanical work done on it, is it part of the
20   Audatex system that you use? Is that an input into that?
21 A  No.
22 Q  Okay. Can you give me an example of any case where you
23   have ever -- in adjusting a diminished value loss you
24   have ever considered as part of actually valuing the
25   market value loss the fact that a car has had prior

Page 71

1    mechanical work done on it?
2  A  Well, there was an Audi SUV that had constant issues with
3    the electrical system, and there was an extreme history
4    of it and provided all the documents by the customer of
5    all the -- all the work and how often it was in the shop
6    for those electrical issues that were unrelated to the
7    accident. They were preexisting.
8  Q  So what does that have to do with a reduction in market
9    value from its pre-accident value to its value as a car
10   that has had repairs to damage on its body, frame, and
11   structure or paint?
12 A  All of that information was reported by the dealership
13   onto Carfax as well, so a future buyer would see all
14   those incidents, which could impact the value to the
15   buyer.
16 Q  But if that same Audi had or did not have those prior
17   mechanical issues, it's going to affect its pre-accident
18   value and its post-accident value, right?
19 A  It depends. I would need to know more than that. I
20   wouldn't make my decision off of one question.
21 Q  Can you tell me any way in which invoices for repair work
22   that had been performed, including mechanical work or the
23   maintenance records, affects the difference between the
24   pre-loss value and the post-loss value of the vehicle?
25 A  That's basically a duplication of the first -- first

Page 72

1    bullet point.
2  Q  Okay. So then combining bullet point 1 and 2, can you
3    tell me how any records of mechanical work that's been
4    done on the car or repair work done on the car affects
5    the difference between the pre-loss value of the vehicle
6    and its post-repair value?
7  A  A buyer may not be willing to pay as much for a vehicle
8    if they know there's been an extensive mechanical history
9    on the car.
10 Q  And that affects a vehicle's pre-loss value, right?
11 A  It could affect the post-loss value as well.
12 Q  Do you have any evidence to show that the -- that the
13   effect of any prior mechanical repair work on the
14   vehicle, that the impact that it would have on the
15   vehicle as a percentage between its pre-loss value and
16   its post-repair value changes?
17         MR. BENNETT: Object to form.
18         THE WITNESS: That's why we take each
19   claim on its own individual basis.
20 Q  (By Mr. Nealey) Well, I'm not asking you whether you
21   take each claim on an individual basis. I'm asking you
22   if you have any evidence or any explanation even you can
23   give me of why the impact of prior mechanical work, if
24   any, on the vehicle or prior maintenance of the work, if
25   any of it, that that would change between its

18 (Pages 69 to 72)

1    pre-repair -- pre-loss condition -- pre-loss value and
2    its post-repair value.
3              MR. BENNETT: Object to form.
4              THE WITNESS: I didn't say it would
5    change between them. It could be the same.
6  Q  (By Mr. Nealey) And, in fact, you would expect it not to
7    change, right?
8  A  No. I didn't say that either.
9  Q  Okay. Well, can you give me any reason why it would
10   change?
11 A  I explained that a buyer may not be willing to pay as
12   much for the vehicle knowing it has had previous issues.
13 Q  And they would be unwilling to pay that extra amount of
14   money before the accident that Pemco covered as much as
15   after the accident that Pemco covered; right; it wouldn't
16   change?
17 A  I do not work for Pemco.
18 Q  I'm sorry, Am Fam, so scratch that. Let me ask again.
19   And, in fact -- if, in fact, somebody was willing to
20   pay less for a vehicle because of prior repair work on a
21   car or what the maintenance records showed, that impact
22   is going to be the same to its pre-loss value as it is to
23   its value after it's been in an accident and had repairs
24   to its body, frame, paint, and structure, right?
25             MR. BENNETT: Object to form.

Page 73

1              THE WITNESS: I don't understand your
2    question.
3  Q  (By Mr. Nealey) Can you give me any reason -- any
4    evidence to show that the impact of mechanical work on a
5    vehicle or repair work on a vehicle would -- would vary
6    as to its impact on market value for the vehicle before
7    the accident, pre-loss value, as opposed to its
8    post-repair value?
9              MR. BENNETT: Same objection; form.
10             THE WITNESS: Are you asking if
11   there's a difference in the type of mechanical work that
12   was completed?
13 Q  (By Mr. Nealey) No. I'm asking you if you can give me
14   any explanation or any evidence to show that if you had
15   an impact on the vehicle's pre-loss value --
16 A  Okay.
17 Q  -- due to mechanical work or repair records or anything,
18   that that would change or be any different than the
19   impact you have after the vehicle has been in an accident
20   where it sustained body, paint, frame, or structural
21   damage and was repaired by American Family, it's value
22   after those repairs.
23 A  The value could remain the same after the accident of
24   what it was pre-loss. Again, that's why we look at each
25   claim and take all factors into consideration.

Page 74

1  Q  So you would agree with me that if there is an impact due
2    to mechanical work or repair work that was done on the
3    vehicle, it's going to be the same impact to its pre-loss
4    value as its post-repair value, right?
5              MR. BENNETT: Object to form.
6              THE WITNESS: There's not always
7    necessarily a loss of value --
8  Q  (By Mr. Nealey) Okay.
9  A  -- as with repair work.
10 Q  But if there is a loss, it's going to remain the same to
11   its pre-loss value as its post-repair value, right?
12             MR. BENNETT: Object to form.
13             THE WITNESS: I do not know.
14 Q  (By Mr. Nealey) Okay. Well, let me give you just a
15   hypothetical, okay? Let's assume that you have
16   determined that because of the repair work that was done
17   on this car and the mechanical work, for instance, your
18   Audi, that the Audi had $1,000 less pre-loss value as a
19   result of those preexisting mechanical issues, do you
20   have any evidence to show that the -- that the post-loss
21   value would also not be $1,000 lower?
22             MR. BENNETT: Object to form.
23             THE WITNESS: I do not have any
24   physical evidence.
25 Q  (By Mr. Nealey) Okay. And you would assume that

Page 75

1    whatever impact mechanical work would have on its
2    pre-loss value, you would see the same impact after it
3    has been in an accident covered by American Family, where
4    it had body, paint, frame, or structural repair, right?
5  A  It may have --
6              MR. BENNETT: Object to form.
7              THE WITNESS: -- retained the exact
8    same value that it had before the accident.
9  Q  (By Mr. Nealey) Okay.
10 A  Just because it had body, frame repair work doesn't mean
11   that it lost value.
12 Q  I'm not saying that, but whatever impact there was from
13   mechanical work or the repair records on the vehicle is
14   going to be the same to its pre-loss value as its
15   post-repair value, right?
16             MR. BENNETT: Object to form.
17             THE WITNESS: There may not have been
18   a loss in value from the mechanical work. Again, it's
19   something we take into consideration to know what the
20   history of the vehicle is.
21 Q  (By Mr. Nealey) So to put it another way, if you
22   determine a vehicle loses 2 percent of its value to its
23   pre-loss value because of mechanical work, then you're
24   going to assume that it's going to lose 2 percent of its
25   value after repairs to its post-repair value due to those

Page 76

19 (Pages 73 to 76)

1    mechanical issues, right?
2  A  No. I would not assume that.
3  Q  Would you assume it would change?
4  A  I do not know.
5  Q  Do you have any evidence it would change?
6  A  I would look at each claim and everything submitted on
7    its own to see what we have.
8  Q  Do you have any evidence you can give me or any logical
9    explanation why the impact of repair work on a vehicle or
10    the mechanical records, the impact on the value of that
11    vehicle would change between its pre-loss value and its
12    post-loss value?
13  A  It's all opinion by everybody providing value.
14  Q  Okay. So you don't have anything you can point me to
15    that somehow the impact of mechanical work would change
16    from a pre-loss value to a post-loss value?
17  A  I never said that it would change. I never said it
18    wouldn't change.
19  Q  You don't have any evidence either way?
20  A  I did not say it would change.
21  Q  Okay. Good.
22    Now, then the "names and auto insurance policy
23    numbers for all insurance companies that have provided
24    physical damage coverage for this vehicle."
25    Why do you need that?

Page 77

1  A  That is so that if there has been a potential prior loss
2    on a vehicle, if we need to obtain new photos or
3    information from the prior insurance company on what that
4    damage was, we may call and ask for some photos, if
5    they'll release them to us.
6  Q  Now, you've already run this vehicle at this point in
7    the -- in the ISO database, right?
8  A  If we have the VIN and ICS, it runs automatically.
9  Q  Okay. And you always have the VIN, right?
10  A  We don't always have the correct VIN, if it wasn't set up
11    on the policy correctly, so sometimes it takes a physical
12    inspection to get the correct VIN.
13  Q  Well, if you plug the VIN in, it's plugged in wrong,
14    because it has VIN check, it just doesn't run and it
15    tells you there's an error in the VIN, right?
16  A  It's like I said: If sometimes it's on the policy
17    incorrectly --
18  Q  Yeah.
19  A  -- and it takes a physically inspection to verify the
20    actual VIN, we would not have had the ISO --
21  Q  Well --
22  A  -- on the correct car --
23  Q  Okay.
24  A  -- at the initial reporting of the claim.
25  Q  Well, it will tell you that the -- it will tell you that

Page 78

1    it's the wrong VIN?
2  A  We look at the VIN and verify it against the policy.
3  Q  Well, you don't physically do that. You look at the
4    repair estimate, if it's done by a DRP shop, right, and
5    you pull the VIN, if need be?
6  A  There's a photo of the VIN, and it's compared in the shop
7    because DRP is expected to verify it's an accurate VIN --
8  Q  Okay.
9  A  -- against the policy.
10  Q  So you don't actually go look at the vehicle to do it;
11    you look at the photograph?
12  A  I do not handle DRP claims.
13  Q  Okay. Well, when you have a -- when you go out and
14    estimate, you check the VIN, right?
15  A  In person.
16  Q  Yes. And if it's a DRP, it's done by the DRP shop?
17  A  I do not work at the DRP shops.
18  Q  Okay. But the sole reason to ask for all names and
19    insurance policies is so you can then call those
20    insurance carriers and ask for records on prior
21    accidents?
22  A  It's if we have a concern about something that may not
23    have been repaired.
24  Q  Oh, it's unrepaired damage --
25  A  Potentially.

Page 79

1  Q  -- you're looking for?
2    Okay. Anything other than unrepaired damage?
3  A  It could be that our impact was on top of the other one.
4    There could be a variety of reasons.
5  Q  Well, if your impact was on top of an earlier impact, how
6    does that impact your --
7  A  I would hope we would have already called them and -- to
8    obtain -- so we can separate the damages.
9  Q  Okay. And, in fact, whenever a vehicle is brought in,
10    one of the things that you do when you estimate is you
11    look to see if there's prior damage in the area of the
12    impact, right?
13  A  Yes, sir.
14  Q  Okay. And you record in your file in your estimate if
15    there's prior -- prior impact in the area, right?
16  A  Yes.
17  Q  Okay. So, for instance, when we look at Ms. Bower's
18    claim and we look at your -- just as an example, I'll
19    mark as Exhibit 12 -- here is a document entitled
20    AMFAM_B-12.
21    This was created by you?
22    (Exhibit No. 12 marked for
23    identification.)
24
25    THE WITNESS: No.

Page 80

| | |
|---|---|
| 1  Q  (By Mr. Nealey)  Who created that? | 1  A  Uh-huh. |
| 2  A  This is a page in ICS, which is our claims system. | 2  Q  Uh-huh.  Why do you ask for that? |
| 3  Q  Okay.  And on here, there's a note that says "no prior | 3  A  We don't insure a lot of vehicles from start to finish of |
| 4      damage"? | 4      their lifetime.  Customers change insurance companies. |
| 5  A  I did not fill that out.  That's filled out by the care | 5      And that just assists us in knowing if the vehicle has |
| 6      center when she reports the claim. | 6      been involved in other losses. |
| 7  Q  Okay.  That's in -- so this is an -- so Ms. Bower was | 7  Q  Well, if you've insured the vehicle for the whole time, |
| 8      asked whether there was prior damage in the area? | 8      do you take that bullet point out of this letter, or do |
| 9  A  She is asked by -- every customer is asked at the time of | 9      you just send the letter? |
| 10      the report if there's prior damage on the car. | 10  A  I don't look to see when the person purchased the car |
| 11  Q  Okay.  So when you send this letter out, which has been | 11      versus when the policy is taken out. |
| 12      marked as Exhibit 11, when you send it out, you've | 12  Q  Okay.  So you would send the same letter whether the car |
| 13      already asked the customer with the initial claim if | 13      has been insured from Day 1 with zero miles or if they |
| 14      there was any prior damage on the car, right? | 14      had just gotten it, same letter? |
| 15  A  They've been asked.  It doesn't mean that there wasn't | 15  A  And a customer can tell me that it had -- it had been |
| 16      prior damage on the car. | 16      insured since it was brand new. |
| 17  Q  Okay.  But every time that you send this letter out | 17  Q  Okay.  And, again, 4 is asking for the same information |
| 18      asking for this information, Am Fam has already asked -- | 18      that you are asking people when they originally called |
| 19      with the initial intake of the claim, they've already | 19      in, which is to find out if there's prior damage in that |
| 20      asked the insured whether there was prior damage on the | 20      area of the vehicle, right? |
| 21      car, right? | 21  A  Again, it's a call center function that I don't have |
| 22  A  The customer was asked in this case, yes. | 22      their list of questions that they ask, but it does appear |
| 23  Q  Okay.  Well, that's a standard thing to do, right? | 23      that it was asked. |
| 24  A  I believe so.  It's a care center -- | 24  Q  Okay.  But the Item 4 in the letter that's been marked as |
| 25  Q  Okay. | 25      Exhibit 11, the purpose of that is to try to get any -- |
| Page 81 | Page 83 |

| | |
|---|---|
| 1  A  -- task. | 1      any information on prior accidents that might be in the |
| 2  Q  And then the care center notes no prior damage or they | 2      same area of the vehicle, right? |
| 3      note prior damage, right? | 3  A  Yes. |
| 4  A  Based on what the customer tells them. | 4  Q  Okay.  And Exhibit 5 [sic], "a notarized copy of the bill |
| 5  Q  Okay.  Understood.  Understood. | 5      of sale agreement for this vehicle," what is that for? |
| 6      And then when you prepared the estimate, you note | 6  A  This is a form letter.  And the notarization I don't |
| 7      whether there's any prior damage on the estimate, if | 7      believe occurred.  This was off of the previous forms |
| 8      there is, right? | 8      where in some states I believe it does -- it can be |
| 9  A  I don't always put it on the estimate.  I put it in my | 9      notarized.  Bill of sale, it helps us on a newer vehicle. |
| 10      notes -- | 10      In some cases, it can show us more of what the value of |
| 11  Q  Okay. | 11      that vehicle was so we know a start value.  Values aren't |
| 12  A  -- if there's something I'm concerned about. | 12      always available on brand new vehicles on our system. |
| 13  Q  Okay.  So we can be assured that any time that a claim | 13  Q  So you ask everybody to get you a notarized bill of sale |
| 14      gets to the -- has moved forward, the customer has been | 14      on their vehicle? |
| 15      asked with the intake of the claim whether there was | 15  A  They can provide a bill of sale.  They are useful on |
| 16      prior damage, and then somebody from Am Fam, an adjuster | 16      newer cars.  Again, this is a form letter. |
| 17      like you, or somebody working on behalf of Am Fam at the | 17  Q  Okay.  But you specifically -- but this -- regardless of |
| 18      DRP shop, has already checked to the actual physical | 18      whether it's a new vehicle or old vehicle, you can look |
| 19      damage on the vehicle to look for prior damage in that | 19      up the value of the vehicle in the -- in one of your |
| 20      area, right? | 20      systems and find out what the actual cash value of the |
| 21  A  Prior damage is addressed, and a lot of times we are able | 21      vehicle is, right? |
| 22      to address it already, yes. | 22  A  Not always. |
| 23  Q  Okay.  Okay.  So then we've got 4:  "Copies of any and | 23  Q  Well, you looked up Ms. Bower's vehicle and it had 149 |
| 24      all appraisals or estimates of repair for any and all | 24      miles on it, right? |
| 25      insurance claims in which the vehicle has been involved." | 25  A  I didn't look it up. |
| Page 82 | Page 84 |

21 (Pages 81 to 84)

1  Q  The Audatex system looked it up, right?
2  A  Because there was a value for that vehicle --
3  Q  Yes.
4  A  -- doesn't mean there's a value for all vehicles.
5  Q  Okay.  So put it another way, can you think of any
6     example where -- where you, in addressing a diminished
7     value claim, you couldn't look up the value of the
8     vehicle and you relied upon a notarized bill of sale
9     agreement for the vehicle?  Did you actually rely on it?
10 A  Yes.
11 Q  When?
12 A  It wasn't notarized, but it was a bill of sale.  The
13    customer had had the vehicle for a week.  It was struck.
14    And then he traded it in before he made the claim, and we
15    did obtain a bill of sale to determine the realized value
16    and the loss in value.
17 Q  And you found a loss in value?
18 A  The dealership -- he had traded in the vehicle and
19    suffered a tangible loss in value.
20 Q  The dealer came in and said, "We gave him less money for
21    it"?
22 A  The dealer provided us with a prior value and the post
23    value based on their opinion, and it was solely due to
24    the accident.
25 Q  Okay.  So Number 5 really applies in a circumstance where

Page 85

1     somebody is in the meantime sold the car and they're
2     making a claim, right?
3  A  It could.  I would not not review somebody's claim if
4     they did not provide me a bill of sale.
5  Q  Okay.  Well, and then we've got 6, "If this vehicle is
6     leased, a copy of the lease agreement."
7        And is that in there for the issue we discussed that
8     you deny it as a lease claim unless there's something in
9     the lease that somebody can point to that they have some
10    obligation?
11 A  That's so that we know what the leasing terms are and who
12    has the rights to potentially recover diminished value or
13    make that claim.
14 Q  Okay.  Well, do you explain to people that, "Gee, if" --
15    "unless you" -- "unless you owe something under the lease
16    for diminished value to the person from whom you've
17    leased it, we're going to deny the claim," or do you just
18    ask everybody to get you a copy to of their leasing
19    agreement?
20 A  We are under duty to investigate each claim individually,
21    and so we obtain the documents and make our decision then
22    as to whether it would be covered in that particular
23    case.
24 Q  How many times can you think of that you've actually
25    looked at a lease agreement and determined -- in a UIM

Page 86

1     context, you've looked at a lease agreement in a UIM
2     context and decided that your insured can make a claim?
3  A  I have not had it in a UIM context.  I have had it in a
4     property damage context that it was in the language.
5  Q  Okay.  So every time you've asked for the lease
6     agreements, and you've never found it to change your
7     decision that you would deny the claim as to a UIM claim,
8     right?
9  A  At that time because it wasn't the leasing company making
10    the claim.  It was the renter making the claim.
11 Q  Okay.
12 A  And it was solely based on their particular lease.
13 Q  Yeah.  Okay.  Okay.  And, in fact, you know in your
14    system you can pull up -- with the insured information,
15    you know if a vehicle is leased or not, right?
16 A  No.
17 Q  Your system doesn't tell you if a vehicle is leased?
18 A  You would have to run the plates through the state.
19 Q  Okay.  So you can't go into the Am Fam data system and
20    find out if the vehicle was owned or leased?
21 A  No.
22 Q  Okay.  7, "A copy of the current Department of Motor
23    Vehicle' automobile title for this vehicle," and the
24    title history.
25       So you ask the insured to go get a title history

Page 87

1     from the Washington State Department of Licensing?
2  A  If they're able to provide it, we would have a copy of it
3     to know if the vehicle has a prior salvage history.
4  Q  Well, you can run that, right?
5  A  We can.
6  Q  Yes.
7  A  And oftentimes we do.
8  Q  Okay.  Okay.  Well, what has -- what do you use that for
9     regarding handling UIM claims?
10 A  If the vehicle has a prior total loss history, that,
11    obviously, has more than likely impacted the value, but
12    it just gives us information to help make our decision if
13    we feel that it has diminished value as a result of this
14    particular loss.
15 Q  So you're really asking for them to go to the Department
16    of Licensing and get a title history so you can tell if
17    the car has been -- has a salvaged title, right?
18 A  They can provide us with a copy of their registration
19    because it says it on their generally --
20 Q  Okay.
21 A  -- or a copy of the title.
22 Q  So the title history isn't needed really.  The
23    registration would be fine because it's marked as a
24    salvage title, right?
25 A  Yes.  There should be a declaration on it.

Page 88

22 (Pages 85 to 88)

1  Q   Okay.  So although the letter asks them to go get a
2      complete title history from the Washington Department of
3      Licensing, you don't actually need that.  You just need
4      to know if the title is branded as salvaged, right?
5  A   That's what we're looking for, and how they determine to
6      send that information to us can vary.
7  Q   Okay.  And it's just as easy for you guys to go look at
8      the Washington Department of Licensing and see if it's a
9      salvaged title as it is for the insured, right?
10         MR. BENNETT:  Object to form.
11         THE WITNESS:  We can run it.  However,
12     we also have to report all our usage to the state and it
13     has to be reasonable for business uses only, so we have
14     to document and keep track of what we run through the
15     state.
16 Q   (By Mr. Nealey)  Okay.  Meaning you can do it at your
17     computer desk?
18 A   Yes.
19 Q   Okay.  "Any notarized expert appraisals you have obtained
20     providing any diminution in value on the vehicle.  Please
21     note that appraisal fees will not be reimbursed."
22     You require that these things be notarized?
23 A   No.
24 Q   Why does it say "notarized" then?
25 A   That's what the form letter that we send out says.

Page 89

1  Q   Okay.  Well, did you ever ask yourself "if we don't ask
2      that things be notarized why we say it has to be
3      notarized"?
4  A   If a customer provides me something to review, I'm going
5      to review it whether it's notarized or not.
6  Q   Okay.  But you know that it's not easy.  You've got to go
7      take the document of the person down, and they've got to
8      go down to a notary and then they've got to pay the
9      notary fee and they've got to stand in front of somebody
10     to do the notarization, right?
11 A   Notarization doesn't always cost money, if you go to your
12     bank where you bank at.
13 Q   But as far as you, in looking at this thing, whether it's
14     notarized or not is irrelevant to your decision?
15 A   To me personally, yes.
16 Q   Okay.  Are you aware of any policy within American Family
17     in the State of Washington that these things have to be
18     notarized?
19 A   No.
20 Q   Now, when you send this letter to people, which I know it
21     wasn't sent to Ms. Bower, but I think you said you
22     typically send this letter, right?
23 A   I --
24 Q   This is normally sent?
25 A   I typically do.  I would need to look at the claim file

Page 90

1      to determine why.  It may have been she had already sent
2      us an appraisal --
3  Q   Okay.
4  A   -- for review.
5  Q   It would be very unusual that this letter was not sent?
6  A   Very unusual, yes.
7  Q   So looking at the usual custom and practice of sending
8      this letter, when this letter is sent, you would already
9      have an Audatex DV report on the vehicle, right?
10 A   No.
11 Q   Well, you could have obtained one, right?
12 A   No, not always.
13 Q   What information to run an Audatex report would you need
14     to get the information on Exhibit 11 from the insured
15     before you could run that report?
16 A   Well, if we --
17 Q   Can you tell me anything on here that you need to run the
18     Audatex report?
19 A   The prior damage is one of the questions, and if it's
20     possible that the field adjuster doesn't have complete
21     photos of the vehicle, they may not know if there's prior
22     damage or not.  If it was handled as a desk review,
23     oftentimes we only obtain a few photos from the shop that
24     show the area of damage.
25 Q   Any other circumstances?

Page 91

1  A   That's the one that is coming to my mind at the moment.
2  Q   Okay.
3  A   There may be others I can think of, but --
4  Q   So you could run the Audatex diminished value report on
5      any claim without this information other than a
6      circumstance where you might have had a desk review and
7      the photos aren't sufficient?
8  A   Or we don't have the mileage for the vehicle, which is
9      one of the modifiers on there, and if we're taking an
10     estimate from a shop, we may not have the mileage.
11     Oftentimes they don't include the mileage on the
12     estimates.
13 Q   Okay.  Whenever you -- whenever an Am Fam adjuster goes
14     out, you always write down the mileage, right?
15 A   We try to obtain it.  It's not always possible.
16 Q   Why would it not be possible?
17 A   In the case of Ms. Bower's car where the shop had the
18     battery disconnected and out of the car.
19 Q   And, in fact, if I were to show you your DRP guidelines,
20     have you ever seen them before?
21 A   I have not read them.
22 Q   Okay.  Okay.  When you get the Audatex reports, do you
23     send them to your customers when they've made a
24     diminished value request?
25 A   They can review them, absolutely.

Page 92

23 (Pages 89 to 92)

Page 93

1  Q  Do you send them to them?
2  A  We do.
3  Q  Okay.  Because I don't see a copy ever sent to Ms. Bower.
4  A  Okay.
5  Q  Do you have a form letter that you -- you have that you
6     transmit the Audatex that you're aware of?
7  A  As far as transmitting the Audatex to rewrite the Audatex
8     report?
9  Q  No.  No.  A cover letter to send it to the clients, your
10    insured, saying, "Here's our DV assessment from Audatex.
11    Here's the basis and here's how we assess it."
12 A  We don't settle every claim off of Audatex, so no, we
13    don't have a form.
14 Q  Okay.  Do you have a standard practice within American
15    Family with handling UIM claims to send the Audatex to
16    your insureds?
17 A  We will provide the customer with any information to show
18    them what they want to see.
19 Q  Well, if they don't know that you ran an Audatex, they
20    don't know to ask to see it, right?
21 A  We'll tell them that we run an Audatex.
22 Q  Okay.  Do you have a standard form letter or something
23    that you send to people explaining the methodology where
24    you attach it, like this letter that we've seen as
25    Exhibit 11?

Page 94

1  A  Letters are preformed.
2  Q  Okay.  Have you ever written a letter to anyone attaching
3     an Audatex and explaining how it's calculated?
4  A  Yes.
5  Q  Can you tell me what claim that might be in?
6  A  No.  I am not able to --
7  Q  Do you have a vehicle that comes to mind?
8  A  I do not.
9  Q  Okay.  Now, I'm going to mark as Exhibit 13, which has
10    been Bates-stamped AM FAM_MM-2775.
11    Do you know what this is?
12             (Exhibit No. 13 marked for
13             identification.)
14
15    THE WITNESS:  I do not.
16 Q  (By Mr. Nealey)  Okay.  Is that a printout that comes
17    from the Audatex system, or is related to the Audatex
18    system?
19 A  It is not the printout I get.
20 Q  Okay.  So you don't know where -- you haven't seen a
21    document that looks like that?
22 A  No, I have not.
23 Q  Okay.  Now, if we look at this, which I've marked as
24    Exhibit 13, there is a -- it says diminution calculation,
25    base loss of value 10 percent of adjusted retail of

Page 95

1     adjusted retail ACV, and that's the same number used by
2     the Audatex system, right?
3  A  10 percent?
4  Q  Yeah.
5  A  Yes.
6  Q  And then we've got the damage severity modifier.
7     Are these the same damage severity modifiers used by
8     Audatex?
9  A  Without the form in front of me, I'm not able to say 100
10    percent.
11 Q  Do they appear to be the same?
12 A  They appear to be similar.
13 Q  Okay.  Let me pull out the Audatex.  I'm going to give
14    you Exhibit 5.  It may help you a little bit.
15    Does that refresh your recollection, having one of
16    the printouts from Exhibit 5?  Do you see anything
17    different about the diminution calculation shown here on
18    Exhibit 13 under "damage severity modifier" different
19    than what you remember seeing from Audatex?
20 A  I guess what I was referencing is I was referencing the
21    sheet that outlines these modifiers in the Audatex
22    because it's not on the --
23 Q  Okay.
24 A  -- actual Audatex report we receive.
25 Q  Okay.  And then the mileage modifier, does that appear to

Page 96

1     be the same mileage modifier on Exhibit 13 that you would
2     input into the Audatex system for Exhibit 5?
3  A  We do not add a mileage modifier.  It's automatic.
4  Q  Okay.  Meaning the system does it itself?
5  A  Yes.
6  Q  Okay.  Does your guide to Audatex tell you what the
7     adjustment ranges are, or do you know just know by
8     plugging a bunch of numbers?
9  A  You put the mileage in.
10 Q  Okay.
11 A  And it automatically calculates it.
12 Q  Automatically calculates.  Okay.
13    And nothing in the guide -- the documents you've
14    looked at on how you use the system describes what the
15    cutoffs are for the mileage modifiers?
16 A  There may be.  I do not have it memorized.
17 Q  Okay.  I'd like you to turn to Exhibit 9.
18 A  (Witness complies.)
19 Q  And then look at Exhibit 8 -- Exhibit 10 as well, which
20    is the letter that Ms. Bower sent to you.
21    Do you have any -- as the adjuster on the claim, do
22    you have any criticism of the methodology used to
23    calculate diminished value in the -- Mr. Butler's
24    appraisal of the loss contained -- attached to Exhibit
25    10?

24 (Pages 93 to 96)

1    MR. BENNETT: Object to form.
2         THE WITNESS: His appraisal is his
3    opinion.
4    Q  (By Mr. Nealey) Okay. Do you have any criticism of his
5    methodology?
6    A  I would need to --
7         MR. BENNETT: Object to form.
8         THE WITNESS: -- review it.
9    Q  (By Mr. Nealey) Okay. I'm more than happy to have you
10   review it to identify anything you think is incorrect
11   about his methodology.
12        MR. BENNETT: I'll object form. She's
13   not here as an expert witness.
14        THE WITNESS: It's his opinion. I'm
15   unaware of where the percentages come from as well.
16   Q  (By Mr. Nealey) Do you have any criticism of his
17   methodology or the way he calculated the loss?
18   A  Again, I don't know how he determined his numbers other
19   than putting in random percentages.
20   Q  So I take it that you don't have any criticism of his
21   methodology or how he reached his numbers?
22   A  I don't know how he reached his numbers other than
23   putting in random percentages --
24   Q  Okay.
25   A  -- of what he felt were appropriate.

Page 97

1    Q  Do you know how Audatex reached its numbers?
2    A  It's based on the 10 percent.
3    Q  Do you know where the 10 percent came from?
4    A  As we discussed earlier, I was not part of that.
5    Q  Okay. Okay. So I take it since you have no criticism of
6    Mr. Butler's appraisal of the loss, that you didn't
7    decide that it was erroneous; you just disregarded it in
8    deciding whether there was a diminished value loss or
9    not?
10        MR. BENNETT: Object to form.
11        THE WITNESS: That is not true.
12   Q  (By Mr. Nealey) Well, what did you consider?
13   A  Again, I don't know how these numbers were reached or how
14   he established the value, and it's a check system based
15   on a form letter as well. He also stated that there
16   was -- that the damage had been repaired properly --
17   Q  Okay.
18   A  -- back to pre-loss.
19   Q  Okay. Does he say that the damage is repaired to
20   pre-loss?
21   A  He states that it is high quality and visibly
22   undetectable repairs.
23   Q  Where is that?
24   A  Sorry. There's so many pages. I know it's here. He has
25   an asterisk in front of Number 2, "high qualify and

Page 98

1    visibly undetectable repairs." It's on the second to the
2    last page.
3    Q  Okay. And if you look at 93, you see his text there that
4    he's got. He -- "in this case, there are no readily
5    visible indications of prior damage. The repairs are,
6    for the most part, in distinguishable from the rest of
7    the automobile," correct?
8    A  Which paragraph --
9    Q  Do you see it?
10   A  -- are you reading? I apologize.
11   Q  Under "quality of repair."
12   A  Okay. That is what it says.
13   Q  Okay. Okay. And you notice that that is a different
14   level of repair than on what you were looking at on Page
15   106 of pre-loss condition, right?
16   A  It is Number 2, and that's what this says.
17   Q  Okay.
18   A  It says the same thing.
19   Q  And Level 1 is pre-loss condition, right?
20   A  That's what that says.
21   Q  So you would understand, looking at the level of repairs
22   and what he says, is that this vehicle was not in
23   pre-loss condition, but, instead, it had high quality
24   repairs, which is, he said in his text, "for the most
25   part are indistinguishable from the rest of the

Page 99

1    automobile. The repairs have been completed to the best
2    of human ability and that there are no readily visible
3    defects or deficiencies," correct?
4    A  I will disagree. It's in contradiction to what his shop
5    says when they were doing the repairs.
6    Q  Okay. Well, his DV report doesn't say the vehicle is in
7    its pre-loss condition?
8    A  But decisions were made to repair the vehicle based on
9    conversations with his shop that it would be to pre-loss
10   condition and they were --
11   Q  Okay.
12   A  -- contradicting --
13   Q  Okay.
14   A  -- this report.
15   Q  And, in fact, if we look at Exhibit 9, which is actually
16   the letter you sent to Ms. Bower, you don't say that the
17   vehicle is in its pre-loss condition; you say that the
18   damages were properly repaired, right?
19   A  Yes. It says "properly repaired."
20   Q  Do you equate a vehicle being properly repaired with it
21   being in its pre-loss condition?
22   A  It can mean that.
23   Q  Okay. So when you wrote "properly repaired," you meant
24   that the vehicle had been repaired to industry standards,
25   correct?

Page 100

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1   A   Had been repaired to industry standards, and per this
2       report, it was an unrecognizable repair.
3   Q   Okay. But according to the report, not pre-loss?
4   A   According to the conversation with the shop, they were
5       going to make it pre-loss, and their reports contradicted
6       each other, and they're both owned by the same person.
7   Q   Now, you took this loss and you roundtabled it; is that
8       correct?
9   A   Yes, sir.
10  Q   I'd like to just ask you a little -- a couple of things
11      about the file and mark the -- Exhibit 14 is a note that
12      was added that was routed to Mr. Jackson, but it was
13      created by you.
14                      (Exhibit No. 14 marked for
15                       identification.)
16
17  Q   (By Mr. Nealey) What do you mean by this note?
18  A   This is the my note letter Mr. Jackson know that as a
19      result of my physical inspection of the vehicle, I did
20      not feel the damages were consistent with a hit and run.
21  Q   What did you feel they were consistent with?
22  A   Striking a fixed objection.
23  Q   Okay. Did that impact the decision by American Family
24      that this was a UIM claim?
25  A   It impacted our decision on whether there was a UIM

Page 101

1       claim.
2   Q   Okay. And you found this was a UIM claim, right?
3   A   Mr. Jackson found it was a UIM claim.
4   Q   Okay. So American Family, despite your note, made a
5       decision, as a company, that it was a UIM claim?
6   A   They made a business decision.
7                       (Exhibit No. 15 marked for
8                        identification.)
9
10  Q   (By Mr. Nealey) Exhibit 15 is a letter from Mr. Jackson
11      to Ms. Bower that indicates that, quote, "We received
12      your paperwork for diminished value on your vehicle. I
13      will send the claim over to the property damage adjuster,
14      as they will be the one working on the claim with you."
15      I take it that the property damage adjuster they're
16      referring to is you in this case?
17  A   Correct.
18  Q   Okay.
19  A   At this point, I don't believe that it had actually --
20      I'm not sure if it had been assigned to me or not at that
21      particular --
22  Q   Okay. And is it the usual practice at American Family
23      that to the extent someone raises a diminished value
24      claim to assign it to the adjuster who actually went out
25      and appraised the vehicle's physical damage at the time?

Page 102

1   A   No.
2   Q   Okay. What is the practice? Who keeps these things or
3       handles them?
4   A   At the time, they were going to senior adjusters, and I
5       had a senior adjuster title.
6   Q   Okay. So diminished value doesn't go to the person who
7       looked at the car; it goes to a senior adjuster?
8   A   Not necessarily always. Sometimes it is the person who
9       looked at the car.
10  Q   Okay. But there is no view within American Family that
11      the person who handles the DV claims needs to be the
12      person who actually looked at the car?
13  A   No.
14  Q   Okay. So you've routinely handled diminished value
15      claims where you've never seen the vehicle?
16  A   That is correct.
17  Q   And you make a decision as to the diminished value based
18      upon the contents of the file, which would be the
19      estimates and then photographs thereof, right?
20  A   Yes. It allows me to look at everything and see
21      everything in its entirety.
22  Q   Okay. Okay. And you don't feel a need in those
23      circumstances that you go personally see the vehicle
24      before making a decision?
25  A   I may need to.

Page 103

1   Q   And when the photographs are taken, those are photographs
2       taken of the vehicle in its accident condition, right?
3   A   Sometimes.
4   Q   Okay. Meaning that -- that you'll actually make a
5       decision on diminished value where you haven't seen the
6       car and you have photographs of the vehicle in its
7       accident condition and then disassembled, but without
8       having a complete set of vehicles showing the repair work
9       after its done, right?
10                  MR. BENNETT: Object to form.
11                  THE WITNESS: If there's a concern
12      that we need to reinspect the vehicle, we will.
13  Q   (By Mr. Nealey) Okay. I understand that, but you
14      routinely handle diminished value claims where you look
15      at the file and the file will have the repair estimates;
16      they'll have pictures of the damaged areas of the
17      vehicle, but they will not have pictures of the vehicle
18      after it's been repaired, right?
19  A   Sometimes there are photos after the vehicle has been
20      repaired.
21  Q   And sometimes they're not, right?
22  A   Sometimes.
23  Q   In fact, frequently there aren't copies of the --
24      photographs of the vehicle that are taken after it's been
25      repaired?

Page 104

26 (Pages 101 to 104)

Lisa M. McNally
September 10, 2014

1   A   It happens both ways.
2   Q   Okay. And you've handled diminished value claims where
3       you have pictures showing the area of damage and you get
4       the repair estimate but you don't have post-repair
5       photographs, right?
6   A   And I have handled claims the other way as well.
7   Q   Okay. And you've paid claims for diminished value where
8       you haven't inspected the vehicle and you don't have any
9       photographs of the post-repair work on the car, right?
10  A   Yes. We have paid those.
11  Q   And you'll pay them based upon the Audatex system,
12      correct?
13  A   No. We'll pay them based on whatever is presented to us
14      by the customer and our review of the Audatex system and
15      taking all these other things into account to make our
16      decision as to whether we feel there is diminished value,
17      and then we'll settle off of what we feel is appropriate.
18  Q   Well, let me ask another question here.
19          To the extent that the Audatex system shows
20      diminished value, do you pay that?
21  A   Not always.
22  Q   So there's circumstance where the Audatex system shows
23      you there's diminished value but you don't pay it?
24  A   Because there could be other factors that are not
25      included in the Audatex system.

Page 105

1   Q   What would be the circumstances where the Audatex system
2       would show diminished value and you wouldn't pay it?
3   A   There are circumstances of extensive prior losses on the
4       vehicle, circumstances of interior damage to the vehicle
5       that's not addressed on the Audatex system.
6   Q   So I want to go slowly here.
7           So extensive prior damage to the vehicle. Okay.
8   A   As far as prior claims that were repaired, just to
9       clarify that.
10  Q   Okay. Prior repair claims. Okay. Uh-huh.
11  A   Interior damage to the vehicle.
12  Q   Uh-huh.
13  A   There could be a myriad of other reasons that -- that we
14      would -- again, each one is looked at on its own
15      individual basis. We do not generalize.
16  Q   What other circumstances, other than you having some
17      proof of extensive prior damage to the vehicle, prior
18      reported claims or interior damage to the vehicle, might
19      you not pay diminished value when the Audatex showed that
20      you can tell me?
21  A   We can't get ahold of the customer.
22  Q   Okay. Anything else?
23  A   Those are the ones that come to my mind at the moment.
24  Q   Okay.
25  A   There could be more later.

Page 106

1   Q   Okay. So I would like to take one of these.
2           Obviously, if you can't get ahold of the customer,
3       you know, that's just the end of the matter, right?
4   A   They can respond to our letter, and we'll reopen it if
5       they call us.
6   Q   Okay. So putting aside not being able to make contact
7       with the client, why, if there was extensive interior
8       damage to the vehicle, would you pay -- would you not pay
9       the loss if Audatex showed it for damage to the exterior
10      of the vehicle?
11  A   Because Audatex is a tool and it's only just giving us
12      that idea of -- it's not taking into account everything.
13      And if the interior is missing or has extensive prior
14      damage in it, it's not asking us that question. There
15      could be outlying factors that impact our decision.
16  Q   Well, Audatex is looking at the extensive of damage to
17      the vehicle's paint, body, and structural systems, right?
18  A   It also asks about prior damage.
19  Q   Okay.
20  A   But its body -- the ratings are on the body category, if
21      you look at that other document that we don't have.
22  Q   Yes. Agreed. Understand.
23          So Audatex is concerned about damage.
24          In determining if there's some diminished market
25      value on the vehicle, Audatex is looking at the existence

Page 107

1       of damage to the body's frame, structure, paint or body,
2       right?
3   A   Audatex primarily looks at that.
4   Q   Okay. And then it also looks at whether there's prior
5       damage to the vehicle's frame, structure, body, or point,
6       right?
7   A   Yes.
8   Q   Okay. And Audatex doesn't concern itself with whether
9       the vehicle has unrelated mechanical issues, right?
10  A   Audatex does not.
11  Q   Okay. And Audatex doesn't factor in whether there's
12      unrelated issues with the vehicle's interior, right?
13  A   It does not factor in that.
14  Q   Okay. Why do you think -- if Audatex decides, based upon
15      the vehicle's pre-loss value and the fact that it has had
16      damage to the -- to the body, paint, frame, or structure
17      of the vehicle and it has a reduction in value, why would
18      you think that reduction in value as a result of the
19      damage to the outside of the vehicle would not exist as a
20      result of prior interior damage?
21  A   I did not create the Audatex methodology for what they
22      would consider and what they didn't.
23  Q   I'm asking you why, if Audatex, looking just at the
24      exterior of the vehicle, decides that there's a reduction
25      in the vehicle's market value as a result of the accident

Page 108

27 (Pages 105 to 108)

**Page 109**

1    and repair, why you would think that -- that reduction in
2    market value would not exist because the vehicle had had
3    some form of interior damage to it?
4  A  It may.
5  Q  Apart from -- why?
6  A  Excuse me.  It may exist.
7  Q  Well, you said the only time that you might not pay,
8    based upon the Audatex, is if you had interior damage.
9        My question is, why would interior damage, repaired
10    or unrepaired, why would it mean that what Audatex shows,
11    which is the reduction of the vehicle's value as a result
12    of exterior damage, no longer exists?
13        MR. BENNETT:  Object to the form.
14        THE WITNESS:  It's not the only time I
15    said we wouldn't pay.
16  Q  (By Mr. Nealey)  I realize that.  I'm breaking them down,
17    but I'm ask you about just that scenario.  You gave me
18    two -- you gave me three, but two scenarios you may not
19    pay on Audatex, and I'm asking you what is your basis as
20    a -- as a -- I mean, you're a manager for Am Fam, at this
21    point, right?
22  A  Yes, sir.
23  Q  Okay.  As a manager for Am Fam, what is your basis to
24    believe that if the Audatex system says that the vehicle
25    has less value as a result of damage to its exterior,

**Page 110**

1    which has been repaired, its frame, structure, paint, or
2    body work, what's your basis to think that that damage
3    would no longer exist as a matter of market because it
4    had interior damage?
5        MR. BENNETT:  Object to form.
6        THE WITNESS:  There are other factors
7    that can be taken into whether the vehicle has a loss in
8    value besides what's just in that Audatex report.
9  Q  (By Mr. Nealey)  I'm not denying you can't take them into
10    account.  I'm asking you why that would be relevant.
11  A  Well, if there's already a loss in value due to something
12    that's not addressed on that report, it can be addressed
13    outside of that report.
14  Q  (By Mr. Nealey)  And, in fact, any reduction in value of
15    the vehicle as a result of interior damage would be in
16    addition to the reduction due to the damage to the
17    exterior of the vehicle, right?
18  A  It would be something we would take into consideration on
19    the overall condition of the car.
20  Q  Meaning that if Audatex said there was $1,000 worth of
21    diminished value as a result of the damage to the
22    exterior of the vehicle, if the issues with the interior
23    reduced the value of the vehicle by $1,000, then that
24    would be $1,000 on top of what Audatex showed, right?
25        MR. BENNETT:  Object to form.

**Page 111**

1        THE WITNESS:  I do not know.  It's not
2    in that tool, so I do not know how it would be
3    calculated.
4  Q  (By Mr. Nealey)  Okay.  Well, they're a separate loss,
5    right?  You get some reduction for the damage to the
6    outside of the vehicle, and then you get any reduction
7    that you would have from the damage to the interior of
8    the vehicle, right?
9        MR. BENNETT:  Object to form; calls
10    for a legal conclusion.
11        THE WITNESS:  It's a pre-existing
12    condition on the vehicle showing the overall condition of
13    that car if that car was to be for sale.
14  Q  (By Mr. Nealey)  And how does that preexisting condition
15    have anything to do with the additional reduction that
16    comes from the damage to the exterior?
17  A  Because it could be that that's impacting the value, not
18    the accident that occurred.
19  Q  Impacted what value?
20  A  The value of the vehicle that the person says that
21    they've lost.
22  Q  Okay.  But Audatex is giving you a post-repair value and
23    a loss entirely apart from any damage to the interior,
24    right?
25        MR. BENNETT:  Object to form.

**Page 112**

1        THE WITNESS:  They're giving us what
2    they say based on those couple of questions.  It's a
3    tool.  It's an opinion.  It's a tool.
4  Q  (By Mr. Nealey)  Okay.  Now, the second circumstance, you
5    said you might not pay under the Audatex system is when
6    you said, if I'm correct, that you have proof of
7    extensive prior damage to the vehicle and prior claims in
8    the area of the accident; is that correct?
9  A  No, not just in the area of the accident but to the
10    history of the vehicle.
11  Q  So you're operating under what might be called a stigma
12    theory, right?
13  A  If you want to call it that.  There was already a
14    diminishment of value --
15  Q  Okay.
16  A  -- prior to this loss.
17  Q  Okay.  And so when you're making these assumptions and
18    you're not paying, you're assuming it's a stigma loss,
19    i.e., it has nothing to do with whether the damage
20    overlaps or doesn't overlap.  It has to do with the fact
21    of whether it's had an accident with no other
22    considerations?
23  A  It has to do with the information provided to us by the
24    customer and how they feel -- excuse me, felt that they
25    did lose value.

28 (Pages 109 to 112)

1  Q  Okay.  Well, let me give you an example.  You've got an
2     Audatex, and it shows a $2,000 loss in value as a result
3     of the body, frame, structural, and paint damage to the
4     vehicle, okay, Audatex shows $2,000.  And the damage on
5     the -- that Audatex is considering is all in the front of
6     the vehicle, okay, the hood, the fenders, the driver and
7     passenger side door, the front bumper, and -- and the
8     customer has told you that -- at some prior point, that
9     they had had a -- an impact in the rear and that they'd
10    had their bumper replaced --
11 A  Okay.
12 Q  -- entirely different areas of the vehicle, are you going
13    to pay the Audatex estimate, or are you not going to pay
14    it?
15        MR. BENNETT:  Object to form;
16    incomplete hypothetical.
17        THE WITNESS:  It depends.  There's
18    more to finding -- each claim is situational.  We do not
19    generalize and make the same decision on every claim.  We
20    take what we have and make the right decisions.
21 Q  (By Mr. Nealey)  Okay.  Well, I'm asking you, you talked
22    about you wouldn't pay when there's evidence of extensive
23    prior damage to the vehicle was shown in prior claims,
24    and I'm giving you a hypothetical.  You've got a
25    situation where Audatex says $2,000 of diminished value

Page 113

1     as a result of the extensive damage to the front of the
2     car and you are presented with evidence that this vehicle
3     has been hit in the back and that the bumper cover has
4     been replaced.  Are you going to pay that loss or are you
5     not going to pay that loss?
6  A  I don't know.
7  Q  Well, would you consider a -- a prior -- do you have any
8     evidence to show that a prior impact that would be in a
9     separate area of the vehicle would take away the
10    diminished value shown by Audatex?
11 A  I'm sorry.  The -- if the --
12 Q  Can you point me to anything that would support a
13    conclusion by you that -- that if Audatex showed a loss
14    on the claim that damage elsewhere in the vehicle would
15    mean that that loss did not exist?
16 A  Audatex asks if there's prior damage to the vehicle.
17 Q  So Audatex already takes it into account?
18 A  It asks if there's prior damage, not prior losses.
19 Q  What's the distinction you're making?
20 A  Repaired versus unrepaired.
21 Q  So you -- Audatex is, in your opinion, just looking at if
22    it's unrepaired damage?
23 A  Audatex is looking at unrepaired damage.
24 Q  Okay.
25        MR. BENNETT:  It's got -- finish your

Page 114

1     line of questioning.  I don't care.  It's just that it's
2     12:40, so sometime working on a break.
3        MR. NEALEY:  We can take a quick
4     break.  I'm going to try to get us out of here by 3.
5        MR. BENNETT:  Yeah.  And I'm not
6     trying to interrupt you, if you want to complete.
7        MR. NEALEY:  No, no, it's good.  I've
8     got a couple more questions, and then we'll go.
9        MR. BENNETT:  Okay.
10 Q  (By Mr. Nealey)  So as far as the creators of the Audatex
11    system are concerned, the only thing that matters is if
12    there's unrepaired damage in an area, not if the vehicle
13    has prior repair damage elsewhere on the vehicle?
14 A  You would need to ask them their philosophy behind that.
15 Q  Okay.
16 A  That is their opinion.
17 Q  And I'm asking you if you have any information, studies,
18    texts, sources, anything you can point me to, as a
19    manager at Am Fam, that would suggest that if you have
20    prior repair damage in an unrelated area of the vehicle,
21    totally different area of the vehicle, my hypothetical
22    about damage to the bumper cover, that the Audatex
23    numbers are no longer valid?
24 A  I can point you to the fact that cars are on the market
25    for sale with multiple impacts on them.  What the

Page 115

1     customer pays for them, some will pay the full asking.
2     Some will reduce it down to a prior accident.  It's
3     customer by customer, situation by situation.
4  Q  Does the market pay less for vehicles based upon the
5     extensiveness of damage, or is it always the same?
6  A  That's customer preference.
7  Q  Okay.  Do you have any basis to support that opinion?
8     Have you ever studied the market for used cars?
9  A  That is a basis of being a consumer and also basis of
10    talking with dealerships while handling diminished value
11    claims.
12 Q  Well, let me give you a hypothetical then:  You've got
13    two cars.  You've got to buy one for your family.  You
14    get two Ford Tauruses side by side.  And one of them has
15    a -- when you look at it, you can tell that the rear
16    bumper cover has been repainted, so, you know, not the
17    original bumper cover.  And the other one, when you look
18    at it, you see that the hood and the fenders and the
19    front doors have been redone, and when you look inside,
20    you can see that the radiator support has been replaced.
21    There's been some work on it the frame rails, which
22    car -- if everything else is equal about those cars,
23    which car are you going to buy?
24        MR. BENNETT:  Object to form.
25 Q  (By Mr. Nealey)  Choice of the two.

Page 116

**Page 117**

1  A  I would -- I would want to see them. I wouldn't make a
2     decision based on this, and I would buy either one of
3     them.
4  Q  Would you pay the same amount of money for those two
5     cars?
6  A  It depends on the quality of the repair that was done on
7     either car.
8  Q  The repair is proper on both of them.
9  A  Then yes.
10 Q  You would pay the same amount for the car that had been
11    hit in the rear and had its bumper cover replaced as you
12    would the car that has frame rails replaced and
13    structural members replaced in the front and the whole
14    front of the car has been repainted?
15 A  If --
16 Q  You would pay the same?
17 A  If it had been properly repaired, as you just stated it
18    was --
19            THE COURT REPORTER:  Can you slow down
20    just a little bit?
21            THE WITNESS:  Oh, I'm sorry.
22            THE COURT REPORTER:  It's okay.
23            THE WITNESS:  If it had been properly
24    repaired, as you stated that it was, I would.
25 Q  (By Mr. Nealey) Pay the same amount?

**Page 118**

1  A  Uh-huh.
2            MR. NEALEY:  Okay. We can take a
3     break.
4            MR. BENNETT:  All right. 30 minutes?
5            MR. NEALEY:  Sure.
6            (Recess from 12:44 p.m. to
7             1:36 p.m.)
8
9  Q  (By Mr. Nealey) Ms. McNally, I would like you to look at
10    Exhibit 9 again, which is your letter. I think you've
11    got it.
12 A  Yeah.
13 Q  Yeah.
14 A  It's here somewhere. Here it is.
15 Q  And I take it it's fair to say that this is your denial
16    of the diminished value claim to Ms. Bower; is that
17    correct?
18 A  Yes.
19 Q  Okay. What explanation, if any, regarding applicable law
20    did you provide to Ms. Bower in denying her claim?
21 A  There is no applicable law information because there is
22    no applicable law in regards to diminished value.
23 Q  Okay. So you denied her claim not on the basis that it
24    wasn't -- wasn't recoverable under Washington law; you
25    denied it on a factual basis?

**Page 119**

1  A  We denied it based on our decisions of everything that we
2     had in front of us at the time.
3  Q  Okay. And when we look at an explanation in relation to
4     the facts of her claim as to the denial, I take it
5     that -- that the basis for your denial of her claim on a
6     factual basis was your statement that the vehicle was
7     properly repaired and there were no indications that
8     repairs occurred?
9  A  Correct.
10 Q  Okay. So that constituted the grounds for your factual
11    denial of her claim?
12 A  We also did not feel that if a loss had occurred it
13    necessarily sustained a loss in value.
14 Q  Okay. And what was the basis for that?
15 A  That was our opinion.
16 Q  Well, what's the basis for that though?
17 A  Our opinion.
18 Q  Okay. Do you have anything you can point to that could
19    document or analysis, something in writing?
20 A  Just because a vehicle has been in an accident doesn't
21    necessarily mean someone is going to pay less for the
22    vehicle.
23 Q  Okay. And you don't have any market surveys or anything
24    like that you can point to?
25 A  That is our opinion.

**Page 120**

1  Q  "Our," being American Family's?
2  A  That was mine and my manager and the other person that
3     was roundtabled, Candace Chapman, our opinion at the
4     time.
5  Q  Okay. And you sent this denial letter without you,
6     yourself, having ever looked at the repairs to Ms.
7     Bower's vehicle; is that correct?
8  A  I did not look at the repairs to the vehicle, no.
9  Q  Okay. You saw the vehicle in its damaged condition when
10    you adjusted the loss initially, right?
11 A  Yes.
12 Q  Okay. And you did not have any photographs of the
13    repaired vehicle in your possession when you denied the
14    claim, right?
15 A  I would need to look at the file photos.
16 Q  Okay. But -- and if you don't know the answer -- I'm not
17    sure I do either, but you sometimes deny claims for
18    diminished value when you have photographs and you
19    sometimes deny them when you don't have photographs of
20    the repaired vehicle, correct?
21 A  We will pay some claims with photos, and we will pay some
22    claims without photos.
23 Q  Maybe I can -- I don't want to mark it all, but here is a
24    complete, I think, copy, and the photographs are all
25    printed out here. And you're welcome to look through

1    these, but I think they're all of the repair -- the
2    vehicle being repaired. I'm happy to be corrected if I'm
3    incorrect.
4  A  These are all damage or in process photos.
5  Q  Okay.
6  A  And Mr. Butler did not submit any in his report either.
7  Q  Okay. Okay. So to summarize, you were comfortable
8    making a decision on whether the vehicle had diminished
9    value or not and denying the claim without having seen
10   the vehicle in its repaired condition and without a --
11   without having photographs of the vehicle in its repaired
12   condition?
13 A  According to Mr. Butler's report that was submitted by
14   Ms. Bower, the vehicle has been repaired properly and
15   there was undetectable repairs.
16 Q  Okay. Have you been trained on the Washington
17   Administrative Code provisions which relate to auto
18   physical damage claims?
19 A  I have read them.
20 Q  Okay. So you're familiar if I refer to what's called the
21   WAC?
22 A  I can reference it as the WAC, but I would need to
23   physically see them in front of me if you're asking about
24   a specific one.
25 Q  I understand.

Page 121

1    As to that, in a general sense, you recognize that
2    you and American Family have an obligation to fully
3    disclose pertinent benefits, coverages, and other
4    provisions of insurance policies, correct?
5  A  Yes.
6  Q  And the benefits that you get under an insurance policy
7    are the losses that can be paid, right?
8         MR. BENNETT: Objection; calls for a
9    legal conclusion.
10        THE WITNESS: There are various things
11   that can be paid under the damages and the coverages
12   listed in the policy.
13 Q  (By Mr. Nealey) So the losses that can be paid are the
14   coverages and benefits you can obtain, right?
15 A  There are some benefits listed in the policy.
16 Q  Okay. And the losses that are covered under the policy,
17   those are the benefits that you can obtain, right?
18        MR. BENNETT: Object to the form;
19   calls for a legal conclusion.
20        THE WITNESS: Again, there are some
21   things that are specifically stated in the policy, and
22   there are others that are not.
23 Q  (By Mr. Nealey) And there are some things -- losses that
24   are covered under the policy that are benefits you can
25   get under the policy that are not specifically listed in

Page 122

1    the policy, right?
2         MR. BENNETT: Object; calls for a
3    legal conclusion.
4         THE WITNESS: It says that we will
5    repair the vehicle.
6  Q  (By Mr. Nealey) Okay. Well, let me give you an example:
7    Under the Am Fam policy and the way you've construed it,
8    you cover towing on vehicles, right?
9  A  If they have the applicable endorsement.
10 Q  Okay. Well, in a UIM context, you pay for towing, right?
11 A  We'll pay for it as part of the contract to get the
12   vehicle out of the shop the same we would pay for it -- a
13   vehicle in any other loss.
14 Q  Okay. But the policy doesn't say that you'll pay for
15   towing under the UIM section, right?
16 A  If the vehicle has been involved as part of a loss, we
17   will remove the vehicle as part of the claim.
18 Q  Okay. But the policy doesn't say that, right?
19 A  It does not.
20 Q  Okay. But you cover that because that's a loss that
21   flows from the fact that there's been property damage to
22   the vehicle and, therefore, you'll pay it under the
23   coverage, right?
24 A  If the customer tells us their vehicle is not drivable.
25 Q  Okay. So put another way: One of the benefits or one of

Page 123

1    the coverages you get under uninsured motorist is the
2    fact that you'll pay for towing, even though it's not
3    listed in the policy, right?
4         MR. BENNETT: Object to form. It
5    calls for a legal conclusion, if you're analogizing it to
6    the WAC.
7         THE WITNESS: If we're made aware of
8    the towing and the need for it and how it's related to
9    the loss, we'll pay for it.
10 Q  (By Mr. Nealey) Okay. And that's because it's part of
11   the coverage and that's one of the benefits under the
12   policy, right?
13        MR. BENNETT: Same objections.
14        THE WITNESS: If it's needed as a part
15   of the claim and as a result of somebody just wants their
16   vehicle towed out of convenience, we would consider that
17   and look at it separately.
18 Q  (By Mr. Nealey) Okay. So to put it another way: If
19   the -- if under uninsured motorist, if the towing flows
20   out of the fact of property damage to the vehicle, then
21   you'll cover it, right?
22 A  If it's a direct result that the vehicle cannot be driven
23   to the shop, we will move the vehicle to the shop.
24 Q  Okay. So if I'm understanding what you're saying, you
25   cover under -- uninsured motorists, whatever comes

Page 124

31 (Pages 121 to 124)

Lisa M. McNally
September 10, 2014

1    directly out of the fact that there's been property
2    damage to the vehicle; is that correct?
3    A  I'm sorry.  Can you repeat your question?
4    Q  Okay.  If somebody has an accident under the uninsured
5    motorist coverage and the vehicle cannot be driven, okay,
6    then the vehicle -- because it's been in an accident,
7    it's been damaged, it's sustained property damage,
8    correct?
9    A  The fact that it cannot be driven is why we would tow it.
10   Q  Okay.  Because that is a loss that flows from or damage
11   that flows from the fact that it's been in an accident,
12   right?
13   A  The fact that it's been in an accident does not mean that
14   it can't necessarily be driven.
15   Q  Okay.  Well, the severity of the property damage of the
16   vehicle after an accident, if it can't be driven and it
17   needs to be towed, you'll pay for it because those are --
18   are payments that are triggered from the fact that the
19   car has been in an accident and it's not drivable, right?
20   A  We will move the vehicle to the shop for the repairs if
21   we are going to repair the vehicle or pay up to the
22   actual cash value of the vehicle.
23   Q  Okay.  Okay.  Does American Family make any standardized
24   disclosures in the State of Washington as to diminished
25   value in uninsured motorist cases?

Page 125

1    A  Standardized disclosure as -- is there a specific
2    disclosure --
3    Q  Yeah.
4    A  -- you're asking me about?
5    Q  Yes.  Do you make a disclosure to people as to that one
6    of the coverages, benefits, or other pertinent provisions
7    under the UIM policy is that they may receive uninsured
8    payments for any loss due to diminished value?
9             MR. BENNETT:  Object to form on the
10   premise of the question.
11            THE WITNESS:  No, because it's not a
12   coverage listed in the policy.  If a customer asks us
13   about it, we will disclose and answer their questions.
14   Q  (By Mr. Nealey)  Okay.  Well let me ask, if somebody has
15   a non-drivable loss -- I mean a non-drivable vehicle
16   after an accident under the uninsured motorist coverage,
17   will you just have them meet the towing charge, or do you
18   tell them, "Oh, no, we pay towing," if you know the
19   towing took place?
20            MR. BENNETT:  Object to form.
21            THE WITNESS:  There is times that we
22   need to determine if there's even coverage for the loss,
23   and sometimes that has to occur first so a customer can
24   be put on notice that we may not reimburse the towing.
25   Q  (By Mr. Nealey)  Okay.  But at the moment you decide that

Page 126

1    there's coverage, you tell them that you'll pay for the
2    towing, correct?
3    A  Within reason, and we will not pay for multiple tows,
4    again, if the vehicle is to be not drivable as a result
5    of the accident.
6    Q  Okay.  But my question to you is that -- that if you have
7    an uninsured motorist loss and you've determined it to be
8    a uninsured motorist loss and the person has their
9    vehicle towed as part of the repair because it's not
10   drivable, do you wait for them to come and say, "Oh, I've
11   had my car towed.  Will you pay it," or once you know
12   it's an uninsured motorist claim, do you then say, "Yes,
13   we'll pay for your tow"?
14   A  If the customer comes to us and discloses that their
15   vehicle is not drivable, and, at that point, we make the
16   applicable decision, but it's based on what the customer
17   comes to us with.
18   Q  Well, if you have a situation where somebody has had an
19   accident that you've determined is an uninsured motorist
20   claim and that their vehicle had to be towed, it was
21   towed into the shop, do you just not say anything, or --
22   or as part of settling the claim, do you then say, "Oh,
23   and we'll cover the towing"?
24   A  That is part of the customer making their claim for
25   damages with us, and that is a port of their claim that

Page 127

1    they're making to us.
2    Q  Well, do you pay it without them asking and tell them
3    about it, or do you only pay towing when the customer
4    comes to you and says, "I would like you to cover my
5    towing"?
6    A  If we don't know about it, we can't pay for it.
7    Q  Well, I'm just saying if you know about it.  I mean, you
8    know about the towing.  You know that it was towed
9    because you're the adjuster; you go and you look at the
10   car.  You know it was towed in there.  Do you then say to
11   the customer, "Oh, and your car was towed in here.  We
12   cover that under UIM," or do you wait for them to say
13   something to you?
14   A  At that point, they've made their claim with us and
15   they've told us, like you said.  They've incurred a tow
16   bill.  They let us know or the shop will let us know who
17   is providing that, and we'll review their claim.
18   Q  Well, my question is a little different.  My question is,
19   you go out and look at a vehicle.  You know the vehicle
20   is not drivable and it's an uninsured motorist claim.
21   It's been determined by American Family it's uninsured
22   motorist.  Do you then say, "Tell us what the towing is
23   and we'll pay it," or do you not pay that and wait until
24   the insured raises the issue with you?
25   A  There is a conversation with the customer because we have

Page 128

1    to have their permission to move the vehicle anyway, so
2    they've already made us aware that their vehicle is in a
3    tow yard or not drivable. That usually occurs when a
4    claim is reported to us as part of their initial claim.
5  Q  So basically what happens is the -- the insured will say,
6    "Oh, yes, and I have to have my car towed," and the
7    moment they say the word "tow," then you say you'll cover
8    that or won't cover that?
9  A  If they tell us that their vehicle is not drivable,
10    they've presented their claim from what they're looking
11    for from us.
12  Q  Okay. Well, how about a situation where you are the
13    adjuster and you're the field adjuster and you're asked
14    to go look at a car and you go look at the car and the
15    car is at body shop XYZ and you know the car had to be
16    towed there because it's not drivable? Do you then say
17    to the customer, "Tell us what your towing bill is and
18    we'll pay. It's covered," or do you just not say
19    anything and they don't get it if they don't raise the
20    issue"?
21  A  It's very rare -- excuse me, it's very rare a car was
22    towed into a shop and paid for by the customer. It's
23    paid for the shop at the time of the tow and the shop
24    presents it to us.
25  Q  Oh, the shop presents it to you.

Page 129

1    I'd just like to ask, if the shop doesn't present it
2    to you and the customer paid to have it brought in -- say
3    it's at night, late at night and they call the tow truck
4    and the tow truck brings the car in and drops it off in
5    front of the body shop, which sometimes happens, and the
6    customer has paid the towing bill and you know it's towed
7    in there, do you then say to the customer, "Give us your
8    towing bill," or do you just let them eat it?
9  A  The customer will tell us that they have incurred a tow
10    bill. And then at that point they have made their claim
11    that they're seeking those damages.
12  Q  That's not my question. My question is, if the customer
13    doesn't say anything to you but you, as in American
14    Family, knows that they had the car towed and they paid
15    for it, do you then raise it with them and tell them
16    you'll cover it, or do you let them eat it?
17  A  If I know --
18         MR. BENNETT: Object to form.
19         THE WITNESS: If I know that there's
20    been a tow, it's because they've already presented the
21    claim that there's going to be a tow.
22  Q  (By Mr. Nealey) So you're unaware of any situations
23    where -- where you know a tow occurred and you weren't
24    told by the customer that a tow had occurred?
25  A  When the customer is providing us information about their

Page 130

1    vehicle at the initial contact or the assignment is being
2    set up to move to us, that has already occurred by the
3    customer saying where their vehicle is located.
4  Q  So, in essence, what you're telling me then, if I
5    understand, is that the -- is that the customer says,
6    "Oh, I had an accident. It was in, you know, Bothell,
7    and my car is at XYZ shop in Woodenville, and then when
8    you look at the car and you see it in Woodenville, you
9    know it was obviously towed there and you ask them for
10    whatever the tow charges were?
11  A  I don't know that it was necessarily towed there. They
12    could have driven to Woodenville.
13  Q  No. I'm saying if the car is undrivable.
14  A  If it's undrivable, then, typically, again, the shop has
15    already presented us with the bill.
16  Q  The shop doesn't present you with a bill. You know that
17    the customer called and said, "I had an accident in" --
18    "in Bothell and my car is sitting in a shop in
19    Woodenville," and -- and you go in and you look at it and
20    you know the car is not drivable, do you then raise the
21    issue, of, "Oh, well, you get towing reimbursement"?
22  A  If I know that a customer has sustained a tangible loss,
23    then I will address that.
24  Q  Okay. Even if they don't raise towing with you, you'll
25    address it?

Page 131

1  A  At that -- again, if the vehicle wasn't towed, there's
2    nothing to address. Typically, the shop addresses it.
3    There's oftentimes that Triple A tows the vehicle in
4    because they happen to have Triple A coverage as well.
5    They don't always have the vehicle towed through
6    expecting reimbursement on a claim. There's not always a
7    bill. If a customer suffered an out-of-pocket loss, they
8    make their claim to us for reimbursement.
9  Q  And do you believe they've suffered a loss? Even if they
10    don't tell you about towing, you'll raise the issue with
11    them, right?
12         MR. BENNETT: Object to form.
13         THE WITNESS: If I have no reason to
14    suspect there was an out-of-pocket bill, because that
15    doesn't happen very often, then I will not ask, no.
16  Q  (By Mr. Nealey) And if you think there might be an
17    issue, you'll raise it to them, right?
18  A  If the --
19         MR. BENNETT: Object to form.
20         THE WITNESS: If the shop tells me
21    that the customer paid for a bill out of pocket -- again,
22    this is the shop telling me that -- then I will ask the
23    customer about it because, at that point, it's been
24    raised to my attention.
25  Q  (By Mr. Nealey) Okay. Now, under the comprehensive and

Page 132

33 (Pages 129 to 132)

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1  collision coverages, loss and use is covered, right?
2  A  No.
3  Q  It's not?
4  A  Not unless you have a rental endorsement.
5  Q  I'll mark as Exhibit 16 a copy of the policy that was
6     produced in this matter.
7                    (Exhibit No. 16 marked for
8                     identification.)
9
10          MR. BENNETT:  This is Christina
11  Bower's?
12          MR. NEALEY:  Bryce Meyer's.
13  Q  (By Mr. Nealey)  If you look under -- on page -- Bates
14     No. 6 --
15  A  I'm just making sure that this is a Washington policy.
16  Q  It is.
17  A  Sorry.  I saw Minnesota on the front of it, so...
18     (Pause.)
19  Q  Yeah, that's okay.  Right here, if you look, Policy No.
20     WA is --
21  A  That's what I was looking for.  Thank you.
22  Q  Yeah.  Look on page -- Bates No. 2.
23     If you look on Bates No. 6, it says, "Property
24     damage means damage to or destruction of tangible
25     property.  This includes loss of its use."

Page 133

1  A  Where are you reading this at?
2  Q  I'm reading it under Definition G, Page 3 of 8, which is
3     Bates No. 6 right at the bottom.
4  A  Page 6?
5  Q  You're on Page 9?
6  A  That's page -- oh, you're reading these numbers.  I'm
7     reading the page of the policy.
8  Q  That's why I said Bates number.
9  A  "Property damage means damage to or destruction of
10     tangible property."
11  Q  Including -- this includes loss of use?
12  A  That's what it says.
13  Q  Okay.  So reading this, you would get loss of use under
14     the comprehensive and collision coverages, right?
15  A  No.
16  Q  No?  Why not?
17  A  Because you need to have rental car coverage for that.
18     That's not what the definition of comprehensive or
19     collision are when you read further into the policy under
20     car part damages.
21  Q  Okay.
22  A  There is loss of use available under comprehensive for a
23     stolen vehicle.  That is actually stated in the policy.
24  Q  Okay.  What in this policy do you think loss in use is
25     not covered under comprehensive, inclusion of that

Page 134

1     language?  What do you point to?
2  A  The definition of comprehensive and collision.
3  Q  This is under Part 2 of Bates No. 8?
4  A  This is Page 8, Number A under the insuring agreement.
5  Q  And what do you think is the language that excludes loss
6     in use?
7  A  The definition of loss means direct and accidental loss
8     of or damage to your insured car and its equipment.  In
9     the definition of B under "additional definitions," it
10     defines loss.  Loss is direct damage.  A rental car would
11     be indirect damage.
12  Q  Okay.  Is that something you've been taught as an
13     employee of Am Fam?
14  A  That's the policy language.
15  Q  Okay.  But, I mean, you're not -- this is something
16     you've been shown before your -- you've done before?
17  A  I have verified the definition of loss in use in our
18     policies and procedures, correct --
19  Q  Okay.
20  A  -- or I'm sorry, the definition of loss --
21  Q  Okay.
22  A  -- that section.
23  Q  Okay.  Good.  Have you been provided with any guidance in
24     your work within American Family on the case Mueller
25     versus Farmers Insurance Company from the Washington

Page 135

1     Court of Appeals in Washington Supreme Court?
2  A  I have not been provided any training by American Family.
3  Q  Okay.  So you've never read the Mueller versus Farmers
4     opinions?
5  A  I am aware of the court case, but I have not read it
6     front to back.
7  Q  What are you aware of?  What have you been told about it?
8  A  I, from my understanding, is that --
9          MR. BENNETT:  Let me pause just one
10     moment.
11     If you've been told by Counsel --
12          THE WITNESS:  No.
13          MR. BENNETT:  -- then I would instruct
14     you not to -- okay.  Go ahead.  Go ahead.
15          THE WITNESS:  Oh.
16          MR. BENNETT:  You said you've not been
17     told by Counsel?
18          THE WITNESS:  Yeah.  No.  Sorry.
19          MR. BENNETT:  There's to many no's.
20          THE WITNESS:  What's going on here?
21  Q  (By Mr. Nealey)  He's asking if legal counsel told you.
22     If so, don't say.  I'm not asking for legal counsel,
23     apart --
24          MR. BENNETT:  So if I told you
25     something about it, don't talk about it, you know, if

Page 136

34 (Pages 133 to 136)

1    in-house counsel did, but if it's just your own inquiry,
2    you can go ahead and feel free to talk about it.
3            THE WITNESS: Oh, yeah, no. This was
4    just going to be what I was aware of. A first-party
5    coverage under their collision coverage, it wasn't -- it
6    wasn't stated that it was covered or not covered under
7    their first party collision and comprehensive coverages.
8  Q  (By Mr. Nealey) Okay. Okay. And so you've never been
9    given any guidance though on its -- its holdings impact
10   on the payment of diminished value in the State of
11   Washington or generally?
12 A  No.
13 Q  Okay. I'm going to mark as Exhibit 17 a page out of the
14   Butler -- I mean the Bower claim file, which is Bates No.
15   111.
16       And I'd just like to ask you. This appears to be a
17   payment log, and I just want to ask about the first item.
18   It talks about Audatex and $8.
19       Is that a charge for using the diminished value
20   software, or is that a general charge for using the
21   Audatex system for valuing the loss.
22           (Exhibit No. 17 marked for
23            identification.)
24
25           THE WITNESS: That was the charge for

Page 137

1    running Audatex that we receive on every estimate we
2    write.
3  Q  (By Mr. Nealey) Okay. So the $8 charge would be on any
4    case whether you run a diminished value assessment on it
5    or not?
6  A  Correct.
7  Q  Okay. So it doesn't cost American Family anything more
8    to run the Audatex diminished value tool on repair than
9    it would not running it?
10 A  It -- we would pay an $8 charge if we run it, but there's
11   times we don't have to run Audatex if we paid off of a
12   shop estimate.
13 Q  I understand.
14     But every time that you, for instance, go out as an
15   Am Fam adjuster, you always use the Audatex system and
16   there will always be an $8 charge, right?
17 A  Yes.
18 Q  Okay. Put another way, that $8 isn't specific to just
19   diminished value; it's paid on any claim using the
20   Audatex system?
21 A  It's usage of Audatex.
22 Q  Okay. And then I'm going to mark as Exhibit 18 a copy of
23   the notes section from the Bower claim. This looks like
24   a single document. It was produced as a single document,
25   and it's 17 pages. It's AM FAM_B-112 to 128.

Page 138

1    Is this at least your understanding a complete set
2    of the notes that would have been documented to the file
3    for Ms. Bower's claim?
4            (Exhibit No. 18 marked for
5             identification.)
6
7            THE WITNESS: From my understanding,
8    yes.
9  Q  (By Mr. Nealey) Okay. And I would like to just direct
10   you to Page 3 of 17.
11           MR. BENNETT: One second. Could you
12   give me the Bates again.
13           MR. NEALEY: It's Bates No. 114.
14 Q  (By Mr. Nealey) And down here, there is a note that is
15   dated 8/24/2011 at 3:28 p.m. CDT.
16     Did you create that note?
17 A  Yes, I did.
18 Q  Okay. And I take it that this is what you wrote down
19   after you had roundtabled the -- Ms. Bower's situation
20   with your coworkers?
21 A  With my manager and a coworker.
22 Q  Okay. And you say, "Presented and roundtabled insured's
23   DV demand with Candace Chapman and Bryce Hilden."
24     So Bryce Hilden was your manager and Candace Chapman
25   was a coworker?

Page 139

1  A  Yes.
2  Q  Was there a reason why she was involved in this as
3    opposed to somebody else?
4  A  At the time, we had scheduled roundtables once a month,
5    and she also had claims on the calendar to be reviewed.
6  Q  Okay. So this is a more general roundtable than just Ms.
7    Bower's claim?
8  A  Yes.
9  Q  Okay. And every time there's a DV, it's roundtabled,
10   right?
11 A  Yes.
12 Q  Okay. Is it always roundtabled with a manager and
13   somebody else, or can it just be roundtabled just between
14   you and your manager?
15 A  It can be just me and the manager.
16 Q  Okay. And it says, "Based on damage to the vehicle and
17   no structural damage, we do not feel that there is any DV
18   on the IV."
19     What does "IV" stand for?
20 A  Insured vehicle.
21 Q  Insured vehicle, okay.
22     So I take it that, if I'm reading it right, if there
23   had been structural damage in the vehicle, your decision
24   would have been different?
25 A  We would have considered that structural damage. I don't

Page 140

35 (Pages 137 to 140)

Lisa M. McNally
September 10, 2014

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1    know if the decision would have been different, but we
2    would have taken that into our consideration.
3  Q  Okay. But, certainly, at least in the notes that you
4    made contemporaneously with your meeting, you wrote that
5    "based on damage to the vehicle and no structural damage,
6    we do not feel there's any DV," right?
7  A  Based on my note in the file, it says that that is part
8    of the reason why we did not feel there was a DV claim.
9  Q  Okay. Why did you point to the lack of structural damage
10    in specific?
11  A  That's one of the items addressed on the Audatex tool.
12  Q  Okay. So you're really referring to the fact that
13    Audatex bumped you out because you didn't have structural
14    damage?
15  A  Just because there's no structural damage does not mean
16    there isn't DV, and just because there is structural
17    damage doesn't mean that there is DV.
18  Q  And then you said, "The quarter panel is riveted and
19    adhered to vehicle."
20    What does that mean?
21  A  That means there was no welding that occurred on this
22    vehicle.
23  Q  If there had been welding, would you have looked at it
24    differently?
25  A  It's possible. It probably would have been more in line

Page 141

1    with the structural damage.
2  Q  Okay.
3  A  It's just a note.
4  Q  Okay. Well, I'm trying to find out why you -- why you
5    noted the fact of riveting as opposed to welding.
6  A  Because it's a less than basic process.
7  Q  Was the original quarter panel riveted on?
8  A  Yes.
9  Q  Okay. And that's because when you weld parts -- weld on
10    a quarter panel, it weakens the metal in the area you've
11    welded on, right?
12  A  It can.
13       MR. BENNETT: Object to form.
14  Q  (By Mr. Nealey) Okay. So you're certainly aware that
15    when you have to weld on a quarter panel or weld on
16    structural parts, it's going to weaken the steel?
17       MR. BENNETT: Object to form.
18       THE WITNESS: It may not weaken the
19    steel. Again, it's all situational.
20  Q  (By Mr. Nealey) Well, when you heat steel, it changes
21    it's chemical composition, right?
22  A  And there are other components. It depends what all was
23    replaced around it as well.
24  Q  Okay. So you specifically noted on this
25    repair anyway the fact that there hadn't been any welding

Page 142

1    involved on the repair, which might have weakened the
2    steel, right?
3       MR. BENNETT: Object to form.
4       THE WITNESS: This is -- these are
5    items and comments that are in line with the form that we
6    went over earlier that had the just giving an overview of
7    the claim. This is just a note form versus the check
8    sheet.
9  Q  (By Mr. Nealey) Okay. And then you notice the, "Per the
10    convo," which I assume is "conversation," "with Jeff at
11    the shop when the decision was made to RR the quarter
12    panel versus RPR" -- I take it that is remove and repair
13    the quarter panel versus repair it?
14  A  No. That's remove and replace --
15  Q  Remove and replace.
16  A  -- the quarter panel versus repair.
17  Q  Okay -- "the shop adv" -- that's "advised"?
18  A  Yes.
19  Q  -- "that replacing the quarter panel will return it to
20    pre-loss condition."
21    If I'm reading that correct, at least your memory at
22    the time when you wrote this note was that if you had
23    repaired the quarter panel, it would not have returned it
24    to pre-loss condition, but the fact that you had replaced
25    it, you believed it was returned to its pre-loss

Page 143

1    condition?
2  A  Those were direct comments from the shop that did the
3    repairs.
4  Q  Okay. And do you believe there's a difference in taking
5    a quarter panel and repairing it, straightening the metal
6    and adding Bondo to it, as opposed to replacing it --
7       MR. BENNETT: Object to form.
8  Q  (By Mr. Nealey) -- as far as diminished value is
9    concerned?
10       MR. BENNETT: Object to form.
11       THE WITNESS: Not if it's done
12    properly.
13  Q  (By Mr. Nealey) So are you drawing any conclusions about
14    whether diminished value did or did not happen on this
15    vehicle because of -- to your own mind, because it was
16    removed and replaced, the quarter panel, versus repairing
17    it?
18  A  The panel was replaced with a riveted panel. They
19    riveted a new panel back on. It was not a invasive
20    repair.
21       THE COURT REPORTER: It wasn't a what
22    kind of repair?
23       THE WITNESS: I'm sorry. Invasive
24    repair.
25  Q  (By Mr. Nealey) Okay. And you write, "Also, conflict of

Page 144

36 (Pages 141 to 144)

Lisa M. McNally
September 10, 2014

1    interest as the person that completed the DV report also
2    owns the shop that completed the repairs."
3        What's relevant about that?
4  A  If the shop is stating that they're not able to repair
5    the vehicle back to pre-loss condition, there could be a
6    conflict of interest since they can -- it gives them a
7    reason to not repair the vehicle and to have an issue
8    with it in the future and turn around and sell a report
9    to Ms. Bower stating there is diminished value based on
10   the repairs.
11  Q  Well, do you believe that's what Mrs. Butler did, was --
12   said he couldn't repair the vehicle to its pre-loss
13   condition and then sold her a report based on that?
14  A  I was informed by the representatives at his shop -- the
15   reference of "Jeff" in here is not Jeff Butler. That's
16   another Jeff at the shop. I don't know his last name.
17  Q  Okay.
18  A  And my conversation with Jeff and Zach at the shop is
19   that the vehicle would be returned to pre-loss condition.
20  Q  Okay. So reference to Jeff is not to Jeff Butler; it's
21   to some other Jeff?
22  A  It is a different Jeff who worked in the shop. I don't
23   know if he still works there or not.
24  Q  Now, was he adjusting the loss on behalf of Mr. Butler's
25   shop, or what was he? Was he a technician? What?

Page 145

1  A  He's an estimator at the shop.
2  Q  Estimator.
3      So your memory is that Jeff, an estimator at the
4    shop, said that if you removed and replaced the quarter
5    panel with a new part rather than repairing it, that it
6    would be returned to its pre-loss condition?
7  A  Jeff was adamant about it.
8  Q  So why is there a conflict of interest between that and
9    Mr. Butler saying that the vehicle was not fully restored
10   to its pre-loss condition?
11  A  Again, the shop -- Mr. Butler owns the shop where the
12   repairs were done. If something hadn't been done
13   properly, it gives them an opportunity to just state that
14   it's a -- it cannot be done. It's not an independent
15   valuation of the vehicle.
16  Q  Okay. And then the final ground is that the Audatex DV
17   report that also shows zero dollars of DV, right?
18  A  It does say that, yes.
19  Q  And the Audatex report shows no DV because the Audatex
20   report always shows no DV in a circumstance where you
21   have no structural or frame damage, correct?
22  A  I cannot say off the top of my head.
23  Q  Okay. I wanted to just ask a couple of questions about
24   the policy which I gave you and marked as Exhibit --
25  A  -- 16.

Page 146

1  Q  -- 16.
2      First of all, if you look at Bates No. 8, which is
3    the numbers in the bottom, this policy contains an
4    expressed exclusion for diminished value as to
5    comprehensive and collision coverages, correct?
6  A  It states that lost does not mean any difference in the
7    market value.
8  Q  Okay. And it says, "Loss does not mean any difference in
9    the market value of your insured car immediately prior to
10   the loss and the market value of your insured car after
11   repairs from the loss are completed," right?
12  A  That is correct.
13  Q  And that's what I understand diminished value to mean?
14  A  A loss in the market value.
15  Q  Okay. And if you look at Bates No. 12, at the very
16   bottom under "D," it indicates a change in the policy to
17   exclude -- to include language in the limits of liability
18   clause which allows for the taking of betterment
19   deductions, correct?
20  A  I'm sorry. Where are you reading at?
21  Q  I'm looking at "D" in the bottom right corner on Bates
22   No. 12.
23  A  It states that we have the option to.
24  Q  Okay. Do you take betterment deductions on uninsured
25   motorist claims?

Page 147

1  A  No.
2  Q  And that's because there's no language allowing
3    betterment in the UIM section, right?
4  A  Based on the Washington laws around betterment.
5  Q  Okay. Okay. What law specifically?
6  A  That you have to prove that there would be a direct loss
7    in value as a result of a decision that was made
8    replacing the part.
9  Q  I don't understand.
10  A  Sorry. You're adding value to the vehicle as a result of
11   replacing a part.
12  Q  Okay.
13  A  You have to be able to prove there is an added value.
14  Q  Okay. Looking at the uninsured motorist provision --
15  A  What page is that? I'm sorry.
16  Q  It's Page 23.
17  A  Thank you.
18  Q  In looking at the uninsured motorist section of the
19   policy, the insuring agreement is under "C" -- is that
20   correct -- Page 24?
21  A  Insuring agreement is "C."
22  Q  Yeah, C-1, right?
23  A  C-1.
24  Q  Okay. "We will pay compensatory damages an insured
25   person is legally entitled to recover from the owner or

Page 148

1  operator of an uninsured motor vehicle."
2      What do you understand the term compensatory damages
3  to mean?
4          MR. BENNETT:  Object to the extent it
5  calls for a legal conclusion.
6  Q  (By Mr. Nealey)  In your role as a manager for American
7  Family, what have you understood the words "compensatory
8  damages" to mean?
9  A  If a customer would like us to review something for
10  reimburse it, then we will review it.
11  Q  What does compensatory damages mean to you?
12  A  It could be a variety of things.  It could be any sort of
13  reimbursement that they're seeking as a result of the
14  claim.
15  Q  And one of those could be loss in value, right?
16  A  It could be.  It could be a variety of things.
17  Q  Okay.  So loss in value or diminished value would be one
18  element that you would see falling within compensatory
19  damages, right?
20  A  It could fall under it.
21  Q  Okay.  And then -- then it says, "Property damage caused
22  by an accident."
23      Property damage is the trigger for getting coverage
24  for uninsured motorist PD, right?
25  A  If they've suffered a loss of -- to their property --

Page 149

1  Q  Yeah.
2  A  -- to utilize UMPD?
3  Q  Yeah.
4  A  If there's damage --
5  Q  Okay.
6  A  -- and it meets all the other elements of truly being
7  either an uninsured motorist that resulted in it or a hit
8  and run --
9  Q  Okay.
10  A  -- whatever the coverage investigation shows.
11  Q  Okay.  Assuming that the coverage investigation shows
12  that it is an uninsured motorist, property damage is the
13  trigger that allows you to get coverage for uninsured
14  motorist property damage, right?
15  A  You need to suffer an actual loss.
16  Q  Okay.  And so let me give you just an hypothetical, just
17  hypothetical, and the hypothetical is that you have
18  somebody who is -- who is driven off the road, okay, her
19  car is driven off the road into a sandpit, okay, by an
20  uninsured motorist, and the uninsured motorist who drove
21  them off the road stops, you get a license number, you
22  know they have no insurance and your insured's vehicle
23  isn't damaged, it doesn't have any property damage to it
24  but it's stuck in the sandpit and the vehicle needs to be
25  towed out of the sandpit and the towing cost $500, would

Page 150

1  you cover that as an uninsured motorist loss?
2          MR. BENNETT:  Object to form.
3          THE WITNESS:  First, the liability
4  adjuster would need to determine if a loss occurred, and
5  they would need to investigate under phantom vehicle
6  information that's listed previous to that in the policy.
7  Q  (By Mr. Nealey)  We don't even have a phantom vehicle.
8  The driver stops, who drove your insured off the road,
9  they exchange license numbers and everything and the --
10  and the person says, "I'm sorry.  I don't have
11  insurance."
12      Will Pemco -- will American Family -- in a
13  circumstance where there's no physical damage to the
14  vehicle, will they pay for towing in that circumstance
15  under the UIM?
16          MR. BENNETT:  Object to form of the
17  question.
18          THE WITNESS:  I do not make coverage
19  decisions around that, on whether or not that would be a
20  claim.  That would be up to the liability adjuster prior
21  to the claim ever coming up to review.
22  Q  (By Mr. Nealey)  Okay.  Meaning you'll always get brought
23  in when there's been a trigger of some damage to the
24  physical vehicle, right?
25  A  Damage, correct.

Page 151

1  Q  Okay.  There's a provision in here under the insuring
2  agreement that says C-3.  I'll read it to you.  "If any
3  suit is brought by you to determine liability or damages,
4  the owner or operator of the insured motor vehicle must
5  be made a defendant and you must notify us of the suit."
6      Do you see that?
7  A  I do.
8  Q  Now, obviously, if the suit had been filed against
9  American Family by your insured, then there would be no
10  need to notify them of the suit, right?
11          MR. BENNETT:  Object to form; calls
12  for a legal conclusion.
13          THE WITNESS:  I would need to review
14  that with our legal department to interpret that.
15  Q  (By Mr. Nealey)  Okay.  So you don't know what that
16  provision means?
17  A  I do not handle lawsuits.
18  Q  Okay.  So put another way, you read those words and --
19  and you don't know what they mean as far as when those
20  apply?
21  A  I know that if we are being sued, we need to be notified
22  of the suit.  If the insured is suing us, it will go
23  through our legal department.  That does not come through
24  me.
25  Q  Okay.  Then, if you look at Page 5 of the policy, there's

Page 152

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1    language in here under Page 5 B-E about "give us a
2    signed, sworn proof of loss within 60 days after we
3    request it.
4        What is it -- in your practice as an adjuster, what
5    does it mean for you to request a signed, sworn proof of
6    loss?  Have you ever done that?
7  **A  I do not handle liability and coverage investigations.**
8    Q   Okay.  So you've never asked for -- in handling
9    first-party comprehensive collision and uninsured
10   motorist claims, you've never asked for a sign, sworn
11   proof of loss?
12 **A  Folks that handle the theft vehicles do get documents**
13   **signed, but that is not the physical damage department.**
14   **That is casualty.**
15   Q   Okay.  So this language then is used for theft losses?
16 **A  It may be.**
17   Q   Okay.
18 **A  I don't know the exclusiveness because that's not part of**
19   **the policy that I handle.**
20   Q   Okay.  Put another way:  This provision about signed,
21   sworn proof of losses has never had any application to
22   the work you do, handling auto physical damage claims?
23 **A  It has not come up directly.  Again, theft vehicles,**
24   **sometimes we do have to wait for the theft documents to**
25   **be back before we receive the okay to pay the claim.**

Page 153

1    Q   Okay.  That's because you want to know if the car was
2    really stolen instead of being parted off to Mexico or
3    something?
4  **A  That is part of the investigation, the documents they**
5    **require.**
6    Q   Okay.  Then turning to Page 25 of the policy, which is
7    the last page, there is a provision F-2, arbitration.
8        Have you heard about or received training on a case
9    entitled James River versus Washington Department of
10   Transportation?
11 **A  No.**
12   Q   Have you received any guidance in the last year and a
13   half or two years on whether the arbitration provision in
14   your policy is enforceable at this point?
15 **A  No.**
16   Q   Okay.  Now, this provision F-2(a) says, "If we and an
17   insured person do not agree," it says, "then the matter
18   may be arbitrated."
19       In your work working with Am Fam, do you treat
20   arbitration as something that you'll do if both parties
21   agree, or will American Family, under this language, will
22   you seek to use arbitration when the other party doesn't
23   want to arbitrate?
24 **A  From my knowledge, either party can arbitrate.**
25   Q   Have you ever invoked an arbitration proceeding in a

Page 154

1    diminished value case?
2  **A  No.**
3    Q   Have you ever invoked arbitration in a -- settling
4    property damage aspects of any claim?
5  **A  No.**
6    Q   How many claims have you handled in the time that you've
7    been at American Family?
8  **A  A lot.**
9    Q   Thousands and thousands?
10 **A  Yeah.**
11   Q   Thousands and thousands, right?
12 **A  A lot.**
13   Q   Okay.  You've never invoked the arbitration clause to
14   deal with a dispute about the amount of loss on a claim?
15 **A  No.**
16   Q   So whether it's -- you can or cannot is sort of a
17   hypothetical matter since, as a matter of practice, you
18   don't do so?
19 **A  Correct.**
20   Q   Okay.  Are you aware of any of your coworkers ever
21   invoking the arbitration provision?
22 **A  No.**
23   Q   Okay.  Let's take a couple-minute break.  Let me look at
24   my notes, and then I may be either done or as close as
25   possible to being done.

Page 155

1            MR. BENNETT:  Sure.
2                (Recess from 2:24 p.m. to 2:34
3                p.m.)
4
5    Q   (By Mr. Nealey)  I'm just going to ask quickly a couple
6    of questions.
7        I know you were not the primary person handling
8    Bryce Meyer's claims, but I would like to just ask a
9    couple of things because it will help me as I go through
10   this.  If you don't mind, I'm going to mark this as
11   Exhibit 19, but I'll come over here because I can
12   probably move a little more quickly if I just point you
13   at things.
14       These are the notes from Mr. Meyer's claims, and I
15   brought it to ask you about it because your name shows up
16   in a couple of places, but I recognize you're not the
17   primary person.
18       The notes here are from MLF.  I take it that that's
19   Mat Fuqua?
20               (Exhibit No. 19 marked for
21                identification.)
22
23           THE WITNESS:  Matt Fuqua.
24   Q   (By Mr. Nealey)  Is he still with the company?
25 **A  Yes.**

Page 156

39 (Pages 153 to 156)

1  Q  And is he based here in Seattle, or is he based out of
2     Phoenix?
3  A  Our address is Phoenix for all of us.  He is here in
4     Seattle.
5  Q  Okay.  Is he a manager like you, or is he a line
6     adjuster?
7  A  He's in the certified repair program as a reinspector.
8  Q  Oh, okay.  So he's -- he interacts with CRP shops?
9  A  That is correct.
10 Q  Okay.  Does he do damage adjusting as well?
11 A  Sometimes.
12 Q  Sometimes.  Okay.
13    And -- and does he do diminished value issues as far
14    as you know?
15 A  I do not know.
16 Q  Okay.  Okay.  And then going through here we have MLB
17    061.
18    Do you know who that is?
19 A  I do not.
20 Q  Okay.
21 A  I would have to cover over it.
22 Q  That's okay.
23    Okay.  BLC 036, do you know who that is?
24 A  I do not.
25 Q  Okay.  Here's the e-mails that I saw with you.

Page 157

1     Jennifer O'Malley, she works for you; is that
2     correct?
3  A  Yes, she does.
4  Q  Okay.  And then you're listed as the supervisor
5     responding to, but that's earlier on the claim, so would
6     it be fair to say that you would have handled this claim
7     unless it then got shifted to deal with a designated
8     repair facility at some point and then it would be
9     shipped over to Mike Fuqua's department?
10 A  I would not have handled the claim, per se, but Jennifer
11    would have been involved in the claim --
12 Q  Okay.
13 A  -- for the repairs of the vehicle, only.
14 Q  Who is Tina L. Cook?
15 A  I don't know.
16 Q  Okay.  Jennifer is your employee.  Because she writes and
17    she says, "I'm looking at the insured vehicle right now.
18    Insured show me pics of the vehicle pushed into the wall
19    behind where he parked the insured vehicle for work.  If
20    he didn't have the pic showing pushed into the wall, I
21    would question it, but with the pics, it will be hard to
22    argue."
23    Do you know what she's talking about?
24 A  I assume that they wanted confirmation that it was a hit
25    and run, based on that statement --

Page 158

1  Q  Okay.
2  A  -- so she forwarded the photos.
3  Q  So Tina L. Cook, is she in the -- one of these people who
4     distribute liability?
5  A  It's Brianna Cook.
6  Q  Brianna.
7  A  And yes, she is.
8  Q  Okay.  So she's in the liability department?
9  A  She's located in Phoenix.  I do not know her though.
10 Q  Okay.  So Ms. O'Malley comments then relates to having
11    seen some proof that it was, in fact, an uninsured
12    vehicle?
13 A  Relaying that information to --
14 Q  Okay.  And then right here, you may or may not know, is
15    the notes from the initial contact from the insureds, and
16    it says, "Inbound call from insured, Bryce.  Claim
17    acknowledged, gave claim number and confirmed."  "Insured
18    stated vehicle was parked in parking lot unoccupied and
19    noticed damage to vehicle, no passengers, no injuries."
20    And then it says, "Repair Options," "Explained collision
21    coverage and $500 deductible."  "Read CRP" [sic]
22    "disclaimers stating they had the right to choose a
23    repair facility."
24    Do you know what that's referring to?
25 A  It's a CRP disclaimer.

Page 159

1  Q  Yes.
2  A  That's just letting the customer know they have the right
3     to take the vehicle to any shop of their choice.
4  Q  Okay.  And so that disclosure is read to people when they
5     call in with a claim?
6  A  Not always.
7  Q  Okay.  And then it say, "Offered CRP:  Accepted."
8     "Explained all the benefits of CRP."
9     Is there a -- to your knowledge, is there a script
10    or something that's used when people call in regarding
11    the certified repair program?
12 A  I believe they do use scripts.  As far as the extent of
13    it for the CRP, I don't know.
14 Q  Okay.
15 A  I know that they provide a disclaimer if they're going to
16    be making an assignment for a vehicle inspection.
17 Q  Okay.
18 A  If there's no vehicle inspection, there's no disclaimer.
19 Q  There's no disclaimer, okay.
20    Do you know who Angie Zitzelsberger is?
21 A  No, I do not.
22 Q  Okay.  And Mr. Hilden, does he work with Mr. Fuqua?
23 A  That is his supervisor.
24 Q  It's his supervisor.  Okay.
25    Does Mr. Hilden work both with the designated repair

Page 160

```
 1    program and adjusters like in your department, or he just
 2    works with the certified repair program at this point?
 3  A  Mr. Hilden does both.
 4  Q  Does both.  Okay.
 5       I think I have no further questions.  Thank you very
 6    much for your time.
 7  A  Okay.  Thank you.
 8              (Deposition concluded at 2:40 p.m.)
 9              (Signature reserved.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 161

```
 1    STATE OF WASHINGTON )   I, Laura L. Ohman, CCR, a certified
                          ) ss court reporter in the State of
 2    County of Pierce    )   Washington, do hereby certify:
 3
 4         That the foregoing deposition of LISA M. MCNALLY
      was taken before me and completed on September 10th, 2014,
 5    and thereafter was transcribed under my direction; that the
      deposition is a full, true and complete transcript of the
 6    testimony of said witness, including all questions, answers,
      objections, motions and exceptions;
 7
           That the witness, before examination, was by me
 8    duly sworn to testify the truth, the whole truth, and
      nothing but the truth, and that the witness reserved the
 9    right of signature;
10         That I am not a relative, employee, attorney or
      counsel of any party to this action or relative or employee
11    of any such attorney or counsel and that I am not
      financially interested in the said action or the outcome
12    thereof;
13         That I am herewith securely sealing the said
      deposition and promptly delivering the same to
14    Attorney Stephen M. Hansen.
15         IN WITNESS WHEREOF, I have hereunto set my hand
      and affixed my official seal this 17th day of September,
16    2014.
17
18
19
20    _____
      Laura L. Ohman, CCR
21    Certified Court Reporter No. 3186
22
23
24
25
```

Page 162

41 (Pages 161 to 162)